**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Julian J. Pardini, Esq.  SB# 133878
Stephen J. Liberatore, Esq.  SB# 129772
One Sansome Street, Suite 1400
San Francisco, California 94104
Telephone: (415) 362-2580
Facsimile: (415) 434-0882

Attorneys for Defendant
AMCO INSURANCE COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINE DOUGHERTY, | CASE NO. C 07-01140 MHP |
| Plaintiff, | **DECLARATION OF JULIAN J. PARDINI, ESQ., IN SUPPORT OF MOTION OF DEFENDANT AMCO INSURANCE COMPANY FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |
| v. | |
| AMCO INSURANCE COMPANY, and DOES ONE through TWENTY, Inclusive, | Date:   April 28, 2008 |
| Defendant. | Time:   2:00 p.m. |
| | Dept.: 15 — Hon. Marilyn Hall Patel |

I, Julian J. Pardini, declare:

1.    I am an attorney at law, duly licensed to practice before all courts of the State of California, as well as the United States District Court, Northern District of California, and, as a partner in the law firm of Lewis Brisbois Bisgaard & Smith, LLP, am one of the attorneys of record for AMCO Insurance Company ("AMCO"), the defendant in the above-referenced litigation.  I make this declaration in support of AMCO's Motion for Summary Judgment, or in the alternative, Partial Summary Judgment.  I have personal knowledge of the matters set forth herein and, if called upon, could and would testify competently thereto.

2.    As the Court will recall, AMCO filed and served a motion for summary judgment, or in the alternative, partial summary judgment, on June 22, 2007, but the Court, prior to considering and ruling on the motion, wanted the parties to conduct certain discovery and proceed

LEWIS BRISBOIS BISGAARD & SMITH LLP
ONE SANSOME STREET, SUITE 1400
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE (415) 362-2580

1    to mediation. The parties have done so. Thus, AMCO files this revised motion after engaging in

2    discovery, including the depositions of Plaintiff Christine Dougherty and various AMCO

3    personnel, and participating in a mediation.

4        3.    In filing this motion, AMCO re-files the declarations of Jeffrey Mangone,

5    H. Renton Rolph, Jr., Esq., and Darbie Hoffman, and its Request for Judicial Notice, with the

6    same exhibits attached to each, as were submitted to the Court in support of AMCO's earlier

7    motion. (I note that Exhibits A through P are attached to the declaration of Mr. Mangone, Exhibits

8    Q through S are attached to the declaration of Mr. Rolph, and Exhibit T is attached to the

9    declaration of Ms. Hoffman. Also, Exhibit U is attached to AMCO's Request for Judicial Notice.)

10    These declarations and the Request for Judicial Notice and their attached exhibits remain valid as

11    support for AMCO's renewed motion. Each declaration and the Request for Judicial Notice is

12    submitted with a "new" first page bearing the new hearing date and with the earlier document

13    following, in full, as it was submitted to the Court previously.

14        4.    Attached hereto and marked **Exhibit V** are true and correct copies of portions of the

15    transcript of the deposition of Plaintiff Christine Dougherty ("Plaintiff").

16        5.    Attached hereto and marked **Exhibit W** are true and correct copies of portions of

17    the transcript of the deposition of AMCO's Jeff Mangone.

18        6.    Attached hereto and marked **Exhibit X** is a true and correct copy of the

19    February 4, 2003 letter from Plaintiff's counsel, Stephen M. Murphy, to Mr. Mangone.

20        7.    Attached here and marked **Exhibit Y** is a true and correct copy of the

21    February 20, 2003 letter from Mr. Mangone to Mr. Murphy.

22        8.    Attached here and marked **Exhibit Z** is a true and correct copy of the

23    March 20, 2003 letter from Mr. Mangone to Mr. Murphy.

24        9.    Attached here and marked **Exhibit AA** is a true and correct copy of the

25    May 19, 2003 letter from Mr. Mangone to Mr. Murphy.

26    ///

27    ///

28    ///

LEWIS BRISBOIS BISGAARD & SMITH LLP
ONE SANSOME STREET, SUITE 1400
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE (415) 362-2580

DECLARATION OF JULIAN J. PARDINI IN SUPPORT OF AMCO'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 07-01140 MHP

1        10.    Attached here and marked **Exhibit BB** is a true and correct copy of the

2    June 26, 2003 letter from Mr. Mangone to Mr. Murphy.

3

4        I declare under penalty of perjury that the foregoing is true and correct and that this

5    declaration was executed this 18th day of March, 2008, at San Francisco, California.

6

7

8                                        Julian J. Pardini

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LEWIS BRISBOIS BISGAARD & SMITH** LLP
ONE SANSOME STREET, SUITE 1400
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE (415) 362-2580

# EXHIBIT V

A10694C
## CHRISTINE DOUGHERTY - September 6, 2007

1          UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA (San Francisco)

3

4                    ---oOo---

5

6   CHRISTINE DOUGHERTY,                    )

7              Plaintiff,                   )

8     vs.                                   )       No. C 07-01140 MHP

9   AMCO INSURANCE COMPANY, and             )

10  DOES ONE through TWENTY, Inclusive,     )

11            Defendants.                   )

12  _____)

13

14

15                  DEPOSITION OF

16              CHRISTINE DOUGHERTY

17           SAN FRANCISCO, CALIFORNIA

18             SEPTEMBER 6, 2007

19

20

21  ATKINSON-BAKER, INC.

    COURT REPORTERS

22  www.depo.com

    800-288-3376

23

24  REPORTED BY:   CORAL COREY, CSR NO. 10699

25  FILE NO:   A10694C

**Atkinson-Baker, Inc., Court Reporters**

A10694C
## CHRISTINE DOUGHERTY - September 6, 2007

### Page 10

1  that. All right?

2  A.  Yes.

3  Q.  I don't always ask perfect questions.  I

4  promise you I will ask imperfect questions at times today.

5  So don't be embarrassed by that.  All right?

6  A.  Okay.

7  Q.  I will assume that if you respond to my

8  question that you understood it.  Okay?

9  A.  Yes.

10  Q.  If I use any words that you're not familiar

11  with, please let me know that and I'll be happy to work with

12  you so we gain an understanding.  Okay.  All right?

13  A.  Okay.  Thank you.

14  Q.  I suspect we will go most, if not, all of the

15  day today.  Do you have any engagements or appointments that

16  would interfere with that?

17  A.  Nope.

18  Q.  Normally during a deposition, I take a break

19  every hour or so just so we can get up, stretch our legs,

20  use the restroom.  All right?

21  A.  Yes.

22  Q.  If at any time -- if at any time during the

23  deposition you need to take a break, just let me know that,

24  and I'll be happy to accommodate that.  Okay?

25  A.  Thank you.

### Page 11

1  Q.  The only exception to that is if there's a

2  pending question to you, you are required to answer that

3  question before we take a break.

4  A.  I understand.

5  Q.  All right.  Please don't be offended by these

6  next several questions.

7  Have you consumed any alcoholic beverages today?

8  A.  No.

9  Q.  Have you taken any drugs or medications in the

10  last 24 hours that would affect your ability to testify

11  truthfully today?

12  A.  No.

13  Q.  Did you get enough sleep last night?

14  A.  Yes.

15  Q.  Is there any reason we can't get your best

16  most accurate testimony today?

17  A.  Absolutely not.

18  Q.  Okay.  I'm sure Mr. Porter would agree that it

19  is not uncommon during depositions especially in the

20  afternoon after lunch for people to get tired.

21  If that should occur to you today, just let me know

22  that.  There's no rule that we should complete this

23  deposition today.  All right?

24  A.  Yes.

25  Q.  If you feel like you're losing your

### Page 12

1  concentration, if you're not able to understand as well as

2  you were earlier, please let me know.  We'll stop

3  immediately and we'll just reset the remainder of this

4  deposition to another day.

