1   LAW OFFICES OF STEPHEN M. MURPHY
    STEPHEN M. MURPHY (SBN # 103768)
2   JEREMY A. GRAHAM (SBN # 234166)
    180 Montgomery Street, Suite 940
3   San Francisco, CA 94104
    Tel: (415) 986-1338
4   Fax: (415) 986-1231

5   LAW OFFICES OF DAVID M. PORTER
    DAVID M. PORTER (SBN # 124500)
6   44 Montgomery Street, Suite 2500
    San Francisco, CA 94104
7   Tel: (415) 982-8600
    Fax: (415) 391-7808

8
    Attorneys for Plaintiff
9   CHRISTINE DOUGHERTY

10

11                    IN THE UNITED STATES DISTRICT COURT

12               FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14  CHRISTINE DOUGHERTY,          )    NO. C 07-01140 MHP
                                  )
15                                )    **PLAINTIFF'S MEMORANDUM OF**
    Plaintiff,                    )    **POINTS AND AUTHORITIES IN**
16                                )    **OPPOSITION TO MOTION FOR**
    v.                            )    **SUMMARY JUDGMENT, OR IN THE**
17                                )    **ALTERNATIVE, PARTIAL SUMMARY**
                                  )    **JUDGMENT, AND CROSS-MOTION FOR**
18  AMCO INSURANCE COMPANY        )    **CONTINUANCE PURSUANT TO FRCP**
    and DOES ONE through TWENTY,  )    **56(f)**
19  Inclusive,                    )
                                  )    Date: April 28, 2008
20  Defendants.                   )    Time: 2:00 p.m.
                                  )    Judge: Hon. Marilyn Hall Patel
21  _____ )    Dept.: 15

22

23

24

25

26

1

# TABLE OF CONTENTS

2

3

TABLE of CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

4

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

5

6

I.      SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

7

II.     FACTUAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

8

9

III.    PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

10

IV.     DEFENDANT UNREASONABLY WITHHELD POLICY BENEFITS
        THAT WERE DUE TO PLAINTIFF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

11

12

V.      DEFENDANT UNREASONABLY DENIED PLAINTIFF'S CLAIM
        WITHOUT MAKING A FULL INVESTIGATION . . . . . . . . . . . . . . . . . . . . . .   15

13

14

VI.     POLICY BENEFITS WERE CLEARLY OWED TO PLAINTIFF
        PRIOR TO THE ARBITRATOR'S AWARD  . . . . . . . . . . . . . . . . . . . . . . . . .   16

15

16

VII.    PUNITIVE DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

17

18

VIII.   IF THE COURT IS INCLINED TO GRANT DEFENDANT'S MOTION
        OF THE EVIDENCE PRESENTED, PLAINTIFF WOULD REQUEST A
        CONTINUANCE PURSUANT TO F.R.C.P. 56(f) TO ALLOW PLAINTIFF
        ADEQUATE TIME TO CONDUCT DISCOVERY . . . . . . . . . . . . . . . . . . . . .   22

19

20

IX.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

21

22

23

24

25

26

1

# TABLE OF AUTHORITIES

2

FEDERAL CASE LAW

3

<u>United States Supreme Court</u>

4

*Wichita Royalty Co. V. City Nat. Bank of Wichita Falls,*
  306 U.S. 103, 106 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

6

*Erie Railroad Co. v. Tompkins,*
  304 U.S. 64 (1938)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

7

8

<u>Federal Courts of Appeal</u>

9

*Amadeo v. Principal Mut. Life Ins. Co.,*
  290 F.3d 1152, 1161 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

10

*Miller v. Glenn Miller Productions, Inc.,*
  454 F.3d 975, 987 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8

11

12

*VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.,*
  784 F.2d 1472, 1475 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

13

14

FEDERAL RULES OF COURT

15

Federal Rule of Civil Procedure 56(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,22,24

16

17

CALIFORNIA CASE LAW

18

<u>California Supreme Court</u>

19

*College Hospital, Inc. v. Superior Court,*
  8 Cal.4th 704, 726 (Cal. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

20

*Egan v. Mutual of Omaha Ins. Co.,*
  24 Cal.3d 809, 819, 820, 822, 823 (Cal. 1979) . . . . . . . . . . . . . . . 11,15,18,20,21

21

*Foley v. Interactive Data Corp.,*
  47 Cal.3d 654, 684-685 (Cal. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

22

23

*Frommoethelydo v. Fire Ins. Exchange,*
  42 Cal.3d 208, 214-215 (Cal. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

24

*Neal v. Farmers Ins. Exchange,*
  21 Cal.3d 910, 923 (Cal. 1978)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

25

26

**TABLE OF AUTHORITIES - Continued**

*Waller v. Truck Ins. Exchange, Inc.,*
    11 Cal.4th 1 (Cal. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*White v. Ultramar, Inc.,*
    21 Cal.4th 563, 576-577 (Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wilson v. 21st Century Insurance Company,*
    42 Cal.4th 713,719-725 (Cal. 2007) . . . . . . . . . . . . . . . . . . 1,2,8,9,12,13,15,16,18


California Courts of Appeal

*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.,*
    90 Cal.App.4th 335, 346 (Cal.App.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Cruz v. Homebase,*
    83 Cal.App.4th 160, 167 (Cal.App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Downey Savings & Loan Assn. v. Ohio Casualty Co.,*
    189 Cal.App.3d 1072, 1084 (Cal.App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hightower v. Farmers Ins. Exchange,*
    38 Cal.App.4th 853, 862 (Cal.App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Love v. Fire Insurance Exchange,*
    221 Cal.App.3d 1136, 1143-1154 (Cal.App. 1990) . . . . . . . . . . . . . . . . . . . . . 17,18

*Richardson v. Employers Liab. Assur. Corp.,*
    25 Cal.App.3d 232, 239 (Cal.App. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Textron Fin'l Corp. v. National Union Fire Ins. Co. of Pittsburgh,*
    118 Cal.App.4th 1061, 1081 (Cal.App. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Weeks v. Baker & McKenzie,*
    63 Cal.App.4th 1128, 1151 (Cal.App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CALIFORNIA STATUTES

Insurance Code §11580.2(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Insurance Code §11580.26(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Civil Code § 3294        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Civil Code § 3294(a)      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Civil Code § 3294(b)      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

1

## I.  SUMMARY OF ARGUMENT.

2    The evidence before the Court shows that defendant AMCO breached its duties to

3    plaintiff under the implied covenant of good faith and fair dealing by unreasonably

4    withholding policy benefits. It is undisputed that plaintiff made a settlement demand of

5    considerably less than the policy limits, that defendant made no offer, and that the

6    arbitrator (considering essentially the same information presented to AMCO years

7    earlier) awarded plaintiff more than the policy limits.

8    Defendant attempts to justify its failure to make a reasonable offer by blaming

9    plaintiff's counsel for not obtaining additional medical documentation after her claim

10   had been denied. As set forth in the Declaration of Thomas J. Corridan, an

11   experienced insurance claims adjuster and supervisor, AMCO - not plaintiff's counsel -

12   owed a duty to its insured to thoroughly investigate this claim. AMCO violated its duty

13   by failing to conduct a fair and objective evaluation of its insured's claim and by failing

14   to conduct a prompt, unbiased, and thorough investigation into what it considered

15   questionable medical issues surrounding plaintiff's injury claims. Defendant's repeated

16   requests for additional medical documentation, made over the course of nine months

17   after defendant had already denied plaintiff's claim, were nothing more than a delaying

18   tactic. As such, AMCO breached the implied covenant of good faith and fair dealing.