5  A.  Okay.

6  Q.  All right.  Do you have any questions about

7  this procedure before we get started?

8  A.  No thank you.  I do not.

9  Q.  I'm going to start with a little bit of

10  foundational information.

11  As I understand it, you were involved in an

12  automobile accident on April 17, 2001 in Novato on Simmons

13  and San Marin Drive.

14  A.  Correct.

15  Q.  That is the accident that led to the lawsuit

16  against the other driver and the underinsured motorist claim

17  with Amco?

18  A.  Correct.

19  Q.  I served a deposition notice on your attorneys

20  a while back and in that deposition notice I requested some

21  documents; have you ever seen that document before?

22  A.  Yes, this one.

23  Q.  Okay.

24  MR. PORTER:  Why don't we mark one so the record is

25  clear.

### Page 13

1  MR. PARDINI:  I will.  Let's go off the record for

2  a minute.

3  (Brief discussion held off the record.)

4  (Defendant's Exhibit 1

5  was marked for identification.)

6  MR. PARDINI:  Q.  You are familiar with this

7  deposition document; you've seen this before, correct?

8  A.  Yes, sir.

9  Q.  Now, in addition to noticing your deposition,

10  that document, starting on page two, requested six different

11  categories of documents; do you understand that?

12  A.  Yes.

13  Q.  All right.  Did you bring with you today any

14  documents in response to those requests?

15  A.  I brought my entire file that I have on this.

16  Q.  Did you segregate it in any way to try to

17  correlate the documents in your file with the requests?

18  A.  No.

19  Q.  Okay.  Your file looks to be about two to

20  three inches wide.  Let me ask you this.

21  Have you reviewed your entire file recently?

22  A.  Yes.

23  Q.  In preparation for today?

24  A.  Yes.

25  Q.  All right.  Why don't we start -- let me go

4  (Pages 10 to 13)

A10694C
**CHRISTINE DOUGHERTY - September 6, 2007**

### Page 30

1  ever inform Amco that you owned that car?
2      A.   Yes.
3      Q.   And when did you do that?
4      A.   January 13th.
5      Q.   Did you personally do that?
6      A.   I don't recall.
7      Q.   Do you recall how you informed Amco of the
8  purchase of that car?
9      MR. PORTER:  Objection.  Lacks foundation.  I don't
10  know what purchase you're talking about.  She testified it
11  was a birthday gift.
12     MR. PARDINI:  Q.  I misspoke.  Of your acquisition
13  of that car?
14     A.   When I acquire a car, I notify my insurance
15  company within a day, if not the day.
16     Q.   That's just your general policy with regard to
17  when you attain new cars?
18     A.   Yes.
19     Q.   Okay.  After this accident, you instituted a
20  claim with Mr. Osmidoff's insurance company, correct,
21  U.S.A.A.?
22     A.   Yes.
23     Q.   And ultimately you filed a lawsuit against
24  him, correct?
25     A.   Yes.

### Page 31

1      Q.   And I'm going to try to cut through some of
2  this because I already know the answers.  I just want to
3  make sure you're confirming that my understanding is
4  correct.
5      A.   All right.
6      Q.   As I understand it, as a result of -- or
7  during that lawsuit, at some point you reached a settlement
8  with Mr. Osmidoff's insurance company?
9      A.   Yes.
10     Q.   And that was for his policy limits as you
11  understood them of $30,000?
12     A.   Correct.
13     Q.   All right.  During some period of time, as I
14  understand it, you also submitted various medical bills to
15  Amco?
16     A.   Yes.
17     Q.   Did Amco reimburse you for all of your medical
18  bills you submitted?
19     A.   I don't recall.
20     Q.   Do you recall Amco not reimbursing you for any
21  medical bill --
22     A.   No.
23     Q.   -- that you submitted?
24     A.   No.
25     Q.   Do you know the total amount Amco reimbursed

### Page 32

1  you for your medical bills?
2      A.   No.
3      Q.   Do you have an estimate?
4      A.   No.
5      Q.   Couple of things.  I'll ask that you wait
6  until I finish my question before beginning your response so
7  we get a clear record.
8      One of the purposes of a deposition is for me to
9  find out what ultimately you would be testifying about if we
10  go to trial in this case.
11     So I'm going to ask you some questions at various
12  times during the deposition as to what you're claiming
13  against Amco or what your complaints are against Amco with
14  regard to its handling of your claim.
15     We've already talked about a couple of them with
16  regard to your withdrawal of your wage loss claim and with
17  regard to the satisfaction of the property damage component
18  of your claim.  Okay.
19     My question now is, do you have any complaints of
20  the way Amco reimbursed you for the medical bills you
21  submitted?
22     A.   No.
23     Q.   After you settled with Mr. Osmidoff's
24  insurance company you, through your counsel, instituted an
25  underinsured motorist claim with Amco?

### Page 33

1      A.   Yes.
2      Q.   At that time did you have an understanding of
3  what underinsured motorist meant?
4      A.   Yes.
5      Q.   What was your understanding?
6      A.   My understanding is that you buy underinsured
7  motorist insurance because there are times when people do
8  not have enough or back when I started driving don't even
9  have any insurance and you need to be prepared.
10     My dad started that.  You always need to be
11  prepared in case the other guy isn't.
12     Q.   Did you at the time of this claim was
13  instituted appreciate the difference between uninsured
14  motorist and underinsured motorist?
15     A.   Yes.
16     Q.   What did you understand the difference to be?
17     A.   Uninsured motorist means they have no
18  insurance, and that it would fall to my insurance company
19  completely, and then they seek restitution from that party.
20     And underinsured means that they have insurance but
21  not enough to cover the extent of your injuries.
22     Q.   Okay.  Now, when you -- well, first of all,
23  you retained apparently Mr. Murphy to represent you with
24  regard to the underinsured motorist claim; is that correct?
25     A.   Yes.

9  (Pages 30 to 33)

A10694C
**CHRISTINE DOUGHERTY - September 6, 2007**

### Page 86

1 can let you know if I'm not being accurate.
2    But I will represent that Mr. Murphy attached some
3 medical records and other information to that letter when he
4 sent it to Mr. Mangone. Okay.
5    A. Okay.
6    MR. PARDINI: Let's have this marked as Exhibit 24.
7    (Defendant's Exhibit 24
8    was marked for identification.)
9    MR. PARDINI: Q. The court reporter has handed you
10 Exhibit 24. It's a letter from Mr. Mangone to Mr. Murphy
11 dated August 22nd, 2003.
12    A. Go ahead.
13    Q. Okay. Let me paraphrase what Mr. Mangone is
14 saying in this letter to see if you agree.
15    It appears that Mr. Mangone is acknowledging
16 receipt of the settlement demand. He's saying he reviewed
17 the materials provided and he's asking for some additional
18 information; would you agree with that?
19    A. Yes.
20    Q. Do you know if Mr. Murphy responded to this
21 letter?
22    A. No.
23    Q. Exhibit 25, please.
24    (Defendant's Exhibit 25
25    was marked for identification.)