19   Based on strikingly similar facts, the California Supreme Court recently held that

20   summary judgment in favor of the defendant insurer in a bad faith case was improper.

21   In *Wilson v. 21st Century Insurance Company*, 42 Cal.4th 713 (Cal. 2007) (modified

22   without change in disposition at 42 Cal.4th 806a) the plaintiff alleged a bad faith denial

23   of an underinsured motorist claim. The Court held that, in evaluating a claim, the

24   insurer must give at least as much consideration to the interests of its insured as it

25   does to its own interests. *Id*. at 720. Before denying a claim by its own insured, an

26   insurer must affirmatively investigate all possible bases for the claim, as opposed to

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT, AND CROSS-MOTION FOR CONTINUANCE PURSUANT TO FRCP 56(f)

1

1    sitting on its hands and demanding information from the insured or the insured's

2    counsel. *Id*. at 721.

3       Here, AMCO relied on Colossus evaluation software to deny plaintiff's claim. As set

4    forth in the Declaration of Thomas J. Corridan in Opposition to Motion for Summary

5    Judgment, or in the Alternative, for Partial Summary Judgment ("Corridan Decl."),

6    AMCO's reliance on Colossus was biased and unreasonable since both the input and

7    output data were flawed. Defendant has misplaced the Colossus report detailing the

8    evaluation. Nevertheless, the information available indicates that Colossus

9    systematically was unable to consider several relevant aspects of plaintiff's claim. The

10   output was flawed because the program was tuned to reflect average pre-litigation

11   settlements by AMCO and its parent company and not average jury verdicts, arbitration

12   awards, or post-litigation settlements in the relevant venue. Moreover, AMCO's claims

13   supervisor and adjusters were not properly trained on these flaws and limitations in the

14   Colossus program. As such, AMCO's reliance on Colossus for evaluating such claims

15   violated best practices since the system was set up to produce unreasonable and

16   biased evaluations. (Corridan Decl. ¶ 9(c).)

17      AMCO's systematic misuse of Colossus in first-party bodily injury claims such as

18   plaintiff's and refusal to conduct a thorough investigation demonstrates defendant's

19   conscious disregard of plaintiff's rights. Based on the systemic deficiencies of

20   defendant's claims handling practices, and on the ratification of the unreasonable

21   denial of plaintiff's claim by defendant's managing agent, Michael McKeever, a jury

22   may reasonably conclude plaintiff is entitled to punitive damages.

23      Accordingly, the evidence indicates that defendant AMCO's motion should be

24   denied in its entirety. Alternatively, plaintiff moves for a continuance of the hearing

25   since defendant has failed to produce requested evidence in a timely fashion, thereby

26   prejudicing plaintiff's ability to fully oppose this motion. F.R.C.P. 56(f).

## II. FACTUAL HISTORY.

On April 17, 2001, plaintiff was injured in an automobile accident which occurred after the other driver failed to yield at a stop sign. Plaintiff reported the accident to defendant pursuant to her automobile insurance policy. (Declaration of Jeffrey Mangone in Support of Motion of Defendant AMCO Insurance Company for Summary Judgement, or in the Alternative, Partial Summary Judgment ("Mangone Decl."), at ¶ 2.) A week later, the insurer for the other driver (Glenn Osmidoff) notified defendant that it accepted liability for the accident on behalf of its insured.  (Exhibit A to Declaration of David M. Porter in Opposition to Motion for Summary Judgment, or in the Alternative, Partial Summary Judgement, and in Support of Cross-Motion for Continuance Pursuant to FRCP 56(f) ("Porter Decl.) at Bates No. 010085.)

Plaintiff suffered serious injuries, including cervical disc bulges that impinged on the spinal cord and a tear of the rotator cuff. (Exh. B to Porter Decl, deposition of Dr. Sponzilli.) Although plaintiff's treating physicians recommended surgery, plaintiff declined all surgical procedures. (*Id.*) Because she was pregnant, she also could not take pain-relief medication. (*Id.*) Plaintiff gave birth to her son on December 17, 2001. (*Id.*)

In April of 2002, plaintiff filed suit against the other driver, Glenn Osmidoff. (Exhibit A to Declaration of Jeffrey Mangone in Support of Motion of Defendant AMCO Insurance Company for Summary Judgement, or in the Alternative, Partial Summary Judgment ("Mangone Decl.").) Plaintiff settled that case for $30,000, the policy limit of Osmidoff's insurance. (Exh. B to Mangone Decl.) In January of 2003, plaintiff notified defendant that she was filing a claim under the UIM  provisions of her policy, (Mangone Decl. at ¶ 6,) which had a limit of $100,000, (Exhibit T to Declaration of Darbie Hoffman in Support of Motion of Defendant AMCO Insurance Company for Summary Judgement, or in the Alternative, Partial Summary Judgment ("Policy"), at Bates No. 020061,)

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT, AND CROSS-MOTION FOR CONTINUANCE PURSUANT TO FRCP 56(f)

3

1  leaving $70,000 available for plaintiff's claim after the offset for the Osmidoff

2  settlement. Defendant assigned plaintiff's claim to its adjuster, Jeffrey Mangone.

3  (Mangone Decl. at ¶ 2.) Mangone's supervisor was Kelly Bellinghausen, (Mangone

4  deposition at 16:20-17:13,) who was supervised by Michael McKeever. (McKeever

5  deposition at 10:8-18.)  McKeever oversaw defendant's processing of all bodily injury

6  claims in both California and Nevada.  (*Id.* at 7:16-9:3 and Exh. E to Porter Decl.)

7      In February of 2003, plaintiff provided documentation of her injuries and entitlement

8  to policy benefits, including the deposition of her treating physician, Ernest Sponzilli,

9  M.D., taken in the case against the other driver.   (Exh. X to Declaration of Julian J.

10  Pardini in Support of Motion of Defendant AMCO Insurance Company for Summary

11  Judgement, or in the Alternative, Partial Summary Judgment ("Pardini Decl."))  Based

12  on this documentation, Mangone set the reserves at $15,000.  (Exh. A to Porter Decl.

13  at 010095.)

14      In July of 2003, plaintiff provided further documentation of her injuries and

15  entitlement to policy benefits and demanded $45,000 to settle her claim. (Exh. C to

16  Mangone Decl.) At this time plaintiff had complied with all her obligations under her

17  policy to assert her UIM claim. (*See* Exhibit T to Declaration of Darbie Hoffman in

18  Support of Motion of Defendant AMCO Insurance Company for Summary Judgement,

19  or in the Alternative, Partial Summary Judgment ("Policy"), at Bates Nos. 020030 and

20  020051.) Plaintiff's demand letter indicated that plaintiff had suffered "constant pain in

21  her neck and right shoulder for over a year after the incident," and that "she continues

22  to regularly experience aching, pain and stiffness in her neck and shoulder." (*Id.*)

23  These statements were supported by both the medical documentation and by plaintiff's

24  deposition taken by the adverse insurer in her case against Osmidoff, a copy of which

25  was attached to the demand letter. (*Id.*)

26      In a letter dated July 29, 2003, defendant stated that plaintiff's claim file "appears to

1    be complete." (Exh. C to Porter Decl.) The notes entered into the case file by its

2    adjuster Mangone on August 13, 2003 acknowledged "clear liability" on the part of the

3    other driver, (Exh. A to Porter Decl. at 010098,) and that plaintiff was "still experiencing

4    chronic pain symptoms in her neck and shoulder." (*Id*. at 010100.)