### Page 87

1    MR. PARDINI: Q. I've asked the court reporter to
2 give you Exhibit 25. It's a letter from Mr. Mangone at Amco
3 to Mr. Murphy dated October 29, 2003.
4    A. Yes.
5    Q. Have you ever seen this letter before?
6    A. Not that I recall.
7    Q. Do you know if Mr. Murphy responded to this
8 letter?
9    A. No, I do not.
10    MR. PARDINI: Exhibit 26, please.
11    (Defendant's Exhibit 26
12    was marked for identification.)
13    THE WITNESS: Go ahead.
14    MR. PARDINI: Q. Now, on this letter -- well,
15 strike that. All right.
16    I'm sorry, is that the November 26th letter?
17    MR. PORTER: Yes.
18    MR. PARDINI: Q. In this letter, Mr. Mangone
19 writes to Mr. Murphy. His first sentence reads our current
20 evaluation of Mrs. Dougherty's injury claim does not
21 indicate an underinsured motorist for bodily injury is
22 present.
23    And then he asks if Mr. Murphy has had any success
24 in obtaining a more comprehensive report from Dr. Sponzolli
25 with regard to the issue of medical necissity for back

### Page 88

1 surgery; do you see that?
2    A. He has no spell check. Good Lord. This is an
3 awful letter.
4    Q. Have you ever seen this letter before?
5    A. Not that I recall.
6    Q. Do you know if Mr. Murphy responded to this
7 letter?
8    A. No, I do not.
9    MR. PARDINI: 27, please.
10    (Defendant's Exhibit 27
11    was marked for identification.)
12    MR. PARDINI: Exhibit 27 is a letter dated December
13 13, 2003 from Mr. Mangone of Amco to Mr. Murphy.
14    A. Yes.
15    Q. Take a moment, please.
16    A. Go ahead.
17    Q. Have you ever seen this letter before?
18    A. Not that I recall.
19    Q. Do you know if Mr. Murphy responded to this
20 letter?
21    A. I do not.
22    MR. PARDINI: Exhibit 28, please.
23    (Defendant's Exhibit 28
24    was marked for identification.)
25    MR. PARDINI: Exhibit 28 is a letter dated December

### Page 89

1 25, 2003.
2    MR. PORTER: Working all the time.
3    MR. PARDINI: With a very ambitious and hardworking
4 Mr. Mangone of Amco had sent a letter to Mr. Murphy on
5 Christmas Day.
6    In that letter, Mr. Mangone is communicating that
7 your injury is pending the report from Dr. Sponzilli.
8    A. Yes.
9    Q. And he's also asking Mr. Murphy to please
10 contact him concerning this claim, correct?
11    A. Yes.
12    Q. Do you know -- first of all, have you ever
13 seen this letter before?
14    A. Not that I recall.
15    Q. Do you know if Mr. Murphy ever responded to
16 this letter?
17    A. I do not know.
18    MR. PARDINI: 29, please.
19    (Defendant's Exhibit 29
20    was marked for identification.)
21    MR. PARDINI: Marked as Exhibit 29 is a letter
22 dated January 15, 2004 from Mr. Mangone to Mr. Murphy
23 requesting a report from Dr. Sponzilli, correct?
24    A. Yes.
25    Q. Have you ever seen this letter before?

23 (Pages 86 to 89)

A10694C
**CHRISTINE DOUGHERTY - September 6, 2007**

### Page 90

1    A. Not that I recall.

2    Q. Do you know if Mr. Murphy responded to this

3  letter?

4    A. I have no idea.

5    MR. PARDINI: 30, please.

6    (Defendant's Exhibit 30

7    was marked for identification.)

8    MR. PARDINI: Q. Marked as Exhibit 30 is a letter

9  dated February 4, 2004 from Mr. Mangone of Amco to

10  Mr. Murphy. In that letter, Mr. Mangone communicates that

11  he is continuing to wait the receipt of any additional

12  reports or records of Dr. Sponzilli; do you see that?

13    A. Yes.

14    Q. It also asks Mr. Murphy to please advise me of

15  your progress, correct?

16    A. Okay.

17    Q. Is that correct?

18    A. Yes.

19    Q. Have you ever seen this letter before?

20    A. Not that I recall.

21    Q. Do you know if Mr. Murphy responded to this

22  letter?

23    A. I have no idea.

24    MR. PARDINI: 31, please.

25  //

### Page 91

1    (Defendant's Exhibit 31

2    was marked for identification.)

3    MR. PARDINI: Q. Marked as Exhibit 31 is a letter

4  dated March 29th, 2004 from Mr. Mangone to Mr. Murphy.

5    In that Mr. Mangone writes our continued evaluation

6  of Mrs. Dougherty's injury claim is pending the receipt of

7  Dr. Sponzilli's report re: Clarification of the injury; do

8  you see that?

9    A. Yes.

10    Q. Okay. Have you ever seen this letter before?

11    A. Not that I recall.

12    Q. Do you know if Mr. Murphy responded to this

13  letter?

14    A. I have no idea.

15    MR. PARDINI: Exhibit 32, please.

16    (Defendant's Exhibit 32

17    was marked for identification.)

18    MR. PARDINI: Q. The court reporter has handed you

19  Exhibit 32 which is a letter dated April 15, 2004 from

20  Mr. Mangone of Amco to Mr. Murphy.

21    A. Yes.

22    Q. In that letter, Mr. Mangone writes, our

23  evaluation of Mrs. Dougherty's injury claim is pending the

24  additional medical data from Dr. Sponzilli; do you see that?

25    A. Yes.

### Page 92

1    Q. Mr. Mangone also writes please provide us with

2  a status of your efforts; do you see that?

3    A. Yes.

4    Q. Have you ever seen this letter before?

5    A. Not that I recall.

6    Q. Do you know if Mr. Murphy responded to this

7  letter?

8    A. I do not know.

9    MR. PARDINI: Exhibit 33, please.

10    (Defendant's Exhibit 33

11    was marked for identification.)

12    MR. PARDINI: Exhibit 33 is a letter from

13  Mr. Mangone of Amco to Mr. Murphy dated May 6, 2004.

14    In that letter, Mr. Mangone once again articulates

15  that his evaluation of your underinsured motorist claim is

16  pending the receipt of additional records, you, meaning

17  Mr. Murphy, indicated were being sent by Dr. Sponzilli; do

18  you see that?

19    A. Yes.

20    Q. And right after that, Mr. Mangone requests

21  that Mr. Murphy send these documents as soon as practicable;

22  do you see that?

23    A. Yes.

24    Q. Have you ever seen this letter before?

25    A. Not that I know of.

### Page 93

1    Q. Do you know if Mr. Murphy responded to this

2  letter?

3    A. I do not know.

4    Q. Exhibit 34, please.

5    (Defendant's Exhibit 34

6    was marked for identification.)

7    MR. PARDINI: Exhibit 34 is a letter dated June 11,

8  2004 from Mr. Mangone of Amco to Mr. Murphy.

9    In that letter, Mr. Mangone writes we have not

10  heard from you concerning the additional reports from Dr.

11  Sponzilli. At the end he asks Mr. Murphy please advise us

12  of the status of your progress with Ms. Dougherty's doctors,

13  period. If we do not hear from you within a reasonable

14  amount of time, we will presume we can close our file,

15  period; have you ever seen this letter before?

16    A. Not that I recall.

17    Q. Do you know if Mr. Murphy responded to this

18  letter?

19    A. No, I do not.

20    MR. PARDINI: Exhibit 35, please.

21    (Defendant's Exhibit 35

22    was marked for identification.)

23    MR. PARDINI: Q. Exhibit 35 is a letter dated

24  September 28, 2004 from Mr. Mangone to Mr. Murphy.

25    In that letter Mr. Mangone writes this letter is to

**Atkinson-Baker, Inc., Court Reporters**                    **800-288-3376**

**EXHIBIT W**



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

CHRISTINE DOUGHERTY,

        Plaintiff,

vs.

                      No. C 07-01140 MHP

AMCO INSURANCE COMPANY,
and DOES ONE through
TWENTY, inclusive,

        Defendants.

_____/

COPY

DEPOSITION OF JEFFERY V. MANGONE

October 8, 2007

Reported by:

Diane L. Freeman
CSR NO. 5884

LUSK & SNYDER
3715 MONTEREY BOULEVARD
OAKLAND, CALIFORNIA 94619
(510) 482-9991/FAX (510) 482-1052

1

MR. MURPHY:  Q.  Exhibit 3 is a letter from me to you of February 4, 2003.  This is addressed to Santa Rosa.