5        On August 13, 2003 Mangone referred plaintiff's claim to defendant's Colossus unit.

6    (*Id*. at 010101 & Mangone deposition at 95:17-96:2.)  Colossus is claims adjusting

7    software than inputs select data available from the claims file and outputs a settlement

8    range. (Wartach deposition at 13:4-21 & 24:2-28:21.) Mangone's referral indicated that

9    plaintiff had zero percent comparative negligence. (Exh. A to Porter Decl. at 010101

10   and Mangone deposition at 96:3-97:3.) The Colossus unit completed its consultation

11   on August 21, 2003 and concluded that plaintiff had already been fully compensated

12   for her injuries by the $30,000 she had already received from settlement of her case

13   against Osmidoff as well as $5,000 for medical payments. (Exh. A to Porter Decl. at

14   010101-010102.) As utilized by defendant, the settlement range output by Colossus is

15   based solely on pre-litigation settlements within the group of companies owned by

16   defendant's parent company. (Wartach deposition at 46:6-49:9.) Neither jury verdicts,

17   arbitration awards, or post-litigation settlements were reflected in the Colossus analysis

18   of settlement value. (*Id*.)

19       Mangone testified at his deposition that he had no discretion to vary from the

20   Colossus settlement range in making an offer on a claim (Mangone deposition at

21   46:18-25,) and that as a result of the Colossus report he concluded that plaintiff did not

22   have a viable claim.[1]  (*Id*. at 107:22-108:24 & Exh. A to Porter Decl. at 010101

23   &010105) Defendant made no offer to settle plaintiff's claim at this or any other time.

24   (Porter Decl. at ¶ 4 & McKeever deposition at 42:10-21.)

25       From late 2003 through mid-2004, defendant repeatedly requested a "report" from

26

---

[1]Defendant has been unable to locate and produce the Colossus report for plaintiff's claim.

1   Dr. Sponzilli, plaintiff's treating physician, describing the need for future surgery, even

2   though defendant already had the sworn deposition testimony of Dr. Sponzilli. (Exhibits

3   G, H, I, J, K, L, M, & N to Declaration of Jeffrey Mangone in Support of Motion of

4   Defendant AMCO Insurance Company for Summary Judgement, or in the Alternative,

5   Partial Summary Judgment ("Mangone Decl.") Defendant's requests purported to seek

6   information on the need for the surgical procedure that plaintiff had continued to defer

7   indefinitely. (*Id.*) Defendant failed to obtain plaintiff's medical records directly pursuant

8   to a medical release form, have a physician of its own review the medical records

9   plaintiff had provided, request that plaintiff be examined by a physician of its choosing,

10  take its own deposition of Dr. Sponzilli, or exercise any of its other rights under the

11  policy to resolve questions as to plaintiff's medical condition.  (Porter Decl. at ¶ 2;

12  Corrigan Decl. at ¶ 9(f); Mangone deposition at 114:4-115:6.) Instead, in a letter dated

13  September 28, 2004 defendant simply told plaintiff that "we are closing our file. ¶ We

14  previously advised you our evaluation of Ms. Dougherty's injuries did not indicate a

15  viable underinsured motorist claim. Our evaluation was based on the treatment data as

16  provided by your office."  (Exh. O to Mangone Decl.)

17      Plaintiff then demanded that her claim be submitted to arbitration. (Exh. P to

18  Mangone Decl.) On November 9, 2004, Kelly Bellinghausen received authority from

19  Michael McKeever to transfer plaintiff's claim to defendant's litigation section and

20  defendant transferred plaintiff's claim from Mr. Mangone to Linda Howard. (Exh. A to

21  Porter Decl. at 010107 & McKeever deposition at 57:13-19.) On February 24, 2005,

22  Ms. Howard entered into her notes for the claim file that "Carl feels we should make

23  some kind of offer." (Exh. A to Porter Decl. at 010112.)

24      The Honorable Alfred Chiantelli presided over the arbitration hearing in January,

25  2006. (Declaration of Renton Rolph, Esq. in Support of Motion of Defendant AMCO

26  Insurance Company for Summary Judgement, or in the Alternative, Partial Summary

1  Judgment ("Rolph Decl.") at ¶ 6 & Porter Decl. at ¶ 3.) (Contrary to its prior

2  acknowledgment of "clear liability" on the part of the other driver,[2] defendant argued for

3  the first time that the accident was entirely Ms. Dougherty's fault. (Exh. R to Rolph

4  Decl. at Bates No. 01083.) In response to a direct question from Judge Chiantelli,

5  defendant estimated that, assuming plaintiff bore no fault in the accident, her claim

6  underinsured motorist claim was "at most . . . worth $20,000."  (Rolph Decl. at ¶ 6.)

7      In March of 2006, Judge Chiantelli awarded plaintiff $107,874, in excess of the UIM

8  policy limit. (Exh. S to Rolph Decl. ("Award") at 2.) Judge Chiantelli's award expressly

9  assumed that plaintiff would never have the surgical procedure previously

10  recommended. (*Id*. at 3.)

11  **III.    PROCEDURAL HISTORY.**

12      Plaintiff Christine Dougherty filed this action in state court on January 24, 2007

13  alleging causes of action for breach of contract and breach of the implied covenant of

14  good faith and fair dealing against defendant AMCO based on its handling of her UIM

15  claim. Defendant filed an answer in state court and then removed the case to this

16  Court based on diversity jurisdiction.

17      Prior to the initial Case Management Conference, defendant filed its first motion for

18  summary judgment. Because defendant filed its motion without obtaining leave of the

19

20          [2]These include: 1) Osmidoff's insurer accepting full liability a week after the accident, (Exh. A to
Porter Decl. at 010085;) 2) defendant's 8/13/03 note in its claim file, "[t]his is a case of clear liability on the
21  part of the [claimant] driver. The [claimant] failed to yield for the [insured] at a stop sign," (*Id*. at 010098;)
3)" defendant's 11/5/04 note in its claim file marking "Clear" and not marking "Disputed" in the entry
22  following "Liability," (*Id*. at 010106;) 4) defendant's 11/9/04 note in its claim file, "[i]nsured pulled into the
intersection and was in the process of making a left turn when adverse vehicle pulled into intersection
23  from the opposite direction and collided with right rear side of insured vehicle at significant impact.
Independent witness indicates that adverse driver was not looking forward as pulled forward," (*Id*. at
24  010106;) and 5) defendant's 11/12/04 note in its claim file, "[l]iability accepted by other carrier, [insured]
taking a left turn from a [stop sign] and hit by truck coming from opposite direction in moderate impact.
25  [Insured] did not have turn signal on but this does not seem to matter as adverse was looking elsewhere
per witnesses." (*Id*. at 010108.) The first indication that defendant's position had shifted was a year later in
26  its 11/29/05 note in its claim file, "At [arbitration] we'll argue some comparative on the [insured] for making
the left turn and some question about the severity of the injuries as well as pre-existing injuries." (*Id*. at
010118;)

1  court, as required by Judge Marilyn H. Patel's standing orders, this Court did not hear

2  the motion. At the initial Case Management Conference, the Court set a period of

3  ninety days for the parties to conduct discovery prior to defendant being permitted to

4  file its motion for summary judgment. Each party was limited to a single deposition

5  within this period. Plaintiff was later granted leave of the Court to conduct a second

6  deposition.