A.  Oh, I said Professional Drive, I am sorry, Circadian Way, but it intersects with Professional Drive.  That's the same office I referred to earlier as the Santa Rosa office.

Q.  This is not a home office.  This is the Amco office?

A.  Yes.  This was the Allied office, I believe, at that particular point in time.  It would have been -- oh, well.

Q.  There is, looks like, an Allied received stamp, February 6, 2003.

A.  Uh-huh.

Q.  Do you recognize that stamp?

A.  It looks familiar.  It looks like the stamp from Allied PCRO.

Q.  What does "PCRO" stand for?

A.  Pacific Coast Regional Office.

Q.  Do you know what the "RR" stands for?

A.  No, sir, I don't.

MR. MURPHY:  Let's mark this as in order.

(Plaintiff's Exhibit No. 4 was marked for identification.)

79

15:08:46  1
15:08:54  2
15:08:55  3
15:09:00  4
15:09:05  5
15:09:08  6
15:09:10  7
15:09:12  8
15:09:12  9
15:09:16  10
15:09:19  11
15:09:20  12
15:09:24  13
15:09:25  14
15:09:27  15
15:09:29  16
15:09:35  17
15:09:38  18
15:09:40  19
15:09:42  20
15:09:44  21
15:09:46  22
15:10:18  23
15:10:18  24
15:10:18  25

15:10:21　1  　　　　MR. MURPHY:   Q.   Exhibit 4 is a letter from you

15:10:25　2  to me of February 20, '03.

15:10:26　3  　　　　You say:

15:10:29　4  　　　　"Thank you for the material accompanying your

15:10:33　5  February 4, 2003 letter concerning Mrs. Dougherty's

15:10:34　6  Underinsured Motorist Claim.

15:10:37　7  　　　　"It appears that we need to evaluate her --

15:10:40　8  　　　　that all we need to evaluate her injury are the

15:10:42　9  　　　　remainder of her treatment records and billings

15:10:44　10  　　　　for her care."

15:10:47　11  　　　　Was that your belief at the time?

15:10:51　12  　A.　　That we needed the remainder of her treatment

15:10:54　13  records and billings for her care to complete the

15:10:54　14  evaluation?

15:10:55　15  　Q.　　Yes.

15:11:17　16  　A.　　Yes.

15:11:34　17  　　　　MR. MURPHY:　Let me have marked next in order.

15:11:34　18  　　　　　　　　　　　(Plaintiff's Exhibit No. 5 was

15:11:34　19  　　　　　　　　　　　marked for identification.)

15:11:36　20  　　　　MR. MURPHY:　Q.　Look at Exhibit 5.　It's a

15:11:54　21  letter from me to you of July 9, 2003.

15:11:57　22  　　　　Do you recall receiving this letter at about

15:11:59　23  that time?

15:12:03　24  　A.　　I would have to reference my file notes to

15:12:05　25  answer that.

80

Q.    Go ahead and reference them then.

A.    Okay.    Thank you.

Q.    Let me direct you to page 97 of Exhibit 1.    This page goes from at the bottom June 24, '03, and it looks like the next entry is August 1, '03.    I don't see any entries in July.

Do you have any understanding why that is?

A.    No, I don't.

Q.    Would you have in the normal course of business made an entry in the Passport regarding receipt of a settlement demand letter?

A.    At the time I reviewed it, yes.

Q.    So you would have made a note of when you reviewed the letter or when you received the letter?

A.    When I reviewed it.

Q.    Normally you wouldn't put a note in when you received it?

A.    No.    That's what the date stamp is for.

Q.    So does Exhibit 1 tell you when you reviewed the demand?

A.    My 8/1 entry says "Demand received.    The demand is for 45,000."    Goes on to say, "There are not many documents accompanying the demand," which means I must have read it.    Gives a brief recap of what I was able to understand as to what was contained in there.

81

| | | |
|---|---|---|
| 15:14:08 | 1 | So I would say, yes, I reviewed it. |
| 15:14:15 | 2 | Q. There is a note on page 97 at the bottom for |
| 15:14:25 | 3 | 8/1/03, and 98 at the top, 8/13/03. Do those notes help |
| 15:14:28 | 4 | you determine when you completed your review of Exhibit |
| 15:14:30 | 5 | 5, the demand letter? |
| 15:14:34 | 6 | A. Well, my 8/1 note actually ends on the top of |
| 15:14:38 | 7 | page 98. This is reviewing the meds for summary. |
| 15:14:38 | 8 | Q. Right. |
| 15:14:42 | 9 | A. Then the 8/13 entry is a summary of what I |
| 15:14:43 | 10 | reviewed. |
| 15:14:45 | 11 | Q. So can we conclude from this that you completed |
| 15:14:47 | 12 | your review by August 13? |
| 15:14:48 | 13 | A. Yes. |
| 15:14:58 | 14 | Q. Let's look at Exhibit 5, the letter. There is a |
| 15:15:01 | 15 | reference to several attached exhibits. |
| 15:15:03 | 16 | A. What page are you on? |
| 15:15:06 | 17 | Q. On the second page, there is an Exhibit A |
| 15:15:09 | 18 | referenced at the top, which is the police report. Do |
| 15:15:13 | 19 | you recall getting the police report with this? |
| 15:15:14 | 20 | A. With this demand? |
| 15:15:15 | 21 | Q. Yes. |
| 15:15:18 | 22 | A. I would have to look at the demand itself to |
| 15:15:21 | 23 | recall -- or to answer that question comfortably. If |
| 15:15:24 | 24 | you say that it was attached to this, then, yes, I would |
| 15:15:27 | 25 | have reviewed it, and it would have been received with |

82

| | |
|---|---|
| 15:21:56 | 1 |
| 15:21:57 | 2 |
| 15:22:02 | 3 |
| 15:22:14 | 4 |
| 15:22:15 | 5 |
| 15:22:18 | 6 |
| 15:22:22 | 7 |
| 15:22:27 | 8 |
| 15:22:28 | 9 |
| 15:22:30 | 10 |
| 15:22:51 | 11 |
| 15:22:51 | 12 |
| 15:22:51 | 13 |
| 15:22:53 | 14 |
| 15:23:03 | 15 |
| 15:23:04 | 16 |
| 15:23:08 | 17 |
| 15:23:11 | 18 |
| 15:23:16 | 19 |
| 15:23:18 | 20 |
| 15:23:20 | 21 |
| 15:23:21 | 22 |
| 15:23:23 | 23 |
| 15:23:24 | 24 |
| 15:23:24 | 25 |

needed to complete the evaluation rather than simply begin it?

A.   Well, I felt that there was enough information to simply begin the evaluation.  I would have to take a look at any letters that I had written to refresh my memory to exactly what it was that I was looking for concerning your demand and additional data, or I could always just continue to browse through this Exhibit 1 here.

MR. MURPHY:  Let me mark another exhibit.  Maybe I can short circuit that.

(Plaintiff's Exhibit No. 6 was marked for identification.)

MR. MURPHY:  Q.  Look at Exhibit 6, this is a letter from you to me of July 29th, '03.

Do you recall sending this letter?

A.   I don't recall it specifically.  I send out a lot of letters like this; but, yeah, if I receive a demand, I'll respond.

MR. PARDINI:  Just listen to his question and answer his precise question.

THE WITNESS:  Oh, I am sorry.

MR. PARDINI:  The question was do you remember sending that letter.

THE WITNESS:  No, I do not.