7      Although the Court extended the time for discovery through March 10, 2008,

8  defendant has not yet fully complied with its discovery obligations in response to

9  plaintiff's requests. Defendant has not responded to plaintiff's request to produce

10  Jeffrey Mangone for further deposition and allow him to answer questions regarding

11  his setting of the reserves for plaintiff's claim. (Porter Decl. at ¶ 6.) Also, defendant

12  produced additional documents the same day this Opposition was filed and plaintiff

13  has not yet had time to review them. (*Id*. at 5.)

14  **IV.   DEFENDANT UNREASONABLY WITHHELD POLICY BENEFITS THAT**
    **WERE DUE TO PLAINTIFF.**

15      In a motion for summary judgment, the burden is on the moving party to show that

16  there is no disputed issue of material fact and that it is entitled to judgment as a matter

17  of law. All facts and inferences must be considered in the light most favorable to the

18  non-moving party. *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 987 (9th Cir.

19  2006).

20      In *Wilson v. 21st Century Insurance Company*, 42 Cal.4th 713 (Cal. 2007) (modified

21  without change in disposition at 42 Cal.4th 806a), the plaintiff insured alleged bad faith

22  arising from the insurer's denial of her underinsured motorist claim and the subsequent

23  two-year delay in the payment of her claim. *Id*. at 717-720. The Court held that a jury

24  could find 21st Century liable for bad faith even though, subsequent to Wilson's

25  demand for arbitration, it conducted an independent medical examination, concluded

26  that plaintiff's claim was valid, and paid the limits of her policy. *Id*. at 719.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT, AND CROSS-MOTION FOR CONTINUANCE PURSUANT TO FRCP 56(f)

8

1    Thus, *Wilson* rejected a similar argument now advanced by AMCO:  that because

2    the contract allows plaintiff the right to demand arbitration, AMCO complied with the

3    contract by receiving plaintiff's demand for arbitration and paying the arbitrator's

4    award; and that without a breach of the contract, it cannot be liable for acting in bad

5    faith. (Motion for Summary Judgment at 14-15.) Taken to its logical conclusion,

6    defendant's argument would allow an insurer to deny every UIM claim, regardless of

7    the claim's merits, but nevertheless perform the terms of the contract and be immune

8    from bad faith liability by paying out benefits only when ordered to do so by an

9    arbitrator.[3]

10   The California Supreme Court soundly rejected that theory in *Wilson,* holding that

11   submitting to a insured's demand for arbitration does not excuse an insurer from

12   withholding policy benefits after an insured has provided adequate documentation to

13   support a claim. *Wilson*, *supra*, at 721.

14   The issue here, as in *Wilson*, is whether the insurer's initial denial of the insured's

15   claim was reasonable in light of the information then at its disposal and the totality of

16   the circumstances. *Id*. at 723. In *Wilson*, the Court found sufficient evidence that 21st

17   Century's conclusions that plaintiff's injuries were either preexisting, not severe, or

18   both, were not reasonably based on the medical documentation provided to it by

19   Wilson. *Id*. at 721-722. Similarly, there is sufficient evidence here that defendant's

20   conclusion that plaintiff's injuries did not support a viable claim absent the medical

21   necessity of future surgery was not reasonably based on the medical documentation

22   provided to it by plaintiff.

23   On July 29, 2003, defendant notified plaintiff that "[y]our settlement package

24

25   [3]Michael McKeever, produced as defendant's Person Most Knowledgeable on, among other topics, "AMCO's policies, procedures, and practices regarding filing, responding to, evaluating, adjusting, and handling claims for uninsured and underinsured coverage between 2002 and 2007," testified at his

26   deposition that defendant satisfied its obligations under the insurance code and the contract by acceding to plaintiff's demand for arbitration. (McKeever deposition at 51:7-21.)

appears to be complete." At that time defendant was in possession of the following

documents, all provided by plaintiff in support of her claim:

1) Plaintiff's state court complaint filed against Glenn Osmidoff, the negligent driver.

2) The release of all claims settling her case against Osmidoff.

3) The declarations portion of Osmidoff's insurance policy.

4) The deposition of plaintiff's treating physician, Ernest Sponzilli. M.D. taken in her case against Osmidoff.

5) Plaintiff's deposition taken in her case against Osmidoff case.

6) The police report from the April 17, 2001 accident.

7) The records of plaintiff's treatment from Dr. Sponzilli.

8) Relevant portions of the records of plaintiff's treatment from Dr. Simmonds, her OBGYN, confirming her pregnancy.

9) The records of plaintiff's physical therapy.

10) The records of plaintiff's acupuncture treatment.

11) Plaintiff's MRI's ordered by Dr. Sponzilli.

12) The billing records related to the treatment listed as nos. 7, 9, 10, and 11, above.

(Exh. X to Pardini Decl. & Exh. C to Mangone Decl.)

In addition to the above-listed documentation, plaintiff sent defendant a four-page

demand letter outlining the basis for her claim together with a demand for $45,000, or

one-half the policy limits. (Exh. X to Pardini Decl.) Although plaintiff's medical

documentation indicated that treatment was ongoing, plaintiff's demand letter

demonstrated that she was entitled to the full amount of her demand based on her

pain and suffering and the treatment she had received to date. (*Id*. & Corrigan Decl. at

¶ 9(c).) Regarding plaintiff's pain and suffering, the letter stated:

> Ms. Dougherty suffered constant pain in her neck and right shoulder for over a year after the incident. The pain made Ms. Dougherty's pregnancy more difficult to endure. . . . . . . Although the pain in Ms. Dougherty's neck and shoulder

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT, AND CROSS-MOTION FOR CONTINUANCE PURSUANT TO FRCP 56(f)

10

1

> has decreased, she continues to regularly experience
> aching, pain and stiffness in her neck and shoulder.

(Exh. X to Pardini Decl.) Plaintiff's pain and suffering were further documented in her deposition taken in the Osmidoff case, where she had been questioned extensively by opposing counsel. (*Id*. noting that plaintiff's deposition in the Osmidoff case was attached.)

In his notes to the claim file for August 13, 2003, defendant's claims adjuster wrote that "[t]his is a case of clear liability . . . [Osmidoff] failed to yield for [plaintiff] at a stop sign." (Exh. A to Porter Decl. at 010098.) He further wrote that "[t]he impact to [plaintiff's vehicle] was significant." (*Id*.) Regarding plaintiff's injuries he wrote "[t]he initial exam reports that the insured had no prior history for the complaints reported – radiating neck pain," (*Id*.), and "[plaintiff] has discontinued care, however, she is still experiencing chronic pain symptoms in her neck and shoulder." (*Id*. at 010100.) On August 22, 2003, defendant's adjuster wrote in the claim file that "[i]t is not unreasonable to expect continuing pain from the accident injuries." (*Id*. at 010102.) That same day defendant notified plaintiff that "[o]ur review and evaluation of Mrs. Dougherty's treatment data is complete."  (Exh. D to Mangone Decl.)