86

| | |
|---|---|
| 15:23:26 | 1 |
| 15:23:27 | 2 |
| 15:23:30 | 3 |
| 15:23:31 | 4 |
| 15:23:35 | 5 |
| 15:23:36 | 6 |
| 15:23:39 | 7 |
| 15:23:41 | 8 |
| 15:23:43 | 9 |
| 15:23:45 | 10 |
| 15:23:52 | 11 |
| 15:23:56 | 12 |
| 15:24:00 | 13 |
| 15:24:06 | 14 |
| 15:24:09 | 15 |
| 15:24:09 | 16 |
| 15:24:12 | 17 |
| 15:24:15 | 18 |
| 15:24:18 | 19 |
| 15:24:20 | 20 |
| 15:24:21 | 21 |
| 15:24:24 | 22 |
| 15:24:28 | 23 |
| 15:24:35 | 24 |
| 15:24:38 | 25 |

MR. MURPHY:  Q.  Do you typically sign letters?

A.  Yes, I do.

Q.  And do you send them from your home office?

A.  Yes.

Q.  And when the Santa Rosa office was opened, did you still work out of your home office?

A.  Yes.

Q.  So would you print out the letters from home and then sign them and mail them yourself?

A.  Yes.

Q.  Now, Exhibit 6 says:

"This letter acknowledges the receipt of the documents supporting Mrs. Dougherty's offer of settlement of $45,000 for her Underinsured Motorist bodily injury claim, arising from the subject accident.

"Your settlement packet appears to be complete, and is in review for evaluation."

When you say "is in review," does that mean you are the one reviewing it or someone else is reviewing it?

A.  It means the company is reviewing it.  As an employee of the company, I'm reviewing it.  That would account for the entries that I make into the log.

Q.  The entries of August 1st, and August 13th?

87

15:24:45    1    A.    Yes.    It's a process.

15:24:47    2    Q.    So is the process typically that you would do

3    the initial review?

15:24:49

15:24:50    4    A.    Back then, yes.

15:24:53    5    Q.    And then would you come up with a dollar figure

6    yourself then?

15:24:54

15:24:55    7    A.    No.

15:24:59    8    Q.    Would you -- you didn't submit it to Colossus

15:25:04    9    yourself, the data, you sent it to the Colossus unit?

15:25:08    10    A.    I sent the data that was provided in the demand,

15:25:12    11    I put that into the claim file.

15:25:19    12    Q.    In the form of the notes, Passport notes?

15:25:24    13    A.    The physical demand -- well, actually, the

15:25:27    14    electronically scanned demand was electronically

15:25:31    15    attached to the file, or, I should say, attached to the

15:25:36    16    electronic file, which is aside from Passport.

15:25:40    17    Q.    So you would actually have the demand letter

15:25:44    18    scanned and the attachments scanned into the file?

15:25:47    19    A.    It came to me already scanned.

15:26:02    20    Q.    All right.    So once you review the demand

15:26:06    21    package and the documents, you put notes in the Passport

15:26:07    22    notes, correct?

15:26:09    23    A.    Yes, sir.

15:26:12    24    Q.    Do you do anything else in terms of documenting

15:26:17    25    your evaluation of the demand?

88

A.    At this time my responsibility was to review the demand and give a brief overview of the injury and what was contained in the treatment data and then refer the file for evaluation.

Q.    Looking at Exhibit 1, page 98, notes for August 13th, '03; do you have that there?

A.    Yes, sir, I do.

Q.    You wrote:

      "This is a case of clear liability on the part
      of the claimant driver.  The claimant failed to
      yield for the insured at a stop sign."

      And that conclusion of yours was based on your review of all the materials provided?

A.    Of the statement from the policyholder, from our insured driver, and a review of the police report.

Q.    Did you review the statement from an independent witness?

A.    I don't remember.  If it was contained within the police report, I did.

Q.    Then you wrote "The impact to the IV" -- is that the insured vehicle?

A.    Yes, sir.

Q.    -- "was significant, causing about $7,000 in damages."

      So when you use the term "significant" there,

89

15:27:49  1    what do you mean?

15:27:52  2         A.    That it was more than just a moderate hit.

15:27:58  3    $7,000 is a lot of damage to the vehicle.  I'm referring

15:28:00  4    to the vehicle damage only.

15:28:07  5         Q.    Right, right.  Toward the bottom of that note

15:28:12  6    you wrote, "The pregnancy is the key factor for the

15:28:15  7    insured's delayed care.  Her injury could not be

15:28:18  8    properly diagnosed until after the baby was delivered."

15:28:22  9         Was that information of any significance to you

15:28:23  10   in evaluating this case?

15:28:27  11        A.    Well, as it is with anyone looking at a claim --

15:28:30  12   I'll just answer the question, yes, it was.

15:28:31  13        Q.    Why was that significant?

15:28:38  14        A.    Somebody is injured, the expectation would be

15:28:44  15   for them to receive treatment as soon as practicable.

15:28:48  16   Our policyholder's condition, that is, being pregnant,

15:28:50  17   precluded her from doing that.

15:28:53  18        Any delays in care and so forth are factors we

15:28:58  19   need to look at and explain into the claim file toward

15:29:32  20   the evaluation of the injury itself.

15:29:34  21        Q.    Turn the page to 99 on Exhibit 1, further notes

15:29:43  22   for August 13th.

15:29:47  23        It appears you are summarizing the MRI report

15:29:56  24   with, "Mild disk protrusion at C5-C6-7" -- excuse me,

15:30:01  25   "C5-6 and C6-7.  Some posterior aspect spurring and

90

bulge at C3-4."

Q.    Do you have any medical training at all?

A.    No.

Q.    I mean, do you have any kind of training on how to evaluate the significance of cervical disk injuries?

A.    In what regard?

Q.    In terms of whether an injury is traumatically induced or may be degenerative.

A.    No, not really.

Q.    When you set reserves for claims, do you consider the severity of the injury?

A.    Yes.

Q.    Do you have any understanding whether the injury, as described in this MRI, is severe?

A.    No.

Q.    Did you take into account the disk bulges as shown on the MRI in setting reserves for Ms. Dougherty?

A.    That was part of it.

Q.    Do you have any recollection how much of your reserves was based on her neck injuries as opposed to other injuries?

A.    No.

Q.    Toward the bottom of that note there is a reference to the right shoulder:

"Impression...

91

15:31:25  1        "Partial undersurface articular surface tear of

15:31:30  2    the supraspinatus adjacent to an area of erosion in

15:31:32  3    the greater tuberosity."

15:31:34  4        Do you have any understanding what that means?

15:31:39  5    A.   Not without an anatomy chart in front of me.

15:31:43  6    Q.   Did you use an anatomy chart in evaluating this

15:31:43  7    case?

15:31:46  8    A.   No.

15:31:51  9    Q.   Have you ever heard of a rotator cuff tear?

15:31:52  10   A.   Yes, I have.

15:31:54  11   Q.   Did you have an understanding that Ms. Dougherty

15:31:58  12   suffered a rotator cuff tear in this accident?

15:32:01  13   A.   I would have to look at my notes to refresh my

15:32:03  14   memory on that.

15:32:10  15   Q.   Have you ever evaluated a claim involving a

15:32:11  16   rotator cuff tear?

15:32:12  17   A.   Yes.

15:32:14  18   Q.   Do you have any recollection as to what reserves

15:32:15  19   you set for those claims?

15:32:16  20   A.   No, I do not.

15:32:19  21   Q.   Do you have an understanding whether a rotator

15:32:23  22   cuff tear is a serious injury or not?

15:32:25  23        MR. PARDINI:  I am going to object on the

15:32:28  24   grounds that it's vague and ambiguous, the term

15:32:32  25   "serious."  If you are able to answer, please, go ahead.

                                                              92

THE WITNESS: Well, you said "understanding." I've seen it go both ways. I've handled claims for people that have had severe rotator cuff tears. I've seen reports saying that the rotator cuff tear was severe, this, that, and the other, recommending surgery and so forth. The patient would go in for physical therapy, no surgery, they were fine. There would be a follow-up exam and, you know, there was no affect.