Nevertheless, defendant denied plaintiff's claim.[4] Over a year later on September 28, 2004, defendant wrote to plaintiff's counsel, "we are closing our file. We previously advised you our evaluation of Ms. Dougherty's injuries did not indicate a viable underinsured motorist claim. Our evaluation was based on the treatment data as provided by your office."

Defendant's moving papers simply ignore its own affirmative obligation to conduct a

---

[4]Defendant disputes that it ever "denied" plaintiff's claim. (McKeever deposition at 50:19-51:1.) The record, however, is replete with contemporaneous admissions by defendant that it did deny plaintiff's claim. "Our current evaluation of Mrs. Dougherty's injury claim does not indicate an underinsured motorist for bodily injury [sic.] is present. (Exh. F to Mangone Decl.) "We previously advised you our evaluation of Ms. Dougherty's injuries did not indicate a viable underinsured motorist claim." (Exh. O to Mangone Decl..) "Claim denied by claims rep due to injury evaluation." (Exh. A to Porter Decl. at 010108).

1    prompt, reasonable, and thorough investigation, even though it has long been the law

2    than an insurer is required to **fully inquire** into possible bases that might support he

3    insured's claim. *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 819 (Cal. 1979)

4    (emphasis added)[5].  Instead, defendant merely blames plaintiff for not procuring an

5    additional medical "report" **after** it had already notified plaintiff that her claim was

6    denied. (Motion for Summary Judgment at 9-10, 12-13.)

7        Facially, these requests sought a "report" as to whether future surgery was of such

8    medical necessity that plaintiff would inevitably have to undergo the surgery, even

9    though AMCO already had Dr. Sponzilli's deposition on this subject. (*Id*.) Defendant

10   also had other documentation to support a claim for the full amount of her demand

11   based on her injuries, independent of the need for surgery. Judge Chiantelli's award

12   expressly stated "this award was issued with the opinion that the claimant will **not** have

13   any related surgery in the near future." (Award at 3, emphasis added.) Judge Chiantelli

14   found that plaintiff had proven $100,000 in "general damages which is reasonable

15   compensation for the pain and suffering she endured from the accident through the

16   birth of her child, her recuperation period and present permanent condition." (*Id*. at 2.)

17       As in *Wilson*, there is sufficient evidence here that "a jury could find that [defendant]

18   lacked any factual basis for [its] conclusion [that plaintiff's claim was not valid] and that

19   in reaching it the company had unfairly ignored medical evidence submitted by its

20   insured." *Wilson*, *supra*, at 724.

21       When evaluating a first-party claim, "an insurer must give at least as much

22   consideration to the interests of the insured as it gives to its own interests. When the

23   insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is

24   subject to liability in tort." *Id*. at 720 (quoting *Frommoethelydo v. Fire Ins. Exchange*, 42

25

26       [5] A thorough investigation by AMCO should have included interviews with witnesses with significant information. *Downey Savings & Loan Assn. v. Ohio Casualty Co.*, 189 Cal.App.3d 1072, 1084 (Cal.App. 1987).

1    Cal.3d 208, 214-215 (Cal. 1986)).

2        In *Wilson*, the California Supreme Court also rejected 21st Century's contention that

3    it was Wilson's attorney's failure to provide it with additional medical documentation

4    that was responsible for its initial failure to properly evaluate Wilson's claim:

> 21st Century observes that after its claims examiner told
> plaintiff's attorney . . . of his opinion that the submitted
> medical reports did not support the claim of cervical disk
> injury from the accident, [plaintiff's attorney] did not argue
> the point further or immediately send additional medical
> information. 21st Century maintains this relieved it of any
> duty to further assess or evaluate the claim, at least until it
> received more information. But [plaintiff's attorney] had
> already drawn the claims examiner's attention to [Wilson's
> treating physician]'s report and opinion. **A jury could find
> that the insurer's willingness to receive additional
> information did not conclusively demonstrate its good
> faith in disregarding the information already provided.**

12    *Id*. at 722, fn. 6 (emphasis added).

13        21st Century also argued that its denial of plaintiff's claim was reasonable in light of

14    the fact that it did not learn until after Wilson demanded arbitration that she had opted

15    to forgo recommended surgery. *Id*. at 719, 725. The Court noted, however, that "the

16    basis for Wilson's policy limits claim, as communicated in her attorney's demand letter,

17    was not that the neck injury was so severe as to require expensive treatment in the

18    short term, but rather that it was continuing to cause her significant pain . . . ¶ . . . ¶ . . .

19    Plaintiff's . . . demand for the policy limits did not depend on anticipated future

20    damages for spinal surgery." *Id*. at 725.

21        Here, as in *Wilson*, plaintiff's demand letter asserted a viable claim based on her

22    injuries and ongoing pain and suffering, supported by significant medical

23    documentation. Defendant's claim file is replete with notes acknowledging that plaintiff

24    suffered from continuing pain due to her injuries.[6] Here, as in *Wilson*, the validity of

25    _____

26        [6]These include defendant's 8/13/03 notes in its claim file that "[t]he initial exam reports that the
     insured had no prior history for the complaints reported – radiating neck pain," (Exh. A to Porter Decl. at
     010098,) and "[t]he [insured] has discontinued care, however, she is still experiencing chronic pain

1    plaintiff's claim was independent of the necessity, or lack thereof, of future surgery.

2    Unlike in *Wilson*, however, defendant here did nothing to mitigate its bad faith once

3    plaintiff demanded arbitration. Rather, defendant compounded its bad faith by arguing

4    – for the first time – that plaintiff was entirely at fault in the underlying collision.

5    Defendant's position was not only rejected by the arbitrator, it was contrary to every

6    piece of evidence and every prior indication and acknowledgment in its own claims

7    file.[7] Moreover, defendant acted in bad faith simply by requiring plaintiff to arbitrate

8    without making any offer whatsoever.

9    An insurer's duties to its insured pursuant to the covenant of good faith and fair

10   dealing continue after a demand for arbitration. "The mere availability of an arbitration

11   procedure does not insulate an insurer from liability for bad faith in its handling of an

12   uninsured motorist claim." *Hightower v. Farmers Ins. Exchange*, 38 Cal.App.4th 853,

13   862 (Cal.App. 1995) (reversing summary judgment for defendant insurer).

14   In support of its holding, *Hightower* cited *Richardson v. Employers Liab. Assur.*

15   *Corp.*, 25 Cal.App.3d 232, 239 (Cal.App. 1972) where an insurer was found to have

16   acted in bad faith by, among other acts, withholding payment of benefits "months after

17   it knew the claim to be completely valid; [and] forc[ing] an arbitration hearing on a claim

18   against which it already knew that it had no defense." *Id*.

19   Defendant's reliance on California Insurance Code section 11580.2(f) for the same

20   proposition is misplaced. That section requires that disputes between an insurer and

21   insured be submitted to arbitration. AMCO contends that by participating in an

22   arbitration that is required by law and contract to do it is immune from liability here.

23   (Motion for Summary Judgment at 13-14.) This argument must also be rejected.

24   _____

25   symptoms in her neck and shoulder," (*Id*. at 010100,) as well as defendant's 11/22/03 note in its claim file,
     "[i]t is not unreasonable to expect continuing pain from the accident injuries." (*Id*. at 010102.)