I've seen other people -- other cases where people have had rotator cuff tears that were described as nominal, very minor tear, and surgery repair was required.

So I've seen them both ways. That's my understanding of it. So in some cases I would say, yes, my understanding is that it can be severe. Other cases, no, it is my understanding they are not that severe. It just depends on the person; the injury; the type of care they receive; how much they're willing to contribute to their recovery; how much they're able to contribute to their recovery; what their physical condition was before the accident, during the period recovery, and afterwards.

So there are many factors that go into it. It isn't just like, "Oh, okay, we have a rotator cuff tear, that's going to be cubbyholed over into the rotator cuff

93

15:34:04  1    area, and that's worth X number of dollars." That's

15:34:07  2    what I've seen, and that's not what I understand.

15:34:10  3        Q.    Did you determine whether Ms. Dougherty's

15:34:12  4    rotator -- excuse me, did you determine whether

15:34:16  5    Ms. Dougherty's right shoulder injury was severe?

15:34:19  6        A.    That wasn't -- that wasn't the impression I had,

15:34:22  7    and it also wasn't my responsibility for determining

15:34:24  8    that, because that would have led to completing the

15:34:28  9    evaluation, which I did not do.

15:34:30  10       Q.    You said it was not your impression that her

15:34:34  11   injury to her right shoulder was severe; is that the

15:34:35  12   first thing you said?

15:34:36  13       A.    Yes.

15:34:37  14       Q.    What did you base that on?

15:34:41  15       A.    Well, there was a lack of clinical data from

15:34:44  16   Dr. Sponzilli indicating that it required surgical

15:34:48  17   repair.  There was some mention that perhaps the surgery

15:34:54  18   would be had or not, would be done or not, that nothing

15:34:58  19   -- there was no indication of a note from the orthopedic

15:35:05  20   surgeon indicating a medical necessity for that.  So

15:35:08  21   based upon that information, I would say it was not that

15:35:09  22   severe.

15:35:10  23       Q.    So are you saying that if the shoulder did not

15:35:13  24   require surgery that you would conclude it was not a

15:35:14  25   severe injury?

94

A.   That was one factor.

Q.   What are the others?

A.   When her last treatment date was.  I think, the span of time between -- at least the time of the review and the evaluation of the case and her last treatment date, according to the records that I was able to review.

Q.   Take a look at page 100 on Exhibit 1.  Toward the bottom, there is continuation of the August 13th, '03 note.  It says, "The insured has discontinued care, however, she is still experiencing chronic pain symptoms in her neck and shoulder."

I just want to confirm, is that the continuation of your review of the document provided to you?

A.   That's a continuation of my -- of my review and my entry of the data that I received.

Q.   Next page, 101, August 13, '03, you have a note at 11:48 a.m, and it says "Special instructions"; what does that mean?

A.   Well, if you look at the date, it says 8-13-03, "Instructions to:  COLO1."

Q.   Colossus?

A.   There you go.  This was the referral to the Colossus unit at that time, and that was how it was made.  This note generates an e-mail to whoever was the

95

15:37:12  1   supervisor of that unit advising them that the referral

15:37:15  2   was being made.

15:37:22  3       Q.   Is the information that you've included with

15:37:24  4   these instructions standard information that you would

15:37:26  5   include in any referral to Colossus?

15:37:33  6       A.   Are you referring to what I've indicated after

15:37:37  7   each one of these colons here?

15:37:40  8       Q.   No, I'm interested in the categories.

15:37:42  9       A.   What categories?

15:37:46  10      Q.   Let's start with "Comparative negligence"; is

15:37:50  11  that a category you would always address in your

15:37:51  12  reference to Colossus?

15:37:55  13      A.   I am sorry.  I see.  This is a standard macro.

15:37:57  14      Q.   That's what I meant to ask.

15:37:58  15      A.   Okay.

15:38:02  16      Q.   So you have a standard macro that sets out

15:38:04  17  fields that you are supposed to complete when you send

15:38:04  18  it to Colossus?

15:38:06  19      A.   Right.

15:38:06  20      Q.   Is that right?

15:38:07  21      A.   Yes.

15:38:13  22      Q.   So comparative negligence is one, and is the

15:38:13  23  percent zero your assessment?

15:38:14  24      A.   Yes.

15:38:18  25      Q.   So Ms. Dougherty was not negligent at all in

96

1    causing this accident was your conclusion?

2        A.    At the level where the claim was at that point,

3    yes, that's correct.

4        Q.    Then "Seatbelt status," does that mean whether

5    the insured was wearing a seatbelt?

6        A.    That's correct.

7        Q.    You wrote yes, correct?

8        A.    Keep in mind, this would not necessarily be for

9    the insured -- in this particular case, it is for the

10   policyholder -- but the injured party.

11       Q.    The claimant, if it's a third-party case?

12       A.    Whoever, the injured party.   Seatbelt status,

13   yes, meaning they were wearing a seatbelt.

14       Q.    Is the macro for the Colossus the same whether

15   it's a third-party case or a first-party case?

16       A.    Yes.

17       Q.    That is, you provide the same type of

18   information to Colossus on a third-party case as you do

19   a first-party case?

20       A.    Yes.

21       Q.    Then you have "Meds incurred," and this is the

22   medical bills you are aware of?

23       A.    Correct.

24       Q.    Then "Meds adjustment," and you wrote, "$30,000

25   - prior settlement.   This is a UIM case."   So why is

97

15:38:20
15:38:24
15:38:25
15:38:28
15:38:30
15:38:30
15:38:32
15:38:36
15:38:38
15:38:41
15:38:45
15:38:48
15:38:51
15:38:55
15:38:59
15:39:00
15:39:03
15:39:04
15:39:06
15:39:07
15:39:12
15:39:12
15:39:13
15:39:15
15:39:20

15:55:41  1    your supervisor?

15:55:42  2        A.    No.

15:55:43  3        Q.    Never?

15:55:46  4        A.    I don't recall.  If there is a note in here

15:55:51  5    about that, then that would mean that I did, but just

15:56:09  6    right now, I don't recall without checking.

15:56:12  7            MR. MURPHY:  Mark this next in order.

15:56:12  8                        (Plaintiff's Exhibit No. 7 was

15:56:12  9                        marked for identification.)

15:56:15  10           MR. MURPHY:  Q.  Take a look at Exhibit 7.  It's

15:56:20  11   a letter from me to you, August 22, '03.

15:56:23  12       A.    It's a two-year-old address.

15:56:38  13       Q.    Yes.  Older than that, actually, four years old.

15:56:41  14           You authored this letter?

15:56:41  15       A.    Yes.

15:56:42  16       Q.    You write:

15:56:45  17           "Our review and evaluation of Mrs. Dougherty's

15:56:47  18       treatment data is complete."

15:56:50  19           Did you mean both your review and evaluation as

15:56:52  20   well as the Colossus review and evaluation?

15:56:55  21       A.    Neither, actually.

15:56:56  22       Q.    What did you mean?

15:56:58  23       A.    Well, read on.

15:57:01  24       Q.    Well, tell me what you meant by that first

15:57:01  25   statement.

                                                                109

A.    What I explained in the body of the letter, that based upon the information available at this particular point in time -- I can read this to you, but I don't think I should.

Q.    You don't need to do that.

A.    Okay.  I can give you the intent there.  The intent is that the evaluation that we had, based upon the data that we received, is complete.

Q.    Well, is there any reason you did not put in the letter that your evaluation showed that the case had no value?

A.    Well, no, no, because I recognize that there was still data out there that -- or at least I believed there was still reports, records, data that I'm requesting in this letter, some clarification concerning her future surgery.

Q.    Well, you ask first, you ask if there is any wage loss, and you had not been given any information on wage loss, right?