26   [7] The only independent witness to the accident said Osmidoff failed to yield, and Osmidoff was
     cited and pled guilty for failure to yield. *See* footnote 1, *supra*.

1    "[W]hile Insurance Code section 11580.26, subdivision (b), immunizes an insurer

2    from liability for the bare act of requesting arbitration of an uninsured motorist claim, it

3    does not insulate an insurer from liability toward its insured for failing to attempt in

4    good faith to effectuate a prompt and fair settlement of a claim in which liability is

5    reasonably clear, or for other wrongful acts." Id. at 856.

6    "The key to a bad faith claim is whether or not the insurer's denial of coverage was

7    reasonable. [Citation] [T]he reasonableness of an insurer's claims-handling conduct is

8    ordinarily a question of fact." *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152,

9    1161 (9th Cir. 2002) (reversing summary judgment in a bad faith claim based on

10   evidence that the insurer ignored medical opinions submitted by the insured in support

11   of her claim; quotations and citations omitted).

12   Although the covenant of good faith and fair dealing is implied in every contract, this

13   implied covenant has special significance in the insurance context because insurers

14   "are invested with a discretionary power affecting the rights of another, and the

15   insurance business is affected with a public interest and offers services of a quasi-

16   public nature." *Amadeo*, *supra*, at 1161 (quotations and citations omitted).

17   Here, there is more than sufficient evidence for a jury to find that defendant placed

18   its own interests ahead of its insured in its handling of plaintiff's underinsured motorist

19   claim, and in so doing acted in bad faith. (*See* Corrigan Decl. at ¶ 9(a) & (k).)

20   **V.    DEFENDANT UNREASONABLY DENIED PLAINTIFF'S CLAIM WITHOUT
           MAKING A FULL INVESTIGATION.**

21   As in *Wilson*, defendant's failure here to fully and affirmatively investigate plaintiff's

22   claim before denying it provides an independent ground for liability. At the time that

23   Wilson filed her claim, she provided medical documentation of the injuries to her neck.

24   Nevertheless, 21st Century denied Wilson's claim without doing any investigation of its

25   own to resolve any doubts it had as to the validity of Wilson's claim. *Id*. at 721-722.

26   "To protect its insured's contractual interest in security and peace of mind, 'it is

1  essential that an insurer fully inquire into possible bases that might support the

2  insured's claim' before denying it." *Id.* at 721 (quoting *Egan v. Mutual of Omaha Ins.*

3  *Co.*, 24 Cal.3d 809, 819 (Cal. 1979)).

4  "21st Century, of course, was not obliged to accept [Wilson's treating physician]'s

5  opinion without scrutiny or investigation. To the extent it had good faith doubts, the

6  insurer would have been within its rights to investigate the basis for Wilson's claim by

7  asking Dr. Southern to reexamine or further explain his findings, having a physician

8  review all the submitted medical records and offer an opinion, or, if necessary, having

9  its insured examined by other physicians . . ." *Id.* at 722. Having denied Wilson's claim

10  without having exercised these contractual rights, however, a jury was entitled to find

11  that 21st Century had acted in bad faith. *Id.*

12  Here, if it were true, as defendant claims, that it had a good faith belief that the

13  viability of plaintiff's claim depended on additional medical clarification as to the

14  necessity of future surgery, then defendant had a duty to use the myriad tools at its

15  disposal to acquire this information **before** it denied plaintiff's claim. These included:

16  1) obtaining an interview with the treating doctor by using a release form signed by the

17  insured, 2) seeking an independent medical examiner's review of the medical records,

18  3) scheduling an independent medical examination; 4) interviewing Ms. Dougherty or

19  requesting an Examination Under Oath as allowed under its insurance policy. (*See*

20  Corridan Decl. at ¶ 9(d) & (f).)

21  Defendant acknowledges that an independent medical examination was an

22  available tool to resolve its outstanding questions about the necessity of surgery.

23  (McKeever deposition at 36:13-37:20.) Defendant's adjuster acknowledges that he

24  could have requested such an examination, but did not because "[i]ndependent

25  medical examinations, or really any kind of examination is intrusive, it's time

26  consuming, it's stressful. She'd already been through all that. She's already has her

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT, AND CROSS-MOTION FOR CONTINUANCE PURSUANT TO FRCP 56(f)

16

1    stress, she's already had her inconvenience and so forth." (Mangone deposition at

2    114:12-115:6.) Notwithstanding the adjuster's concern for plaintiff, conducting an

3    independent medical review of the records in its possession, and/or deposing plaintiff's

4    treating physicians would not have inconvenienced her at all.[8]

5        "An insurer's good or bad faith must be evaluated in light of the totality of the

6    circumstances surrounding its actions." *Id*. at 723. Under the facts presented here, as

7    in *Wilson*, there is, at a **minimum**, "a triable issue of fact [] as to whether it was

8    reasonable to deny [plaintiff's] claim on the grounds stated without further medical

9    investigation." *Id*.

10   ## VI.    POLICY BENEFITS WERE CLEARLY OWED TO PLAINTIFF PRIOR TO THE ARBITRATOR'S AWARD.

11       Defendant's principal argument is that it did not withhold policy benefits that were

12   "clearly owed" to plaintiff. Plaintiff has refuted this argument above. Properly reviewed,

13   the documentation plaintiff had provided to defendant as of July of 2003 conclusively

14   demonstrated that plaintiff was entitled to at least her $45,000 demand. (Corridan

15   Decl. at ¶ 9(d).) As of August of 2003, defendant had completed its evaluation and

16   concluded, wrongly, that plaintiff did not have a viable claim. Based on the same

17   evidence, over two and a half years later, the arbitrator awarded plaintiff in excess of

18   the policy limits and far more than her settlement demand.

19       Defendant cites *Love v. Fire Insurance Exchange*, 221 Cal.App. 3d 1136 (Cal.App.

20   1990) as the primary authority supporting its motion. *Love* has been cited with approval

21   by the California Supreme Court for the proposition that "if there is no potential for

22   coverage and, hence, no duty to defend under the terms of the policy, there can be no

23   action for breach of the implied covenant of good faith and fair dealing." *Waller v.*

24   *Truck Ins. Exchange, Inc.*, 11 Cal.4th 1 (Cal. 1995) (citing *Love*, *supra*, at 1151-1153).

25

26

[8]These methods of investigation would, however, have been conducted at defendant's expense.

*Waller* arose in the context of a commercial general liability insurer's duty to defend a third-party action. *Id.* at 10. Because this case involves a first-party underinsured motorist claim, there is no question of the potential for coverage. As Judge Chiantelli stated in his award, "[t]here is no issue of underinsurance coverage in this case." (Award at 1.)

*Love*, on the other hand, did arise in the context of a first-party claim. *Love*, *supra*, at 1141-1142. However, the holding in *Love* was that plaintiff's claim was barred by the statute of limitations. *Id.* at 1143-1144. The Loves waited to file their bad faith action until "almost seven years after their claims were alleged to be wrongfully denied." *Id.* The remaining portion of the appellate court's opinion, including the citations relied on by defendant here, consists of a lengthy exegesis on whether or not the relationship between the insurer and the insured can be properly characterized as that of a true fiduciary.[9] *Id.* at 1144-1150. As indicated in the concurring opinion, this portion of the opinion is dicta. "The opinion's discussion regarding the extent to which the insurer is a 'true' fiduciary is well-written and certainly interesting in the abstract. Unfortunately, I find the discussion completely unnecessary to the result we reach." *Id.* at 1154 (Wiener, J. concurring). Plaintiff here has not alleged that defendant breached a duty of disclosure grounded in its role as a fiduciary.