A.    No, I hadn't.  I just wanted to verify to make sure that was correct.

Q.    The other issue was whether she was going to have surgery?

A.    That is correct.

Q.    As far as you knew, she had opted not to have

110

surgery.

A.   As far as I knew, she may have opted not to have surgery, but I didn't know whether or not that was a medical necessity, and that was the data I was looking for, as to whether or not the surgery was a medical necessity, but it can be a medical necessity and she can choose not to have the surgery, because that's her choice, so the evaluation would have to include the medical necessity, I guess, part of it.

The surgery is an inevitable, whether she has it now or she's forced to have it eight years from now.  It should be included in the evaluation to give the policyholder as much benefit as we possibly can for the client.

Q.   Well, when you say you wanted to know if the surgery was a medical necessity, do you mean whether her doctor had recommended she have the surgery?

A.   Correct.

Q.   And if he had recommended she have the surgery but she decided not to, would that have affected your evaluation of the claim?

A.   Yes.

Q.   In what way?

A.   Well, although I thought I answered that question, I'll do it again.

111

It would be one of those surgeries, if it's a medical necessity, she couldn't ignore it forever. Ultimately, eventually, she would have to have it. Say that she decides not to, it's still something, a future expense that she could incur, that she would incur and should be evaluated so she can be compensated for it.

Q.   If the doctor recommended surgery and she chooses not to have it and never in fact did have it, would the fact of the doctor recommending surgery increase the value of the claim?

A.   Recommending it to the extent that it was a medical necessity, that it had to be done, that it was part of her injury claim; is that what you mean?

Q.   If you want to put those conditions on it, sure.

A.   If it's part of her injury and it's a surgery that would have had to have been done, regardless of what she chooses to do, I would -- I would do my best to get that included in the evaluation of her claim.

Q.   What do you mean you would do your best to get it included?

A.   I would put it into the evaluation of the claim, and if I could get authority to settle the claim based upon that evaluation, I would do it.

Q.   So would that information that the doctor recommended the surgery increase the value of the claim

112

16:01:06  1    in your mind?

16:01:08  2         A.    There is a potential for that.

16:01:11  3         Q.    Did you read Dr. Sponzilli's deposition?

16:01:13  4         A.    I read his deposition.

16:01:16  5         Q.    And did you read his testimony where he said he

16:01:17  6    would recommend surgery?

16:01:21  7         A.    I read his deposition that said he would

16:01:26  8    recommend surgery, but I saw no clinical data to back up

16:01:29  9    that recommendation, which is what I requested.

16:01:33  10        Q.    What clinical data did you want?

16:01:39  11        A.    Well, typically, I will see testing that's done,

16:01:42  12   or, for that matter, just remove all the testing.  How

16:01:44  13   about some, you know, an examination, some notes as a

16:01:51  14   result of an examination, or a plan of care?  Nothing

16:01:56  15   like that was contained within his deposition, just

16:01:59  16   that, you know, the surgery could be, could not be done.

16:02:05  17   It wasn't clear that it was a medical necessity from his

16:02:28  18   deposition.

16:02:31  19             I can continue my answer to that question, too,

16:02:32  20   if you'd like.

16:02:32  21        Q.    Sure.

16:02:32  22        A.    Is that okay with you, Mr. Pardini?

16:02:35  23        Q.    I want you to finish your answer, I'm not

16:02:36  24   interrupting it.

16:02:40  25        A.    All right.  Well, there are plenty of times we

                                                                      113

1  see doctors who recommend surgery and a second opinion

2  will be had, and the second-opinion doctor won't

3  recommend the surgery.

4      Q.   Did you ever ask for a second opinion with

5  regard to Ms. Dougherty's situation?

6      A.   No, I didn't see any reason to put the

7  policyholder through that, such as an independent

8  medical examination, if that's what you mean.

9      Q.   Do you do -- do you request medical examinations

10  from time to time?

11     A.   If the case warrants it.

12     Q.   Do you understand that under the insurance

13  policy that Amco or Allied has a right to an

14  examination?

15     A.   Yes, sir, I know that.

16     Q.   Did you ever give any consideration to having

17  Ms. Dougherty examined by a company of -- a doctor of

18  the company's choosing?

19     A.   I opted not to put Mrs. Dougherty through that.

20     Q.   Why?

21     A.   Independent medical examinations, or really any

22  kind of examination is intrusive, it's time consuming,

23  it's stressful.  She'd already been through all that.

24  She's already has her stress, she's already had her

25  inconvenience and so forth.  No need to be poked and

114

16:03:50  1  prodded when all we needed was a simple note from

16:03:54  2  Dr. Sponzilli explaining whether this surgery was a

16:03:55  3  medical necessity.

16:03:57  4     I figured that would be a lot easier than

16:03:59  5  sending her through an independent medical examination,

16:04:11  6  and it was just a note that I was asking for.

16:04:15  7     MR. MURPHY:  Let me have marked as next in order

16:04:25  8  an excerpt from Dr. Sponzilli's deposition.

16:04:25  9          (Plaintiff's Exhibit No. 8 was

16:04:25  10          marked for identification.)

16:04:29  11     THE WITNESS:  Mr. Murphy, if it's okay with you

16:04:32  12  and Mr. Pardini, can we take a break?  I have been

16:04:33  13  drinking a lot of water.

16:04:35  14     MR. MURPHY:  Sure.  No need to explain.

16:04:40  15     THE VIDEOGRAPHER:  This is the video operator.

16:04:41  16  The time is 4:04.  We are going off the record.

16:15:20  17     (Recess taken.)

16:15:22  18     THE VIDEOGRAPHER:  We are back on the record,

16:15:25  19  and it is 4:15.

16:15:31  20     MR. MURPHY:  Q.  I marked as Exhibit 8 excerpts

16:15:35  21  from the Sponzilli deposition that were taken from the

16:15:39  22  defendant's initial disclosure.  So take a look at page

16:15:47  23  122 -- excuse me, Bates stamp number 222, which is the

16:15:51  24  second page in, and I am going to read to you a question

16:15:55  25  and answer and ask you something about it.  At the top,

115

be demanded before the company has an obligation to

initiate arbitration proceedings?

    A.    Yes.

        MR. PARDINI:  Sorry.  I am going to object on

the ground that it misconstrues the policy language and

California law.

        THE WITNESS:  Sorry, James.

        MR. MURPHY:  Q.  Have you ever yourself

suggested arbitration when you and the claimant's

attorney do not agree on the value of an underinsured

motorist claim?

    A.    For this case?

    Q.    Ever, in any case.

    A.    Have I suggested arbitration?  No, I've

suggested mediation.  It's not up to me to suggest the

arbitration, but I will suggest mediation.

    Q.    Did you suggest mediation in this case before

you closed your file?

    A.    Didn't have an opportunity.

    Q.    Why not?

    A.    Just never came up.  I didn't get any contact

from you to discuss any aspect of this case over, well,

it was over 12 months; otherwise, I would have discussed

mediation.

    Q.    What would have been mediated, given the value

# EXHIBIT X

## LAW OFFICES OF STEPHEN M. MURPHY

STEPHEN M. MURPHY
NIKKI HALL

JEFFREY B. MEADE
Paralegal

February 4, 2003

Jeffrey V. Mangone
Special Claims Representative
AMCO Insurance Company
2301 Circadian Way
P.O. Box 849
Santa Rosa CA 95402-0849

     Re: Christine Dougherty
     Your Insured: Christine D. Rayburn
     Your File No.: 84F99015 PPA 0008899321
     Date of Incident: 4/17/01

Dear Mr. Mangone:

     In response to your letter dated January 9, 2003, enclosed please find the following items for your review and file:

1.  Copy of the Complaint re: *Dougherty v. Osmidoff*, Marin County Superior Court case No. CV021897;

2.  Copy of the Release of All Claims regarding *Dougherty v. Osmidoff*, Marin County Superior Court case No. CV021897;

3.  Copy of the Declarations portion of USAA policy No. 00601 10 57C 7101 4, Elizabeth M. and Glen R. Osmidoff, insured;

4.  Copy of the deposition of Ernest Sponzilli, M.D. taken November 26, 2002; and

5.  Copy of the deposition of Christine Dougherty taken August 9, 2002.

     We will provide further information and documentation with regard to Ms. Dougherty's injuries and wage loss as it becomes available. If you have any questions, please call.