Further, as this Court is well aware, under federal diversity jurisdiction, only the opinions of a state's Supreme Court are controlling on matters of state law. *See*, *e.g.*, *Wichita Royalty Co. v. City Nat. Bank of Wichita Falls*, 306 U.S. 103, 106 (1939) ("It was the duty of the federal court to apply the law of Texas as declared by its highest court." citing *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)). Given the California

---

[9]The final section of the *Love* opinion, cited once by defendant, simply concludes that where no policy benefits whatsoever are due to an insured, there can be no claim for bad faith based on a delay in the denial of the unmeritorious claim. *Id.* at 1151-1153. This unremarkable conclusion has no application here because the arbitrator determined that policy benefits were owed to plaintiff and awarded her in excess of the policy limits.

1  Supreme Court's recent holding in *Wilson*, *supra*, it is extremely unlikely that the Court

2  would follow the *dicta* in *Love* to insulate insurers from liability in the manner urged by

3  defendant here.

4  **VII.    PUNITIVE DAMAGES**

5  Summary judgment should also be denied on the issue of punitive damages. The

6  California Supreme Court has emphasized that punitive damages play an important

7  role in insurance bad faith claims in "recognition of insurers' underlying public

8  obligations and reflect an attempt to restore balance in the contractual relationship."

9  *Egan, supra.*, 24 Cal.3d at 820.

10  Civil Code section 3294 provides for the recovery of punitive damages where a

11  defendant has acted with "oppression, fraud, or malice." Civ. Code § 3294(a). A

12  corporation's liability for punitive damages extends to acts committed by "an officer,

13  director, or managing agent of the corporation." Civil Code § 3294(b). Punitive

14  damages are appropriate where a managing agent has ratified the bad acts giving rise

15  to liability. *See*, *e.g.*, *Weeks v. Baker & McKenzie*, 63 Cal.App.4th 1128, 1151

16  (Cal.App. 1998); *see also College Hospital, Inc. v. Superior Court*, 8 Cal.4th 704, 726

17  (Cal. 1994) ("For purposes of determining an employer's liability for punitive damages,

18  ratification generally occurs where, under the particular circumstances, the employer

19  demonstrates an intent to adopt or approve oppressive, fraudulent, or malicious

20  behavior by an employee in the performance of his job duties.")

21  Because a company's general policies and procedures are necessarily ratified at the

22  highest levels of management, malice may be established by a showing that

23  defendant's bad acts resulted from such company-wide policies and procedures, as

24  opposed to isolated and aberrant acts of negligence. *See*, *e.g.*, *Cruz v. Homebase*, 83

25  Cal.App.4th 160, 167 (Cal.App. 2000). Here, there is sufficient evidence for a jury to

26  find that defendant's bad faith denial of plaintiff's claim was a direct result of its

1    company-wide practices and procedures with respect to Colossus.

2    Defendant rigged its Colossus analysis at both the input and the output stage to

3    systematically undervalue its insureds' claims. (Corridan Decl. at ¶ 9(g).) First,

4    defendant had a policy and practice of failing to properly evaluate first-party claims by

5    inputting incomplete data into Colossus. Second, defendant set the settlement range

6    output by Colossus based solely on prelitigation settlements.

7    Further, defendant concealed the undervaluation of claims by Colossus from its own

8    adjusters. Mangone, however, did not input the data into Colossus himself. All data

9    entry for Colossus was done by the Colossus unit. Mangone never spoke with the

10   person in the Colossus unit who entered the data for plaintiff's claim. Thus, he had no

11   way of identifying the information in the claims file that was not considered by

12   Colossus.

13   Additionally, defendant appears not to have educated the claims-handing side of its

14   operation as to the basis for the settlement range output by Colossus. Michael

15   McKeever,[10] produced as defendant's Person Most Knowledgeable on "AMCO's

16   policies, procedures, and practices regarding utilizing Colossus to evaluate claims in

17   your California offices from 2002 through 2007," testified that "what Colossus used to

18   evaluate their general damage evaluations [was] Jury verdicts." (McKeever deposition

19   at 64:25-66:20.) Jason Wartach testified that he was personally involved in the "tuning"

20   process that set the settlement ranges for Colossus based on a "sample [of] 250 to

21   300 files" internal to Allied, the group of companies owned by defendant's parent

22   company. "Litigated files were not included in the tuning sample." (Wartach deposition

23   at 45:19-50:22.)

24   After reviewing plaintiff's medical documentation, Mangone set the reserves at

25   $15,000 – according to defendant, the amount it "probably will pay." (McKeever

26

---

[10]McKeever was Mangone's direct supervisor's direct supervisor.

1    deposition at 41:12-23.) Six months later, he received the Colossus report valuing

2    plaintiff's claim at zero. (Exh. A to Porter Decl. at 010101-010102). Even if Mangone

3    recognized that the Colossus valuation was unreasonably low, he would have been

4    incapable of reviewing the specific information ignored by Colossus to determine how

5    much value this information added to the claim. Also, he would not have known to

6    consult a compendium of average jury verdicts to supplement the results of the

7    Colossus report and provide a high-end estimate of the true value of plaintiff's claim.

8         On an even more general level, defendant failed to establish policies and

9    procedures for handing first-party claims that were different than its handling of third-

10   party claims in spite of the specific duties that an insurer owes to its own insured.

11   Liability is imposed for bad faith in a first-party claim based on the "special relationship"

12   between insurer and insured. *See*, *e.g.*, *Foley v. Interactive Data Corp.*, 47 Cal.3d 654,

13   684-685 (Cal. 1988) (citing *Egan*, *supra*, 24 Cal.3d at 820).

14        McKeever testified that defendant has "the same duties to third parties as we do the

15   first parties. . . . we call third parties our customers. . . . they are not treated differently."

16   McKeever testified that defendant "give[s] first parties the benefit of the doubt," but

17   also testified that defendant would give third parties the benefit of the doubt

18   "[d]epend[ing] on the facts of the case." (McKeever deposition at 59:23-61:1.)

19        Punitive damages may also be imposed when an insurer acts "in conscious

20   disregard of the rights of its insured." *Egan*, *supra*, 24 Cal.3d at 822 (quoting *Neal v.*

21   *Farmers Ins. Exchange*, 21 Cal.3d 910, 923 (Cal. 1978). Here, there is more than

22   sufficient evidence for a jury to find that defendant consciously disregarded plaintiff's

23   rights when it denied plaintiff's claim based on a woefully inadequate evaluation and

24   without any affirmative investigation. Moreover, after defendant denied plaintiff's claim

25   and plaintiff demanded arbitration, an entry in the claim file indicates that "Carl feels

26   we should make some kind of offer." Yet no offer was made. At the arbitration,

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT, AND CROSS-MOTION FOR CONTINUANCE PURSUANT TO FRCP 56(f)

21

1  defendant took the unsupportable position that plaintiff was at fault in the accident and

2  admitted that plaintiff's claim had some significant value – up to $20,000 – if she was

3  found not to have been at fault. (Rolph Decl. at ¶ 6.) Defendant's failure to make at

4  least some attempt to settle what it should have recognized as a valid claim constitutes

5  a conscious disregard of plaintiff's rights. (Corridan Decl. at ¶ 9(i) & (k).)