     Very truly yours,

     Stephen M. Murphy

ALLIED-PCRO
FEB 0 6 2003
RR

SMM/jbm
encls

44 Montgomery Street
Suite 1000
San Francisco, CA 94104

CERTIFIED AS CIVIL TRIAL SPECIALIST BY NATIONAL BOARD OF TRIAL ADVOCACY
ADMITTED IN CALIFORNIA AND MASSACHUSETTS
REPRESENTING PLAINTIFFS IN EMPLOYMENT AND PERSONAL INJURY LITIGATION

Telephone: (415) 986-1338
Fax: (415) 288-1836
Email: smurphy@1ustice.com
www.sick-leave.com

**EXHIBIT Y**



**Allied**
Insurance

a member of Nationwide Insurance

February 20, 2003

**Pacific Coast Regional Office**
2301 Circadian Way P.O. Box 849
Santa Rosa, California 95402-0849

Mr. Stephen Murphy, Esq.
44 Montgomery Street
Suite 1000
San Francisco California 94104

Re    Your Client:         Christine Dougherty Rayburn
      Our Policyholders:   Christine Dougherty Rayburn and Malcome Rayburn
      Policy Number:       PPA 0008899321
      Claim Number:        84F99015
      Date of Accident:    April 17, 2001

Dear Mr. Murphy:

Thank you for the material accompanying your February 4, 2003; letter, concerning Mrs. Dougherty's Underinsured Motorist claim.

It appears that all we need to evaluate her injury are the remainder of her treatment records and billings for her care. Please let me know if Mrs. Dougherty is still undergoing treatment, and if the surgical intervention has taken place.

Respectfully,

Jeffrey V. Mangone
Special Claims Representative II
AMCO Insurance Company
(707)-769-1542 Voice
(707) 769-1547 Facsimile

Allied Group, Inc.
AMCO Insurance Company
Allied Property and Casualty Insurance Company
Depositors Insurance Company

**EXHIBIT Z**



**Allied**
Insurance

a member of Nationwide Insurance

AMCO Insurance Company
Pacific Coast Regional Office
P.O. Box 849
Santa Rosa, CA  95402-0849
Phone:  707-542-2502 / 800-552-2437

STEPHEN MURPHY  ESQ.

44 MONTGOMERY ST #1000
SAN FRANCISCO CA 94104

JUNE 26, 2003
35720
HRH OF NORTHERN CALIFORNIA
75 ROWLAND WAY STE 350

Claim: 84F99015
Date of Loss: 04/17 /01
Insured: CHRISTINE RAYBURN
Policy Number:     PPA 0008899321
Company: 0278              78 84F99

We have received the information and/or documentation which you provided to us in reference to the above claim.  In our efforts to properly investigate and evaluate your claim, we have determined that additional time will be required to give it the proper consideration and/or to make a final determination.  The reason for the additional time needed is as follows:

RE: CHRISTINE DOUGHERTY RAYBURN)

THE EVALUATION OF YOUR CLIENT'S UNDERINSURED MOTORIST CLAIM
IS PENDING THE RECEIPT OF HER INJURY TREATMENT DATA.

    _X_       Please provide the following information needed to aid in our determination.

PLEASE FORWARD TEH INFORMATION YOU HAVE AVAILABLE SO WE MAY
BEGIN OUR REVIEW.
THANK YOU.

    _____       A determination whether your claim should be accepted and/or denied cannot be made
until the following event, process or third party determination is made.

Should you have any questions or have any other information of which you wish us to consider in the handling of your claim, please contact the undersigned at the telephone number listed above.

JEFF MANGONE (707) 769-1542
Claim Department
AMCO Insurance Company

11846 (04-94)

010318

# EXHIBIT AA

**Allied**
**Insurance**

a member of Nationwide Insurance

AMCO Insurance Company
Pacific Coast Regional Office
P.O. Box 849
Santa Rosa, CA 95402-0849
Phone: 707-542-2502 / 800-552-2437

MAY,19, 2003
35720
HRH OF NORTHERN CALIFORNIA
75 ROWLAND WAY STE 350

MR. STEPHEN MURPHY, ESQ.

44 MONTGOMERY ST #1000
SAN FRANCISCO CA 94104

Claim: 84F99015
Date of Loss: 04/17/01
Insured: CHRISTINE RAYBURN
Policy Number:     PPA 0008899321
Company: 0278            78 84F99

We have received the information and/or documentation which you provided to us in reference to the above claim. In our efforts to properly investigate and evaluate your claim, we have determined that additional time will be required to give it the proper consideration and/or to make a final determination. The reason for the additional time needed is as follows:

YOUR CLIENT: CHRISTINE RAYBURN

THE EVALUATION OF MRS. RAYBURN'S UNDRINSURED MOTORIST CLAIM IS PENDING THE RECEIPT OF THE DICUMENTS FOR HER INJURY TREATMENTS.

___X___      Please provide the following information needed to aid in our determination.

PLEASE SEND THE TREATMENT DATA AS SOON AS PRACTICABLE.
IN THE MEANTIME, PLEASE CONTACT US AND PROVIDE A STATUS CONCERNING THIS CLAIM.

_____      A determination whether your claim should be accepted and/or denied cannot be made until the following event, process or third party determination is made.

Should you have any questions or have any other information of which you wish us to consider in the handling of your claim, please contact the undersigned at the telephone number listed above.

JEFF MANGONE (707) 769-1542
Claim Department
AMCO Insurance Company

11846 (04-94)

010317

# EXHIBIT BB



**Allied**
Insurance

a member of Nationwide Insurance

MARCH 20, 2003

35720
HRH OF NORTHERN CALIFORNIA
75 ROWLAND WAY STE 350

AMCO Insurance Company
Pacific Coast Regional Office
P.O. Box 849
Santa Rosa, CA 95402-0849
Phone: 707-542-2502 / 800-552-2437

MR. STEPHEN MURPHY, ESQ.
44 MONTGOMERY STREET
SUITE 1000
SAN FRANCISCO CA 94104

Claim: 84F99015
Date of Loss: 04/17/01
Insured: CHRISTINE RAYBURN
Policy Number:    PPA 0008899321
Company: 0278          78 84F99

We have received the information and/or documentation which you provided to us in reference to the above claim. In our efforts to properly investigate and evaluate your claim, we have determined that additional time will be required to give it the proper consideration and/or to make a final determination. The reason for the additional time needed is as follows:

RE: YOUR CLIENT CHRISTINE RAYBURN

THE EVALUATION OF MS. RAYBURN'S UNDERINSURED MOTORIST CLAIM FOR
BODILY INJURY IS PENDING THE RECEIPT OF HER INJURY/TREATMENT DOCUMENTS.

___X___    Please provide the following information needed to aid in our determination.

PLEASE FORWARD THE DOCUMENTS - BILLINGS, REPORTS, RECORDS, TREATMENT
NOTES, AND SO FROTH, FOR OUR REVIEW.

_____    A determination whether your claim should be accepted and/or denied cannot be made
until the following event, process or third party determination is made.

Should you have any questions or have any other information of which you wish us to consider in the handling of your claim, please contact the undersigned at the telephone number listed above.

JEFF MANGONE (707) 769-1542
Claim Department
AMCO Insurance Company

11846 (04-94)