6      Punitive damages may also be imposed against an insurer where a "managing

7  agent" of the defendant is responsible for bad faith in the handling of the claim at

8  issue. *Egan, supra.*, 24 Cal.3d at 822-823; *see also Textron Fin'l Corp. v. National*

9  *Union Fire Ins. Co. Of Pittsburgh*, 118 Cal.App.4th 1061, 1081 (Cal.App. 2004).

10     A managing agent is an employee who "exercise[s] substantial discretionary

11  authority over significant aspects of a corporation's business." *White v. Ultramar, Inc.*,

12  21 Cal.4th 563, 576-577 (Cal. 1999).

13     Here, after plaintiff demanded arbitration, defendant referred her claim to its

14  litigation unit without making any settlement offer whatsoever. Kelly Bellinghausen

15  transferred plaintiff's claim to the litigation section, and Michael McKeever approved

16  and ratified the transfer. At this time, McKeever served as defendant's Field Claims

17  Director for all of California and Nevada. (McKeever deposition at 6:16-7:7.) There can

18  be no question that McKeever qualifies as a managing agent of defendant. . . . . . . . .

19  **VIII.   IF THE COURT IS INCLINED TO GRANT DEFENDANT'S MOTION ON THE**
20  **EVIDENCE PRESENTED, PLAINTIFF WOULD REQUEST A CONTINUANCE**
    **PURSUANT TO F.R.C.P. 56(f) TO ALLOW PLAINTIFF ADEQUATE TIME TO**
    **CONDUCT DISCOVERY.**

21     The Federal Rules of Civil Procedure authorize this Court to grant a continuance of

22  a defendant's motion for summary judgement to allow plaintiff to conduct discovery in

23  order to obtain evidence necessary to its opposition. F.R.C.P. 56(f).

24     This Court ordered the parties to comply with limited discovery for purposes of

25  defendant's motion for summary judgment. The Court set a period of ninety days for

26  the parties to conduct discovery. Each party was limited to a single deposition within

1  this period. Plaintiff was later granted leave of the Court to conduct a second

2  deposition, and a subsequent order was entered extending the time for discovery

3  through March 10, 2008 was stipulated to by the parties and signed by the Court.

4      This Court found that limited discovery was appropriate based on defendant's

5  proffered theory of its entitlement to summary judgment, which it claimed required no

6  discovery at all. Defendant has abandoned that theory in the motion now before the

7  Court, and instead relies on a more fact-intensive theory.

8      Plaintiff has been diligent in her efforts to complete all necessary discovery within

9  the time allowed by the Court's orders. The day this Opposition was filed, defendant

10  produced documents that it had previously withheld pending the entry of a stipulated

11  protective order. The Protective Order stipulated to by the parties was signed by

12  plaintiff's counsel on December 21, 2007, and entered by this Court on December 28,

13  2007. Plaintiff has not had time to review the documents belatedly produced by

14  defendant and incorporate them into her Opposition.

15      Most of the evidence needed to support plaintiff's allegations of bad faith is

16  necessarily in the exclusive possession of the defendant. The "allegations which assert

17  such a [bad faith] claim must show that the conduct of the defendant . . . demonstrates

18  a failure or refusal to discharge contractual responsibilities, prompted not by an honest

19  mistake, bad judgment or negligence but rather by a conscious and deliberate act,

20  which unfairly frustrates the agreed common purposes and disappoints the reasonable

21  expectations of the other party." *Chateau Chamberay Homeowners Assn. v.*

22  *Associated Internat. Ins. Co.*, 90 Cal.App.4th 335, 346 (Cal.App. 2001).

23      Jeffrey Mangone's claim file notes for February 20, 2003 state that "[t]he injury

24  appears to be of a serious enough nature and the surgery to repair the shoulder injury

25  is going to happen sooner or later, if the insured has not already had the operation. ¶ I

26  am increasing the UIM reserves to $15k, adjusting accordingly." At Mangone's

1  deposition, defendant instructed him not to answer questions about his decision-

2  making process in increasing the reserves.

3      The parties later agreed that defendant would produce a Person Most

4  Knowledgeable on the subject of how the reserves were set for plaintiff's claim and

5  defendant produced Michael McKeever. At Mr. McKeever's deposition he was unable

6  to say with any clarity what the basis had been for Mr. Mangone's increasing the

7  reserves on February 20, 2003. He had never spoken to Mr. Mangone about the issue,

8  and did not do so in preparation for his deposition.

9      On the day this Opposition was filed, defendant agreed to produce Mr. Mangone for

10  further questioning and allow him to testify regarding his setting of the reserves. This

11  further deposition of Mr. Mangone has, however, not yet taken place.

12      Information about how the reserves were set would demonstrate whether

13  defendant's estimate of its potential exposure was reasonable. Plaintiff would be able

14  to compare the information relied on by defendant in setting reserves for plaintiff's

15  claim with the best practices in the industry and determine whether, had it followed

16  such practices, defendant should have known that plaintiff's claim had significant

17  value. Further, because Mr. Mangone set the reserves for $15,000, plaintiff expects

18  that his testimony will reveal that he had reason to believe plaintiff's claim was viable,

19  in contrast to the Colossus report which valued plaintiff's claim at zero.

20      A Rule 56(f) should be granted where the moving party "specifically identifies []

21  relevant information, [and] where there is some basis for believing that the information

22  sought actually exists." *VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d

23  1472, 1475 (9th Cir. 1986). The motion should be denied only "where it [is] clear that

24  the evidence sought [is] almost certainly nonexistent or [is] the object of pure

25  speculation." *Id*.

26      Plaintiff requests that this Court grant a continuance until thirty-five days after the

1    parties jointly certify to the Court that all outstanding discovery has been completed.

2    Plaintiff also requests leave from the Court to amend its opposition to defendant's

3    motion for summary judgement based on the information obtained from defendant's

4    further production.

5    **IX.    CONCLUSION.**

6        For the foregoing reasons, defendant's Motion for Summary Judgment, or in the

7    Alternative, Partial Summary Judgment, should be denied in its entirety. Alternatively,

8    pursuant to Federal Rule of Civil Procedure 56(f), plaintiff Christine Dougherty requests

9    that this Court continue the hearing on Defendant AMCO Insurance Co.'s motion for

10   summary judgment currently set for April 28, 2008 until thirty-five days after defendant

11   demonstrates to the Court that it has complied with its outstanding obligations to

12   respond to plaintiff's discovery requests, or such other time as deemed appropriate by

13   the Court. If such a continuance is granted Plaintiff Christine Dougherty requests leave

14   to amend her opposition to Defendant AMCO Insurance Company's motion for

15   summary judgment.

16

17   Dated: April 7, 2008                    LAW OFFICES OF STEPHEN M. MURPHY

18                                           By: **/s/ Stephen M. Murphy**
                                             STEPHEN M. MURPHY
19                                           Attorney for Plaintiff

20

21

22

23

24

25

26

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT, AND CROSS-MOTION FOR CONTINUANCE PURSUANT TO FRCP 56(f)