LAW OFFICES OF STEPHEN M. MURPHY
STEPHEN M. MURPHY (SBN # 103768)
JEREMY A. GRAHAM (SBN # 234166)
180 Montgomery Street, Suite 940
San Francisco, CA 94104
Tel:   (415) 986-1338
Fax:  (415) 986-1231

LAW OFFICES OF DAVID M. PORTER
DAVID M. PORTER (SBN # 124500)
44 Montgomery Street, Suite 2500
San Francisco, CA 94104
Tel: (415) 982-8600
Fax: (415) 391-7808

Attorneys for Plaintiff
CHRISTINE DOUGHERTY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CHRISTINE DOUGHERTY, | ) | NO. C 07-01140 MHP |
| | ) | |
| Plaintiff, | ) | **DECLARATION OF DAVID M. PORTER** |
| | ) | **IN OPPOSITION TO MOTION FOR** |
| v. | ) | **SUMMARY JUDGMENT, OR IN THE** |
| | ) | **ALTERNATIVE, PARTIAL SUMMARY** |
| | ) | **JUDGMENT, AND IN SUPPORT OF** |
| AMCO INSURANCE COMPANY | ) | **CROSS-MOTION FOR CONTINUANCE** |
| and DOES ONE through TWENTY, | ) | **PURSUANT TO FRCP 56(f)** |
| Inclusive, | ) | |
| | ) | Date:   April 28, 2008 |
| Defendants. | ) | Time:   2:00 p.m. |
| | ) | Judge: Hon. Marilyn Hall Patel |
| _____ __ ) | | Dept.:  15 |

I, DAVID M. PORTER, do declare under penalty of perjury as follows:

1.    I am an attorney admitted to practice law in the State of California and in

the Northern District of California, and am one of the attorneys of record for the

Plaintiff in the above-referenced matter.

2.      I represented plaintiff in the underlying action against the underinsured motorist and in her claim for underinsured motorist coverage against defendant AMCO Insurance Company.  At no time prior to plaintiff's demand for arbitration in November, 2004 did defendant: (1) obtain plaintiff's medical records directly pursuant to a medical release form, (2) have a physician of its own review the medical records plaintiff had provided, (3) request that plaintiff be examined by a physician of its choosing, (4) take its own deposition of plaintiff's treating physicians, (5) take its own deposition of plaintiff.  Following plaintiff's demand for arbitration, defendant took the depositions of Plaintiff and the underinsured, negligent driver, Glenn Osmidoff.

3.      I was present at the arbitration hearing before the Honorable Alfred Chiantelli (retired) on January 26, 2006.  At the arbitration hearing, defendant did not present any evidence regarding Plaintiff's injuries or medical condition.  Rather, AMCO relied entirely on the treatment by and opinions of plaintiff's treating physicians.  I have also reviewed the letters and accompanying documentation supporting plaintiff's underinsured motorist claim which plaintiff's  counsel provided to defendant on February 4, 2003 and July 9, 2003.  The evidence reviewed by Judge Chiantelli at the arbitration was essentially the same as defendant had in its possession as of July of 2003.  The only difference was that Judge Chiantelli took live testimony from Dr. Sponzilli, by telephone, whereas AMCO had Dr. Sponzilli's deposition testimony from the Osmidoff case.  The substance of each were the same.

4.      At no time during the over three-year pendency of Plaintiff's underinsured motorist claim did Defendant AMCO ever make any offer to settle the claim between the notice of Plaintiff's underinsured motorist claim in January of 2003 and the payment of the arbitration award in March of 29, 2006.

5.      On Thursday, April 3, 2008, my co-counsel, Jeremy A. Graham, and I met and conferred with defense counsel Julian J. Pardini and Stephen J. Liberatore at

defense counsel's office pursuant to the direction of this Court.  During our meet and

confer session, defense counsel committed to produce the documents that defendant

had previously withheld in response to plaintiff's first document requests back in 2007.

Defense counsel withheld those documents pending Plaintiff's stipulation to a

Protective Order.  Plaintiff executed the Stipulated Protective Order on December 21,

2007, over 100 days ago. To date, defense counsel has not produced the previously

withheld documents. [NOTE: A package was delivered from defense counsel's office

to the office of my co-counsel, Stephen M. Murphy, at 4:45 p.m. on Monday, April 7,

2008, the deadline for filing Plaintiff's Opposition to Defendant's Motion For Summary

Judgment.  I will be unable to review the contents of that package before this

Declaration is filed.]

6.    Nor has defense counsel committed to produce a Person Most

Knowledgeable as to "all data relied upon by AMCO in setting reserves for Plaintiff's

claims."  AMCO originally produced Michael McKeever on this topic, but Mr. McKeever

did not have any personal knowledge on that issue.  I therefore requested of defense

counsel that AMCO produce Jeffrey Mangone again and allow him to answer further

questions about his reasoning in setting the reserves for plaintiff's underinsured

motorist claim.  It is clear that Mr. Mangone's knowledge on that issue is superior to

Mr. McKeever's.  At Mr. Mangone's previous deposition, defense counsel instructed

him not to answer any questions on this issue.  Now that AMCO has produced the

reserves information pursuant to the Court's Order, Plaintiff should be able to resume

its examination of Mr. Mangone.  At the time of this writing, defense counsel has not

responded as to whether he will produce Mr. Mangone for further questioning or not.

7.    Finally, I requested that defense counsel provide an unredacted copy of

a document which he had previously redacted to delete information related to AMCO's

subrogation claim against Mr. Osmidoff.  I have heard nothing back from Mr. Pardini as

1  to whether he will produce the unredacted document.

2      8.      Attached as Exhibit A is a true and correct copy of excerpts from the

3  notes defendant entered into its file for plaintiff's claim utilizing its Passport system.

4  The Passport notes attached hereto were produced to by defendant as documents

5  Bates Stamped Nos. 010082 through 010124 in response to this Court's Order

6  directing defendant to produce documents evidencing and reflecting the reserves that

7  defendant set for plaintiff's underinsured motorist claim.  The same Passport notes

8  had been previously produced by defendant as documents Bates Stamped Nos.

9  010082 through 010123 with the reserve information redacted.

10      9.      Attached as Exhibit B is a true and correct copy of excerpts from the

11  transcript of the deposition of Jeffrey Mangone taken by plaintiff's counsel in this

12  matter on October 8, 2007.  Exhibit 1 to Mangone's deposition consisted of the

13  redacted Passport notes produced by defendant as documents Bates Stamped Nos.

14  010082 through 010123 and referred to in Paragraph No. 8, above.

15      10.      Attached as Exhibit X to the Declaration of defense counsel Julian J.

16  Pardini in support of AMCO's Motion for Summary Judgment is a true and correct copy

17  of Exhibit 3 to the deposition of Jeffrey Mangone, taken in this matter on October 8,

18  2007 (correspondence from Plaintiff's counsel, Stephen M. Murphy, to Defendant

19  AMCO dated February 4, 2003).

20      11.      Attached as Exhibit C to the Declaration of Jeffrey Mangone in support

21  of AMCO's Motion for Summary Judgment is a true and correct copy of Exhibit 5 to the

22  deposition of Jeffrey Mangone, taken on October 8, 2007 (correspondence from

23  Plaintiff's counsel, Stephen M. Murphy, to Defendant AMCO dated July 9, 2003).

24      12.      Attached hereto as Exhibit C is a true and correct copy of Exhibit 6 to the

25  deposition of Jeffrey Mangone, taken in this matter on October 8, 2007

26  (correspondence from AMCO's adjuster, Jeffrey Mangone, to Plaintiff's counsel,

1    Stephen M. Murphy, dated July 29, 2003).

2        13.    Attached as Exhibit D is a true and correct copy of excerpts from the

3    transcript of the deposition of Jason Wartach taken by plaintiff's counsel in this matter

4    on March 4, 2008 and Exhibits thereto.

5        14.    Attached as Exhibit E is a true and correct copy of excerpts from the

6    transcript of the deposition of Michael McKeever taken by plaintiff's counsel in this

7    matter on March 6, 2008 and Exhibits thereto.

8        I make this declaration of my own personal knowledge.  I declare under penalty

9    of perjury under the laws of the United States of America and the State of California

10   that the foregoing is true and correct.

11       Executed this 7th day of April, 2008 at San Francisco, California.

12

13                                        _____/s/ David M. Porter_____
                                          DAVID M. PORTER
14

15

16

17

18

19

20

21

22

23

24

25

26

## ATTESTATION PURSUANT TO GENERAL ORDER 45

I, STEPHEN M. MURPHY, hereby declare as follows:

I am one of the attorneys of record for Plaintiff Christine Dougherty in this action and am duly licensed to practice law in the State of California and in the U.S. District Court for the Northern District of California.

I hereby attest that concurrence from attorney and declarant David M. Porter has been obtained in the filing of this Letter Brief.

I declare under the penalty of perjury under the laws of the Untied States of America that the foregoing is true and correct and, if called as a witness, I could testify competently thereto.

Executed at San Francisco, California, this 7th day of April, 2008.

_____/s/ Stephen M. Murphy_____
STEPHEN M. MURPHY

```
         * * * * * * *   FOLLOWING IS TO CONFIRM AC31 FAX/EMAIL SENT * * * *

            THIS SYSM FAX HAS BEEN SENT TO ADP. TO ADJUSTER 0067884ESH020.
 04-19-01 INSTRUCTIONS TO:SCOTT HARTER            FROM:HOFFMAN, STEVE    8:42AM
 P

            FULL INVESTIGATION
 MODEL/YEAR/V                                     X ID VEHICLE MAKE

            RESPONSIBLE FOR CONTACT
 EST                                             X COMPLETE ITEMIZED REPAIR

            MEDICAL INFO EACH CLAIMANT            X AGREED PRICE/PRIOR
 DAMAGE/

            DEATH CERTIFICATE
            CHECK FOR OTHER INSURANCE             X BOOK VALUE/MARKET SURVEY
 SPECIAL INSTRUCTIONS:                            X INSURED AUTO 002
 PLEASE INSPECT VEHICLE PER ASSIGNMENT REQUEST
 FROM THE INSIDE CASUALTY CLAIM REP.
```

04-23-01  6:27P CST ENTERED BY ESH020            HARTER, SCOTT
VEHICLE INSPECTED 4-19-01 WITH INSD. WORKED UP EST FOR DMG FOR VISUAL
DAMAGE, FOR $7525.00 VEH IS TOTAL LOSS. I CALLED INSD AND MADE OFFER
A

S PER ADP AUTOSOURCE $6780.00 PLUS TAX ETC. SHE  PROBABLY GOING THRU
ADVERSE CARRIER.
         * * * * * * * *   FOLLOWING IS TO CONFIRM AC31 FAX/EMAIL SENT * * * *

04-23-01 INSTRUCTIONS TO:MANGONJ
N                                                FROM:HARTER, SCOTT    6:43PM

         SPECIAL INSTRUCTIONS:
         BE ADVISED THAT OFFER WAS MADE TO INSD FOR ACP PER ADP $6780.00
         PLUS TAX ETC. SHE PROBABLY GOING THRU ADV CARRIER. PLEASE ADVISE HER
         INTENTIONS AFTER SPEAKING TO HER.

04-24-01 10:58A CST ENTERED BY EJM064            MANGONE, JEFFREY
         THE INSD SENT A POLICE REPORT VIA FAX...

         THE CLMT PULLED INTO THE INTERSECTION WELL AFTER THE INSD HAD
         ADVANCED FROM HER STOP SIGN. THE WITNESS REPORTED TO THE
         POLICE THE CLMT WAS NOT LOOKING FORWARD WHEN HE PULLED INTO THE
         INTERSECTION. THE INSD WAS ALMOST THROUGH THE INTERSECTION
         AT THE POINT OF THE IMPACT.

         CALLED FOR CLMT AGAIN - HE INDICATED I SHOULD DEAL WITH HIS CARRIER
         RATHER THAN HIM REGARDINGTHE ACCIDENT.

         MESSAGE LEFT FOR THE INSD RE: USAA AND IF THEY ARE HANDLING HER
         CLAIM.

04-25-01  6:22P CST ENTERED BY EJM064            MANGONE, JEFFREY
         CALL FROM USAA - THEY ARE ACCEPTING LIABILITY.

         WILL HANDE THE INSD'S CLAIMS.

04-25-01  6:24P CST ENTERED BY EJM064            MANGONE, JEFFREY
         ADVISED THE INSURED. SHE WILL VERIFY WITH USAA, AND ADVISE.

04-30-01  6:21P CST ENTERED BY EJM064            MANGONE, JEFFREY
         INSD VERIFEID USAA HAS EXTENDED COVERAGE - PAYING FOR RENTAL,
REPAIRS,
         ETC.

05-03-01  7:30P CST ENTERED BY EJM064            MANGONE, JEFFREY

FAR BELOW THE REASONABLE VALUE OF THIS CLM, THEREFORE, AMCO RIGHTS OF
REIMBURSMNT ARE NOT IMPLICATED AND AMCO IS ENTITLED TO NO REIMBRSMNT.
HE GOES ON TO SAY INSD WILL BE MAKING A UIMBI CLM/JKN

02-20-03   7:30A CST ENTERED BY EJM064              MANGONE, JEFFREY
A LTR WAS SENT TO ATTY 1/9/03 REQUESTING DOCS - SETTLEMENT DOCS,
RELEASE, ETC.

THE ATTY RESPOONDED WITH THE FOLLOWING:

COPY OF THE COMPLAINT, DOUGHERTY V. OSMIDOFF
COPY OF THE RELEASE
COPY OF OSMIDOFF USAA DEC SHEET, $30K BI LIMIT
COPY OF THE DEPO OF DR. SPONZILLI, MD (INSD'S MD)
COPY OF THE INSD'S DEPO

PENDING:

INJURY DOCS FOR EVAL

THE REPORTS WE HAVE INDICATE THE INSD SUSTAINED A TORN ROTATOR CUFF
AND C5-6 DISC HERNIATION AS A RESULT OF THE ACCIDENT.

THERE WAS A PRIOR INJURY IN 1999 INVOLVING HER THORACIC SPINE. THE
INJURY FROM THIS ACCIDENT INVOLVES HER NECK AND SHOULDER.

I ACK THE ATTY'S MATERIAL AND REQUESTED THE MEDS AND REMAINING DOCS
ASAP FOR EVAL.

02-20-03   7:44A CST ENTERED BY EJM064              MANGONE, JEFFREY
THE DEPO AND PRESENT RECORDS DO NOT MENTION OR
INDICATE SURGICAL INTERVENTION FOR THE INJURIES, RATHER
"AGGRESSIVE, NON-SURGICAL CARE."

THE INSD HAS HAD PROTRACTED PHYSICAL THERAPY, ACCUPUNCTURE,
AND OTHER NON-SURGICAL PROTOCOLS (NOT SPECIFIED).

THE INJURY APPEARS TO BE OF A SERIOUS ENOUGH NATURE AND THE
SURGERY TO REPAIR THE SHOULDER INJURY IS GOING TO HAPPEN
SOONER OR LATER, IF THE INSD HAS NOT ALREADY HAD THE OPERATION.

I AM INCREASEING THE UIM RESERVES TO $15K, ADJUSTING ACCORDINGLY.

WE MAY NEED TO ADJUST THIS AFTER TEH REST OF THE DOCS ARE IN.

02-28-03  10:02A CST         UPLOADED NOTES FROM COLLECT1
02\27\03 ENTRY  BY EJN005              NICKELL, JULIE
UIMBI RESERVES ARE SET/JKN

03-20-03   7:29P CST ENTERED BY EJM064              MANGONE, JEFFREY
SENT A NOTE TO THE INSD'S ATTY FOR THE INSD'S INJURY DOCS.

BILLS AND RECORDS FOR ALL OF HER CARE.

04-02-03   1:12P CST ENTERED BY EKB004              KELLY BELLINGHAUSEN
*****FILE REVIEW*****
UIM CLAIM. INSURED WAS MAKING A LEFT TURN WITH CONTROL OF THE
INTERSECTION WHEN THE OTHER PARTY ENTERED THE INTERSECTION AND
STRUCK INSURED. INSURED ALLEGES TO HAVE SUSTAINDED A RIGHT
ROTATER CUFF TEAR AND DISC PROTRUSIONS/HERNIATIONS AT C5-6
AND C6-7.

REVIEWING THE MEDS FOR SUMMARY.

08-13-03 10:36A CST ENTERED BY EJM064             MANGONE, JEFFREY
THIS IS A CASE OF CLEAR LIABILITY ON THE PART OF THE CLMNT DRIVER.

THE CLMNT, FAILED TO YIELD FOR THE INSD AT A STOP SIGN.

THE IMPACT TO THE IV WAS SIGNIFICANT, CAUSING ~$7,000 IN DAMAGES TO THE IV. THE CLMNT'S CARRIER PAID THE INSD'S PD 100%.

FOLLOWING THE ACCIDENT, THE INSD CALLED FOR AN APPOINTMENT FOR AN EXAM, AND WAS ABLE TO SCHEDULE ONE FOR THE 24TH - ONE WEEK FOLLOWING THE ACCIDENT.

THE INITIAL EXAM REPORTS THE INSD HAD NO PRIOR HISTORY FOR THE COMPLAINTS REPORTED - RADIATING NECK PAIN.

THERE WAS A MENTION OF A PRIOR ROTATOR CUFF INJURY, OVER 10 YEARS OLD, AND THE INSD HAD RECOVERED FROM THIS INJURY.

THERE IS A LSO A HISTORY OF A THORACIC COMPRESSION IN 1999.

THE PHYSICIAN NOTED RESTRICTED ROM, WITH PAIN.

ASSESSMENT - QUESTION OF CERVICAL DISK HERNIATION, CERVICAL SOFT TISSUE STRAIN, RT ROTATOR CUFF STRAIN.

NOTED - INSD WAS PREGNANT, THEREFORE, NO RADIOGRAPHIC STUDIES PERFORMED.

THE INSD WAS GIVEN AN RX FOR MILD PAIN MEDS AND ADVISED TO REST.

THE PRGNANCY IS THE KEY FACTOR FOR THE INSD'S DELAYED CARE.

HER INJURY COULD NOT BE PROPERLY DX'D UNTIL AFTER THE BABY WAS DELIVERED.

08-13-03 10:53A CST ENTERED BY EJM064             MANGONE, JEFFREY
THE INSD'S ACCOUNT AND REPORT OF HER INJURIES ARE CONSISTANT WITH HER DOCTOR'S FINDINGS.

FROM 4/24/01, THE INSD HAD A FOLLOW UP EXAM AT MT. TAM ORTHO - DR. ERNEST SPONZILLI - FOR ACUTE NECK PAIN - 6/4/01.

IN THE INTERIM, THE INSD HAD 5 PT SESSIONS, WHICH INCLUDED STABILIZATION EXERCISES.

SHE CONTINUED THE USE OF TYLENOL FOR PAIN (SPORADICALLY), AND CONTINUED USE OF A CERVICAL TRACTION COLLAR.

ASSESSMENT ON 6/4/01 - PROBABLE CERVICAL DISK HERNIATION AND RADICULAR PAIN.

THE INSD'S CARE WAS CONSERVATIVE GIVEN THE PREGNANCY (10 WEEKS, AT THAT TIME).

FROM THIS POINT, DR. SPONZILLI RX'D 8 ACUPUNCTURE TX'S.

FOLLOW UP 7/9/01 - SEEN BY A PA AT MT. TAM ORTHO...

ACUPUNCTURE EXTENDED 6 MORE VISITS.

04/19/02 EXAM - THE INSD HAD BEEN UNABLE TO ATTEND HER PT DUE TO
THE ARRIVAL OF HER NEWBORN.

THE CONSERVATIVE CARE CONTINUED.

DR SPONZILLI RX'D ANOTHER 8 TO 12 ACUPUCNTURE SESSIONS.

4/26/02 EXAM - CHRONIC SHOULDER AND NECK PAIN CONTINUING.
EXAM BY RN - NOTED NUMBNESSA ND TINGLING IN INSD'S
RT ARM.

5/07/02 EXAM - SOME MODERATE IMPROVEMENT NOTED, HOWEVER, PAIN IS
REPORTED AS CONSTANT.

DX'D HERNIATED DISKS, RT SHOULDER CUFF TEAR.

5/28/02 EXAM - DECREASE IN PAIN AND INCREASED ROM. CONTINUING
ACUPUNCTURE.

08-13-03 11:32A CST ENTERED BY EJM064          MANGONE, JEFFREY
6/7/02 EXAM - DR SPONZILLI REPORTS INSD WANTS TO CONTINUE
WITH NONINTERVENTIONAL CARE - NO SURGERY.

NO MAJOR CAHNGES IN SYMPTOMS OR CONDITION.

HOEVER - IN THE INSD'S 6/4 AND 6/6/02 EXAMAS, THE RN NOTED NECK
SYMPTOMS IMPROVING 45% WITH SOME CONTINUING DISCOMFORT.

ON 6/11/02 THE RN DOCUMETED CONTINUED INMPROVEMENT WITH ACUPUNCTURE
TREATEMNTS - SHOULDER REPSONDING SLOWER THAN HER NECK.

FROM 6/13 THROUGH 7/9/02, THE RN NOTES INDICATE CONTINUING IMPROVE-
MENT WITH ACUPUNCTURE SESSIONS,
RESIDUAL PAIN CONTINUES.

THE NOVATO BACK CARE (PT) REPORTS 10 VISITS BY THE INSD WITH LITTLE
OR NO CHANGE IN SYMPTOMS.

THE INSD NEVER HAD SURGICAL INTERVENTION, ALTHOUGH IT APPEARS
DR. SPONZILLI MENTIONED THIS TO HER ON A NUMBER OF OCCASIONS.

THERE IS NO INDICATION IN THE RECORDS, HOWEVER, THE SURGERIES
ARE INEVITABLE.

THE INSD HAS DISCONTINUED CARE. HOWEVER, SHE IS STILL EXPERIENCING
CHRONIC PAIN SYMPTOMS IN HER NECK AND SHOULDER.

NO INDICATION OF FUTURE CARE.

08-13-03 11:45A CST ENTERED BY EJM064          MANGONE, JEFFREY
SPECIALS....

$...1,856.00 - MT TAM ORTHO
......970.87 - MARIN IMAGING
......350.00 - NOVATO ACUPUNCTURE CLINIC
....1,025.00 - NOVATO BACK CARE (PT)

$...4,201.87 - TOTAL

010100

NOTED - IN DR SPONZILLI'S DEPOSITION, HE MENTIONS INJECTIONS FOR THE
SHOULDER PAIN, ALONG WITH ARTHROSCOPIC REPAIR OF THE SHOULDER.

THESE PROCEDURES WERE MENTIONED AS AN ALTERNATIVE TO THE AGGRESSIVE
CONSERVATIVE CARE HE RX'D FOR THE INSD.

HOWEVER, THE DOCTOR DID NOT INDICATE THE INSD WOULD EVENTUALLY
REQUIRE EITHER OF THESE PROCEDURES, VERIFYING SHE WOULD
CONTINUE TO EXPERIENCE SOME PAIN AND DISCOMFORT, DEPENDING ON
HER LEVEL OF ACTIVITY.

08-13-03  11:46A CST ENTERED BY EJM064                MANGONE, JEFFREY
BASED UPON THIS SUMMARY, I THINK THE RESERVES REMAIN ADEQUATE.

    * * * * * * * *  FOLLOWING IS TO CONFIRM AC31 FAX/EMAIL SENT * * * *

08-13-03  INSTRUCTIONS TO:COLO1                  FROM:MANGONE, JEFFREY    11:48AM
N

SPECIAL INSTRUCTIONS:
ADJ SHORTNAME: MANGONJ
CLAIMANT NO: 002 - RAYBURN
COMP NEG:  O %
SEAT BELT STATUS: YES
MEDS INCURRED:$4,201.87
MEDS ADJUSTMENT:$30,000 - PRIOR SETTLEMENT THIS IS A UIM CASE
WAGE LOSS:$0
CLAIMANT ATTY: (Y/N)Y
LOW IMPACT LOSS: (Y/N) N CAPTION REPORT IN FILE: (Y/N)Y
08-16-03  2:23P CST ENTERED BY EJM064                 MANGONE, JEFFREY
EXT TLR TO ATTY ADVISING THE EVAL PROCESS IS UNDERWAY.

    * * * * * * * *  FOLLOWING IS TO CONFIRM AC31 FAX/EMAIL SENT * * * *

08-20-03  INSTRUCTIONS TO:DUARTER                FROM:RENFRO, KIMBERLY    4:27PM
N

SPECIAL INSTRUCTIONS:
AFTER REVIEW OF FILE ON CLMNT 01/JUDIEANN, I WAS UNABLE TO LOCATE IN
AWD THE MEDICAL RECORDS FROM LAKEWOOD ORTHO. WE HAVE BILLS IN AWD
THAT
CLMNT WAS SEEN ON 12/6/02 AND 1/6/03, BUT WE NEED THE COMPLETE
MEDICAL
RECORDS/EXAM/SOAP NOTES FROM THE PHYSICIAN TO HAVE A ACCURATE
CONSULT.
ONCE YOU HAVE OBTAINED THESE RECORDS AND THEY ARE IN AWD, PLS
RESUBMIT
YOUR REQUEST FOR CONSULT. IF YOU HAVE ANY FURTHER QUESTIONS PLS FEEL
FREE TO CONTACT ME AT 916-920-7591. THANKS

    * * * * * * * *  FOLLOWING IS TO CONFIRM AC31 FAX/EMAIL SENT * * * *

08-21-03  INSTRUCTIONS TO:MANGONJ                FROM:JO ANN RILEY      2:48PM
N

SPECIAL INSTRUCTIONS:
THIS IS TO ADVISE YOU THE CONSULT IS COMPLETED.

08-22-03  8:10A CST ENTERED BY EJM064              MANGONE, JEFFREY
THE CONSULT...

RANGE IS ROUGHLY EQUAL TO BUT LESS THAN THE UNDERLYING
BI SETTLEMENT.

I REVIEWED THE MED RECORDS, THE INSD'S DEPOSITION (LOCATED IN THE AWD FILE UNDER "BI SETTLEMENT DOCS/POLICY"), AND DR. SPONZILLI'S DEPOSITION (SAME LOCATION AS INSD'S).

THERE IS SOME DISCUSSION OF LOSS OF EARNINGS, BUT ONLY DURING THE INSD'S DEPOSITION.
THE ATTY FOR THE INSD DOES NOT MENTION A CLAIM FOR WAGE LOSS.

THE KEY FACTOR IN THE EVALUATION APPEARS TO BE WHETHER OR NOT THE INSD IS GOING TO OPT FOR SURGICAL REPAIR OF THE DISC HERNIATIONS AND THE SHOULDER INJURY.

WE ARE 28 MONTHS POST ACCIDENT, AND THE INSD HAS NOT OPTED FOR A SURGICAL PROCEDURE.
IT IS NOT CLEAR IF SHE IS CONTINUING WITH ACCUPUNTURE THERAPY, MEDS, OR PT.

THERE IS NO INDICATION FROM HER ORTHO THE INJURIES HAVE CAUSED ANY PERMANENT IMPAIRMENT, HOWEVER, THE ATTY REPORTS THE INSD IS CONTINUING TO EXPERIENCE, ON AN APPARENT REGULAR BASIS, NECK AND SHOULDER ACHES, PAIN, AND STIFFNESS.

THERE IS SOME DOCUMENTATION CONCERNING A TEMPORARY DISABILITY FOR THE YEAR FOLLOWING THE ACCIDENT, BUT, THE INSD ALSO HAD HER BABY DURING THIS PERIOD.

IT IS NOT UNREASONABLE TO EXPECT CONTINUING PAIN FROM THE ACCIDENT INJURIES.
HOWEVER, THE INSD'S DECISION FOR FUTURE CARE, GIVEN THE APPARENT SERIOUS NATURE OF THE INJURIES, IS TO CONTINUE WITH CONSERVATIVE MEASURES - ALTHOUGH THESE MEASURES OR THE CURRENT TREATMENT PROTOCOL IS NOT DESCRIBED.

08-22-03  8:11A CST ENTERED BY EJM064          MANGONE, JEFFREY
LETTER TO THE ATTY ADVISING HIM THE EVALUATION IS COMPLETE, BUT, WE NEED ADDITIONAL INFORMATION TO ESTABLISH THE COURSE OF THE INSD'S FUTURE CARE AND DOCUMENTS FOR HER WAGE LOSS FROM THE INJURIES.

08-28-03  6:39P CST ENTERED BY EJM064          MANGONE, JEFFREY
ATTY CALLED IN RESPONSE TO THE LETTER I SENT REQUESTING THE ADDITIONAL INFORMATION FOR THE INSD'S CASE.

THERE ARE NO LOSS OF EARNINGS.

THE SURGERY IS SOMETHING THE INSD IS CHOOSING NOT TO DO.

I ASKED THE ATTY IF HE HAD SOMETHING FROM DR. SPONZILLI RE: THE MEDICAL NECESSITY OF THE SURGERY.
ATTY WILL QUESTION DR. SPONZILLI ABOUT THIS AND ADVISE.

IF THE SURGERY IS A MEDICAL NECESSITY, AND TEH INSD CHOOSES NOT TO HAVE THE SURGERY, WE CAN PUT MORE MONEY ON THE EVALUATION OF HER GENERAL DAMAGES TO MOVE THE SETTLEMENT RANGE ABOVE THE $30,000.00 RANGE.

09-03-03  8:21A CST ENTERED BY EJM064          MANGONE, JEFFREY
· PENDING - ADDITIONAL MED DOCS FROM THE ATTY FIOR THE INSD.

09-10-03 10:32A CST          UPLOADED NOTES FROM COLLECT1

06-11-04  7:01P CST ENTERED BY EJM064              MANGONE, JEFFREY
          NOTHING FROM THE ATTY.

          OUR PREVIOUS EVAL INDICATED NO UIM CLAIM.

          NTOE TO ATTY FOR MATERIAL OR WE WILL HAVE TO GO BY OUR
          ORIGINAL EVAL.

          * * *  FOLLOWING IS TO CONFIRM AC30 CORRESPONDENCE TRANSACTION  * * *
06-11-04  7:06P  ORDERED BY EJM064                 MANGONE, JEFFREY
          FORM#:923C       ED DATE:1099  30 LINE BLANK MEMO - CLAIMS
          SENT TO: MR. STEPHEN MURPHY  ESQ.        180 MONTGOMERY STE. 940
                   SAN FRANCISCO CA 94104

06-17-04  5:42P CST ENTERED BY EJM064              MANGONE, JEFFREY
          RECEIVED A LETTER FROM INSD'S PHC REQUESTING REIMBURSEMENT
          FOR THEIR MED PAYMENTS.

          LETTER TO RAWLINGS RE: INSD'S EXCESS MED PAY.

          SNET A COPTY OF THE ENDORSEMENT, ALSO.

06-29-04  8:34A CST          UPLOADED NOTES FROM COLLECT1
          06\26\04 ENTRY  BY ECM020              MORSE,CHERIE

06-29-04  8:34A CST          UPLOADED NOTES FROM COLLECT1
          06\26\04 ENTRY  BY ECM020              MORSE,CHERIE

07-20-04  8:32A CST          UPLOADED NOTES FROM COLLECT1
          07\19\04 ENTRY  BY
          SUPERVISOR REVIEW FILE

07-20-04  8:32A CST          UPLOADED NOTES FROM COLLECT1
          07\19\04 ENTRY  BY

07-20-04  8:32A CST          UPLOADED NOTES FROM COLLECT1
          07\19\04 ENTRY  BY
          CLOSED BY SUPERVISOR

09-28-04  2:21P CST ENTERED BY EJM064              MANGONE, JEFFREY
          REVIEWED CLAIM AFTER EXTENDED MED LEAVE.

          THERE HAS BEEN NO REPSONSE TO THE ATTY FOR THE ADDITIONAL INFORMATION
          ON THE INSD'S CARE AND FUTURE CARE.

          THE EVAL FOR THE INJURY DID NOT INDICATE A UIM EXPOSURE, AND THE ATTY
          WAS ADVISED OF THIS.

          THE EVAL RANGE IS $ 26522 - $ 32102. SETTLEMENT WAS MADE FROM
          USAA AT $30,000, THE EXTENT OF THE LIMITS FOR THE CLMNT'S
          POLICY.

          THERE IS A POTENTIAL FOR UIM WITH AN EXPOSURE, BASED UPON THE
          EVAL OF $2,102, THE HIGH END OF THE RANGE.

          THE ATTY'S DEMAND IS AT $45,000.

          LTR TO ATTY, ADVISING HIM WE ARE CLOSING OUR FILE, DUE TO INACTIVITY

AND NO ADDITIONAL INFORMATION INDICATING A CLAIM VALUE GREATER
THAN THE SETTLEMENT MADE WITH USAA.
* * * FOLLOWING IS TO CONFIRM AC30 CORRESPONDENCE TRANSACTION * * *
09-28-04  2:27P  ORDERED BY EJM064                 MANGONE, JEFFREY
    FORM#:923C          ED DATE:1099  30 LINE BLANK MEMO - CLAIMS
    SENT TO: MR. STEPHEN MURPHY  ESQ.        180 MONTGOMERY STE. 940
             SAN FRANCISCO CA 94104

11-05-04 10:57A CST ENTERED BY EJM064              MANGONE, JEFFREY
    ATTY HAS SENT A DEMAND FOR ARBITRATION.

    THE DISPUTE ARISIES FROM THE EVALUATION OF THE INSD'S UIM CLAIM.

    OUR EVAL DOES NOT INDICATE A UIM CLAIM IS PRESENT, AND ATTY WAS
    ADVISED OF THIS NOVEMBER 26, 2003.

11-05-04 11:07A CST ENTERED BY EJM064              MANGONE, JEFFREY
    CALLED FOR THE ATTY RE: A DEMAND AMOUNT.

    THE ATTY IS OUT OF THE OFFICE UNTIL MONDAY, 11/8.

    REFER TO LIT.

    TRANSFER TO LITIGATION
    -----------------------

    NAME OF PERSON SERVED:***DEMAND FOR UIM ARBITRATION

    IF SERVICE BY MAIL, WAS ACK SIGNED AND RETURNED ?

    LOSS FACTS:
    CLMNT FAILED TO YIELD RIGHT OF WAY, HIT IV.

    LIABILITY:    CLEAR XXXXXX          DISPUTED  _____

    DAMAGES:      MEDICAL $ 4201.87     WAGE: $ 00.00

    LAST DEMAND: NONE                   LAST OFFER: DENIED

    REASON FOR SUIT/COMMENTS:

    OUR EVAL OF THE INJURY DOES NOT INDICTE AN UIM CLAIM.


    =========================

11-05-04  5:20P CST ENTERED BY EJM064              MANGONE, JEFFREY
    SPOKE WITH MANAGER RE: MEDIATION.

    ONCE ATTY CALLS BACK I WILL MENTION THIS OPTION TO
    HIM AND PRESS FOR THE MEDIATION.

11-05-04  5:48P CST ENTERED BY EKB004              KELLY BELLINGHAUSEN
    *****REVIEWED*****
    OTHER PARTY FAILED TO YIELD RIGHT-OF-WAY TO INSURED AND STRUCK
    HER. CLAIMANT VEHICLE 1992 FORD F150 P/UP; INSURED VEHICLE
    1969 PORSCHE 912 WITH RIGHT REAR DAMAGES AMOUNTING TO APPROX
    $7000 WHICH WAS PAID BY THE OTHER CARRIER.  .

    INSURED DID NOT START EXPERIENCING PAIN UNTIL A FEWS FOLLOWING THE

ACCIDENT. INITIAL COMPLAINTS WERE OF SEVERE NECK STIFFNESS WITH
PAIN RADIATING DOWN INTO HER RIGHT ARM. SHE WAS IN EARLY STAGES OF
PREGNANCY SO X-RAYS WERE NOT TAKEN. SHE TOOK TYLENOL AND UNDERWENT
PT AND ACCUPUNCTURE UNTIL THE BIRTH OF HER CHILD IN DECEMBER 2001.
SHE THEN HAD AN MRI ORDERED BY ORTHO WHICH REVEALED MILD HERNIATIONS
AT C5-6 AND C6-7 AS WELL AS RIGHT ROTATER CUFF TEAR. SURGERY WAS
OFFERED AS AN OPTION BUT CLAIMANT CHOSE TO UNDERGO CONSERVATIVE
CARE AND CONTINUED WITH PT. RADIATING PAIN EVENTUALLY RESOLVED.
CLAIMANT CONTINUES TO HAVE PERIODIC HEADACHES AND NECK PAIN.

INSURED IS A 43 YR OLD WOMAN WITH HISTORY OF RT ROTATER CUFF TEAR
10 YRS PRE-ACCIDENT WHICH OCCURRED WHILE SHE WAS A SOFTBALL
PITCHING COACH. THE TEAR EVENTUALLY HEALED ON ITS OWN.

MY CONCERN RE: THE ROTATER CUFF TEAR IS THAT THE MRI DOES NOT
DETECT THE OLD TEAR. IT IS POSSIBLE THAT THE TEAR DETECTED
WAS ACTUALLY THE OLD TEAR (?)

NO WAGE LOSS.
MEDS TOTAL $4201.

CLAIMANT CARRIER PAID THEIR LIMITS OF $30,000. THEY ARE SEEKING
$45,000 UNDER THIS POLICY.

DISCUSSED WITH JEFF AND REQUESTED THAT HE CONTACT ATTY TO DISCUSS
POSSIBLE MEDIATION.

IT IS INTERESTING THAT IN ATTY'S ARB DEMAND, THE PROCESS HE
DESCRIBES IS THE APPRAISAL CLAUSE OF THE PHYSICAL DAMAGE
COVERAGE RATHER THAN THE UM ARB PROCESS.

11-05-04  5:48P CST ENTERED BY EKB004                   KELLY BELLINGHAUSEN
          WILL FOLLOW-UP ON MONDAY AND DISCUSS REFERRAL WITH DIRECTOR
          MIKE MCKEEVER IS NECESSARY.

11-09-04 12:47P CST ENTERED BY EKB004                   KELLY BELLINGHAUSEN
          DISCUSSED LOSS WITH DIRECTOR MIKE MCKEEVER. AUTHORITY TO
          REFER TO LITIGATION FOR FURTHER HANDLING. DID SO NOW.

          * * * * * *  FOLLOWING IS TO CONFIRM AC02 CLAIM REP UPDATE  * * * * *
11-09-04  4:02P CST ENTERED BY ESP005               POULSON, STEVE
CR

          REP POSITION 1 CHANGED FROM REP NO 87502 JEFF MANGONE 707-769-1542
                                     TO REP NO 85106 LINDA
HOWARD800-552-2437/X628
          REP NO 83816 SCOTT HARTER 707-765-6773         DELETED FROM REP POSITION
2
          REP NO 72109 TIM KALVIG 14-3260                DELETED FROM REP POSITION
3

11-09-04  4:19P CST ENTERED BY ESP005               POULSON, STEVE
          LINDA, HERE'S A DEMAND FOR UNDERINSURED MOTORIST ARBITRATION IN MARIN
          COUNTY FOR YOU TO HANDLE.

          INSURED HAD STOPPED AT STOP SIGN AT FOUR WAY STOP INTERSECTION.
          INSURED PULLED INTO THE INTERSECTION AND WAS IN THE PROCESS OF MAKING
          A LEFT TURN WHEN ADVERSE VEHICLE PULLED INTO INTERSECTION FROM THE
          OPPOSITE DIRECTION AND COLLIDED WITH RIGHT REAR SIDE OF INSURED
          VEHICLE IN SIGNIFICANT IMPACT. INDEPENDENT WITNESS INDICATES THAT
          ADVERSE DRIVER WAS NOT LOOKING FORWARD AS PULLED FORWARD. INSURED
          SUSTAINED CERVICAL AND RIGHT ROTATOR CUFF INJURIES. DIAGNOSTIC TESTS

WERE DELAYED AS INSURED WAS 10 WEEKS PREGNANT AT THE TIME. INSURED
RECEIVED CONSERVATIVE TREATMENT. AFTER THE BABY WAS BORN AND TESTS
DONE SURGERY WAS MENTIONED AS AN OPTION, BUT INSURED CHOSE NOT TO
HAVE SURGERY. USAA PAID ITS $30K BODILY INJURY LIMIT TO INSURED.
WE HAVE PAID $2,857 OF OUR $5K MEDPAY LIMIT. THIS POLICY HAS $100K
UIM LIMIT LESS OFFSET OF $30K FOR NET OF $70K. DEMAND WAS $45K. WE
HAVE TAKEN THE POSITION THAT INSURED HAS BEEN FULLY COMPENSATED. I
SUGGEST THAT YOU REFER THIS MATTER TO SAN FRANCISCO NTD TO PROTECT
OUT INTERESTS.

I HAVE CREATED THE LITIGATION FOLDER AND TREE ON AWD.

I HAVE MADE THE INITIAL ENTRIES ON THE SUIT REPORT ON THE LITIGATION
FILE DATABASE. YOU CAN MAKE ANY FURTHER ENTRIES NEEDED.

LET ME KNOW IF YO HAVE ANY QUESTIONS. STEVE

11-12-04  3:29P CST ENTERED BY ELH004            HOWARD, LINDA
REC'D AND REV UMBI RE-ASSIGNMENT FROM THE FIELD

**COVERAGE
PERSONAL AUTO POLICY WITH $100K UMBI LIMIT
DRIVER 001 CHRISTINE DOUGHERTY RAYBURN 1-12-60
VEH 002 1969 PORSCH
POLICY IN FORCE SINCE BEFORE 1999 AND LOOKS LIKE A ROLLOVER BUT

REMARK

S DO NOT INDICATE FROM WHAT COMPANY. SHOWS PRIOR UMBI FROM 4-8-99 FOR
SAME DRIVER AND WE PAID HER $90K. NOT AN ALLIED CLAIM #.
POLICY STILL IN FORCE AND OTHERWISE REMARKS ARE INSIGNIFICANT TO LOSS

**REQUEST FOR ARBITRATION DATED 11-4-04
-$30K LIMITS RECEIVED FRO USAA
-DEMAND FOR $45K ADDITIONAL
-CLAIM DENIED BY CLAIMS REP DUE TO INJURY EVALUATION.

*INVESTIGATION
-PR FAULTS ADVERSE DRIVER
-R/S TAKEN FROM INS (REQ TAPE)
-PHOTOS AND REPAIR EST FOR I/V
-INDEX WITH X-REF ONLY
-DEPO TRANS OF INS AND ORTHO IN FILE

**FACTS AND LIABILITY
LIABILITY ACCEPTED BY OTHER CARRIER, INS TAKING A LEFT TURN FROM A
S/S AND HIT BY TRUCK COMING FROM OPPOSITE DIRECTION IN MODERATE

IMPACT

INS DID NOT HAVE LEFT SIGNAL ON BUT THIS DOES NOT SEEM TO MATTER AS
ADVERSE WAS LOOKING ELSEWHERE PER WITNESSES.

**PROPERTY DAMAGE
INS DRIVING 1969 PORSCH WHICH SUSTAINED MODERATE DAMAGE TO THE PASS
REAR CORNER. MOSTLY ABOVE THE WRAPAROUND BUMPER AND UP TO THE REAR
WHEEL-WELL. $7500 REPAIR EST AND VEH WAS TOTALLED AND USAA PAID INS.
DOES NOT INDICATE A HUGE IMPACT HOWEVER THE AGE OF THE VEHICLE AND
LACK OF IMPACT TECHNOLOGY MIGHT BE A FACTOR.
ADVERSE DRIVING 1992 FORD F150 WHICH CLEARLY WENT ABOVE I/V BUMPER.

PR

INDICATES MODERATE DAMAGE TO THE FRONT PASS CORNER.

11-12-04  4:58P CST ENTERED BY ELH004            HOWARD, LINDA
P/C INS ATT/LM ON V/M TO INTRODUCE HIMSELF AND WOULD HE LIKE TO

01-31-05  5:36P CST ENTERED BY ELH004                HOWARD, LINDA

02-04-05 10:52A CST ENTERED BY ELH004               HOWARD, LINDA
         REC'D E-MAIL FROM DEFENSE:

02-24-05  5:30P CST ENTERED BY ELH004               HOWARD, LINDA
         ATT FILE REV ON MONDAY
         -CARL FEELS WE SHOULD MAKE SOME KIND OF AN OFFER
         REVIEWED FILE TO DETERMINE WHAT TO OFFER
         -INS GOT $30K FROM ADVERSE CARRIER BASED ON $4000+ IN TRMT
         -WE HAVE NOT BEEN ABLE TO DETERMINE WHY SHE WAS PAID SO MUCH JUDGING
         BY HE RECORDS REV SO FAR

         -CLAIMS REP SENT DENIAL IN RESPONSE TO $45K DEMAND FROM INS ATT
         -I ORIGINALLY CALLED INS ATT TO SEE IF WE COULD RESOLVE FOR SOME
SMALL
         AMOUNT MORE AND AFTER DISCUSSING W/INS, HE INDICATED THEY FELT
INJURY
         WORTH SIGNIFICANTLY MORE DUE TO HER CONTINUING COMPLAINTS AND THAT
         SHE MAY HAVE HAD ADDITIONAL TRMT AND HE SUGGESTED I SEND OUT TO
COUNS
         -I CALLED STEVE TO DISCUS AND WE AGREED THERE IS NO WAY TO MAKE AN
         EDUCATED OFFER AT THIS POINT AS WE STILL CANNOT FIGURE OUT WHY
ADVERS
         E PAID HER THE $30K AND WE NEED FULL MED INFO

03-03-05 10:59A CST ENTERED BY ELH004               HOWARD, LINDA

11-29-05  1:19P CST ENTERED BY ECW036          WHITE, CHRIS
          FILE REVIEW. UIM ARB IS SCHEDULED FOR 1/06. AT ARB WE'LL ARGUE SOME
          COMPARATIVE ON THE INSD FOR MAKING THE LEFT TURN AND SOME QUESTION
          ABOUT THE SEVERITY OF THE INJURIES AS WELL AS PRE-EXITING INJURIES.
          RESERVE APPEAR ADEQUATE AT $15K.

12-29-05  4:48P CST ENTERED BY ELH004          HOWARD, LINDA
          CALLUP
          ARB SET FOR 1-26-06
          RESET CALLUP FOR 20TH

01-04-06  4:53P CST ENTERED BY ELH004          HOWARD, LINDA

          I COMPUTED LIEN ITEMS AND DEDUCTED THOSE FOR A NEW INJURY, ADDED ON
          OTHER AMOUNTS, NOT IN LIEN, THAT EOBS INDICATE THEY PAID. IF WE ADD
          TO OUR MED PAY THE TOTAL IS $4888.61
          MED PAY $3087.31
          LIEN479.97
          EOBS120.00 TO ACCU
          1201.33 FOR MRIS
          TOTAL$4888.61

          ADVISED DEF OF MY COMPUTATIONS
01-20-06  6:15P CST ENTERED BY ELH004          HOWARD, LINDA
          CALLUP
          ARB SET FOR THE 26TH

01-26-06  6:02P CST ENTERED BY ELH004          HOWARD, LINDA

01-26-06  6:04P CST ENTERED BY ELH004          HOWARD, LINDA
          LIMIT IS $100K, MINUS $15K ALREADY REC;D FROM ADVERSE
          RESERVE AT $15K AND I WILL LEAVE FOR NOW.

01-26-06  6:32P CST ENTERED BY ELH004          HOWARD, LINDA

01-26-06  6:33P CST ENTERED BY ELH004          HOWARD, LINDA
          **********CORRECTION
          LIMIT IS $100K BUT INS RECEIVED $30K FROM OTHER CARRIER, SO $70K

# EXHIBIT B
to Declaration of
David M. Porter

1       UNITED STATES DISTRICT COURT

2       NORTHERN DISTRICT OF CALIFORNIA

3       ---oOo---

4

5 CHRISTINE DOUGHERTY,

6     Plaintiff,

7 vs.        No. C 07-01140 MHP

8 AMCO INSURANCE COMPANY,
 and DOES ONE through
9 TWENTY, inclusive,

10     Defendants.
 _____/
11

12

13

14     DEPOSITION OF JEFFERY V. MANGONE

15       October 8, 2007

16

17 Reported by:

18 Diane L. Freeman
 CSR NO. 5884
19

20

21      LUSK & SNYDER
       3715 MONTEREY BOULEVARD
22     OAKLAND, CALIFORNIA 94619
     (510) 482-9991/FAX (510) 482-1052
23

24

25

1

1          I N D E X

2
                              Page
3      EXAMINATION BY MR. MURPHY ......................... 6
4

5              ---oOo---

6
          QUESTIONS INSTRUCTED NOT TO ANSWER
7
              Page 67/Line 8
8

9

10          E X H I B I T S

11  Plaintiff's                    Page

12  1     010082-010123 - Computer printout of
          Passport file                    47
13
    2     January 6, 2003 letter to Amco Insurance
14        from Stephen Murphy, 1 page          77

15  3     February 4, 2003 letter to Mr. Mangone
          from Mr. Murphy, 1 page          78
16
    4     February 20, '03 letter to Mr. Murphy
17        from Mr. Mangone, 1 page          79

18  5     July 9, 2003 letter to Mr. Mangone
          from Mr. Murphy, 4 pages          80
19
    6     July 29, 2003 letter to Stephem M. Murphy
20        from Jeffery V. Mangone, 1 page       86

21  7     010481 - August 22, '03, letter to
          Stephen Murphy from Jeffery Mangone       109
22
    8     010218, 010222-010226, excerpt from
23        the deposition of Ernest H. Sponzilli,
          M.D.                    115
24
    9     October 29th, '03 letter to Stephen
25        Murphy from Jeff Mangone, 1 page       122

                              2

1          E X H I B I T S (continued)

2 Plaintiff's                        Page

3 10     010510 - September 28, 2004 letter to
          Stephen Murphy from Jeff Mangone, 1 page     131
4
    11    Casualty Best Claims Practices Personal
5          Lines and Commercial April 26, 2007,
          13 pages                          141
6
    12    California Fair Claims Regulations,
7          5/16/07, 24 pages                  151

8
  Defendant's
9
  NONE MARKED.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

13:22:52 1   Q.   What office do you go to?

13:22:55 2   A.   I go to our regional office in Sacramento.

13:22:56 3   Q.   What is the address of that office?

13:23:01 4   A.   I believe it is 1601 Exposition Boulevard,

13:23:03 5 Sacramento, California.

13:23:09 6   Q.   And has that been the office that you'd report

13:23:11 7 to since you started with the company?

13:23:13 8   A.   No, sir.

13:23:16 9   Q.   Tell me the progression of offices you've

13:23:17 10 reported to beginning in '99.

13:23:20 11   A.   '99, would have been the office on Professional

13:23:25 12 Drive in Santa Rosa, California, and I don't recall the

13:23:30 13 address for that.  That office closed, and all of our

13:23:37 14 reporting and regional matters were handled out of

13:23:38 15 Sacramento.

13:23:39 16   Q.   Do you have a recollection of when that office

13:23:41 17 in Santa Rosa closed?

13:23:48 18   A.   No, sir, I don't, not an exact date.  I can't

13:23:51 19 even come close.  I don't remember.

13:23:54 20   Q.   During 2003 and 2004 while you were involved in

13:23:57 21 adjusting this claim, were you reporting to the

13:23:57 22 Sacramento office?

13:23:59 23   A.   Yes, sir.

13:24:00 24   Q.   Who was your supervisor at that time?

13:24:05 25   A.   Kelly Bellinghausen.  If you'd like me to spell

16

13:24:06 1   that, I will.

13:24:07 2     Q.   Thank you, please.

13:24:12 3     A.   B-e-l-l-i-n-g-h-a-u-s-e-n, and Kelly is

13:24:15 4   K-e-l-l-y.

13:24:16 5     Q.   Kelly, male or female?

13:24:18 6     A.   Female.

13:24:21 7     Q.   What was her job title?

13:24:23 8     A.   Manager.

13:24:23 9     Q.   Claims manager?

13:24:25 10    A.   Yes.

13:24:29 11    Q.   What was your job title?

13:24:32 12    A.   I think at that point they called me a Senior

13:24:36 13   Claims Specialist II.

13:24:39 14    Q.   Let me go through your employment to get all

13:24:42 15   your job titles.  When you started in '99, what was your

13:24:43 16   title?

13:24:47 17    A.   At that point it was just -- I think it was

13:24:50 18   Claims Specialist.

13:24:53 19    Q.   When did that change?

13:24:56 20    A.   Late 1999.

13:24:57 21    Q.   To what?

13:25:01 22    A.   Senior Claims Specialist II.

13:25:06 23    Q.   So you've had the same title since late '99?

13:25:08 24    A.   They changed it on me again, and that was

13:25:12 25   recent.  I hate to say this, but I'd have to actually

17

14:04:46 1 party claims?

14:04:47 2   A.   Yes.

14:04:51 3   Q.   When you stopped being the person to input the

14:04:54 4 data, did you get evaluations from the medical

14:04:58 5 department through Colossus on both first and third

14:04:59 6 party claims?

14:05:05 7   A.   Yes, and I think it was called the Colossus unit

14:05:08 8 at that point.

14:05:11 9   Q.   Do you know when the title became the Colossus

14:05:1110 unit?

14:05:1511   A.   No, sir.  Perhaps whenever I had to stop -- or

14:05:1812 perhaps whenever they decided it was time for us to

14:05:2613 stop, us being claim representatives, making data entry

14:05:2914 into Colossus.

14:05:3415   Q.   Do you know the names of any of the people in

14:05:3916 the Colossus unit in 2003-2004, other than Kimberly?

14:05:4217   A.   No.

14:05:5818   Q.   Did you, as a Senior Claims Specialist, have any

14:06:0219 authority to make a settlement offer that was different

14:06:0720 than the offer proposed by Colossus?

14:06:0921   A.   No, sir.

14:06:1322   Q.   So was it your sole responsibility to settle the

14:06:1723 case within the range that was provided by Colossus?

14:06:2424   A.   Based on the data received, yes.  That would be

14:06:5725 data received for the evaluation.

15:35:15 1    A.   That was one factor.

15:35:16 2    Q.   What are the others?

15:35:21 3    A.   When her last treatment date was.  I think, the

15:35:25 4  span of time between -- at least the time of the review

15:35:29 5  and the evaluation of the case and her last treatment

15:35:34 6  date, according to the records that I was able to

15:35:37 7  review.

15:35:58 8    Q.   Take a look at page 100 on Exhibit 1.  Toward

15:36:02 9  the bottom, there is continuation of the August 13th,

15:36:08 10  '03 note.  It says, "The insured has discontinued care,

15:36:12 11  however, she is still experiencing chronic pain symptoms

15:36:13 12  in her neck and shoulder."

15:36:16 13        I just want to confirm, is that the continuation

15:36:19 14  of your review of the document provided to you?

15:36:22 15    A.   That's a continuation of my -- of my review and

15:36:32 16  my entry of the data that I received.

15:36:40 17    Q.   Next page, 101, August 13, '03, you have a note

15:36:45 18  at 11:48 a.m, and it says "Special instructions"; what

15:36:46 19  does that mean?

15:36:53 20    A.   Well, if you look at the date, it says 8-13-03,

15:36:56 21  "Instructions to:  COLO1."

15:36:57 22    Q.   Colossus?

15:37:00 23    A.   There you go.  This was the referral to the

15:37:04 24  Colossus unit at that time, and that was how it was

15:37:08 25  made.  This note generates an e-mail to whoever was the

95

15:37:12 1  supervisor of that unit advising them that the referral

15:37:15 2  was being made.

15:37:22 3      Q.   Is the information that you've included with

15:37:24 4  these instructions standard information that you would

15:37:26 5  include in any referral to Colossus?

15:37:33 6      A.   Are you referring to what I've indicated after

15:37:37 7  each one of these colons here?

15:37:40 8      Q.   No, I'm interested in the categories.

15:37:42 9      A.   What categories?

15:37:46 10     Q.   Let's start with "Comparative negligence"; is

15:37:50 11 that a category you would always address in your

15:37:51 12 reference to Colossus?

15:37:55 13     A.   I am sorry.  I see.  This is a standard macro.

15:37:57 14     Q.   That's what I meant to ask.

15:37:58 15     A.   Okay.

15:38:02 16     Q.   So you have a standard macro that sets out

15:38:04 17 fields that you are supposed to complete when you send

15:38:04 18 it to Colossus?

15:38:06 19     A.   Right.

15:38:06 20     Q.   Is that right?

15:38:07 21     A.   Yes.

15:38:13 22     Q.   So comparative negligence is one, and is the

15:38:13 23 percent zero your assessment?

15:38:14 24     A.   Yes.

15:38:18 25     Q.   So Ms. Dougherty was not negligent at all in

96

LUSK & SNYDER
(510) 482-9991/FAX (510) 482-1052

15:38:20 1 causing this accident was your conclusion?

15:38:24 2    A.   At the level where the claim was at that point,

15:38:25 3 yes, that's correct.

15:38:28 4    Q.   Then "Seatbelt status," does that mean whether

15:38:30 5 the insured was wearing a seatbelt?

15:38:30 6    A.   That's correct.

15:38:32 7    Q.   You wrote yes, correct?

15:38:36 8    A.   Keep in mind, this would not necessarily be for

15:38:38 9 the insured -- in this particular case, it is for the

15:38:41 10 policyholder -- but the injured party.

15:38:45 11    Q.   The claimant, if it's a third-party case?

15:38:48 12    A.   Whoever, the injured party.  Seatbelt status,

15:38:51 13 yes, meaning they were wearing a seatbelt.

15:38:55 14    Q.   Is the macro for the Colossus the same whether

15:38:59 15 it's a third-party case or a first-party case?

15:39:00 16    A.   Yes.

15:39:03 17    Q.   That is, you provide the same type of

15:39:04 18 information to Colossus on a third-party case as you do

15:39:06 19 a first-party case?

15:39:07 20    A.   Yes.

15:39:12 21    Q.   Then you have "Meds incurred," and this is the

15:39:12 22 medical bills you are aware of?

15:39:13 23    A.   Correct.

15:39:15 24    Q.   Then "Meds adjustment," and you wrote, "$30,000

15:39:20 25 - prior settlement.  This is a UIM case."  So why is

15:52:36 1 it was the policyholder was doing at the time that she

15:52:38 2 couldn't do during the recovery from the surgery.

15:52:40 3        So, yeah, it would have been a significant

15:52:44 4 factor.  I mean, there are a lot of factors that go into

15:52:49 5 the evaluation of surgery as opposed to non-surgery,

15:52:51 6 plus the special damages would be increased with the

15:52:57 7 bill fees.

15:52:59 8    Q.   Then toward the bottom of that note, you wrote,

15:53:02 9 "It is not unreasonable to expect continuing pain from

15:53:0810 the accident injuries."  What did you base that on?

15:53:1211    A.   History given by the policyholder that was

15:53:1412 recorded by her treating physicians.

15:53:1713        As you can see, what I'm doing in this note is

15:53:2014 making kind of an overview of -- going back to my

15:53:2615 initial entries concerning the treatment data, and then

15:53:2916 I'm trying to basically pull everything together with

15:53:3517 the consultation that was provided to me from Colossus.

15:53:4018        It's almost a way of, in a sense, thinking out

15:53:4619 loud.  What else do we need?  What else can we obtain or

15:53:5020 ask for that's going to give this policyholder a claim,

15:53:5121 a viable claim?

15:53:5422    Q.   So was it your conclusion after reviewing the

15:53:5823 Colossus report that Ms. Dougherty did not have a viable

15:53:5924 claim?

15:54:0125    A.   At this stage, that's correct.  I mentioned that

107

15:54:04 1 in my notes earlier, that the evaluation from Colossus

15:54:09 2 was roughly equal to but less than underlying BI

15:54:13 3 settlement, and that is found on page 101 at the very

15:54:22 4 bottom, 8/22/03.

15:54:25 5    Q.   Just skipping ahead to put some numbers on that

15:54:31 6 evaluation, if look at 105 --

15:54:33 7    A.   There it is.

15:54:34 8    Q.   -- there is a note September 28, '04.

15:54:35 9    A.   Yes.

15:54:38 10    Q.   It says, "The evaluation range is 26,522 to

15:54:43 11 32,102."  That's the Colossus evaluation range?

15:54:48 12    A.   That is correct, between 26522 and 32102.

15:54:51 13    Q.   Then it says, "There is a potential for UIM with

15:54:56 14 an exposure based upon the evaluation of 2,102, the high

15:54:57 15 end of the range."

15:54:59 16    A.   That is correct.  That would be taking into

15:55:04 17 account the offset allowed for the underlying settlement

15:55:10 18 from USAA of $30,000, and then ignoring the recovery

15:55:15 19 clause under the insurance policy contract for the

15:55:19 20 $4,200-and-change that was paid out under med pay.

15:55:24 21       In essence, we would have to wave a recovery of

15:55:31 22 that money in order for a settlement to be made of 2102.

15:55:34 23 Again, this was all based upon the information available

15:55:37 24 at that time, September 28, 2004.

15:55:40 25    Q.   Did you discuss the Colossus evaluation with

108

16:02:44 1 see doctors who recommend surgery and a second opinion

16:02:46 2 will be had, and the second-opinion doctor won't

16:02:47 3 recommend the surgery.

16:02:49 4     Q.   Did you ever ask for a second opinion with

16:02:52 5 regard to Ms. Dougherty's situation?

16:02:57 6     A.   No, I didn't see any reason to put the

16:03:00 7 policyholder through that, such as an independent

16:03:02 8 medical examination, if that's what you mean.

16:03:05 9     Q.   Do you do -- do you request medical examinations

16:03:0510 from time to time?

16:03:0711     A.   If the case warrants it.

16:03:1012     Q.   Do you understand that under the insurance

16:03:1313 policy that Amco or Allied has a right to an

16:03:1314 examination?

16:03:1515     A.   Yes, sir, I know that.

16:03:1716     Q.   Did you ever give any consideration to having

16:03:1917 Ms. Dougherty examined by a company of -- a doctor of

16:03:2118 the company's choosing?

16:03:2719     A.   I opted not to put Mrs. Dougherty through that.

16:03:2820     Q.   Why?

16:03:3021     A.   Independent medical examinations, or really any

16:03:3522 kind of examination is intrusive, it's time consuming,

16:03:3923 it's stressful.  She'd already been through all that.

16:03:4324 She's already has her stress, she's already had her

16:03:4725 inconvenience and so forth.  No need to be poked and

114

16:03:50 1 prodded when all we needed was a simple note from

16:03:54 2 Dr. Sponzilli explaining whether this surgery was a

16:03:55 3 medical necessity.

16:03:57 4          I figured that would be a lot easier than

16:03:59 5 sending her through an independent medical examination,

16:04:11 6 and it was just a note that I was asking for.

16:04:15 7          MR. MURPHY:  Let me have marked as next in order

16:04:25 8 an excerpt from Dr. Sponzilli's deposition.

16:04:25 9          (Plaintiff's Exhibit No. 8 was

16:04:25 10          marked for identification.)

16:04:29 11          THE WITNESS:  Mr. Murphy, if it's okay with you

16:04:32 12 and Mr. Pardini, can we take a break?  I have been

16:04:33 13 drinking a lot of water.

16:04:35 14          MR. MURPHY:  Sure.  No need to explain.

16:04:40 15          THE VIDEOGRAPHER:  This is the video operator.

16:04:41 16 The time is 4:04.  We are going off the record.

16:15:20 17          (Recess taken.)

16:15:22 18          THE VIDEOGRAPHER:  We are back on the record,

16:15:25 19 and it is 4:15.

16:15:31 20          MR. MURPHY:  Q.  I marked as Exhibit 8 excerpts

16:15:35 21 from the Sponzilli deposition that were taken from the

16:15:39 22 defendant's initial disclosure.  So take a look at page

16:15:47 23 122 -- excuse me, Bates stamp number 222, which is the

16:15:51 24 second page in, and I am going to read to you a question

16:15:55 25 and answer and ask you something about it.  At the top,

# EXHIBIT C
## to Declaration of
## David M. Porter



**Allied**
Insurance

a member of Nationwide Insurance

**Pacific Coast Regional Office**

2301 Circadian Way P.O. Box 849
Santa Rosa, California 95402-0849

July 29, 2003

Mr. Stephen M. Murphy, Esq.
44 Montgomery street
Suite 1000
San Francisco, California 94104

Re:  Your Client:          Christine Dougherty
     Our Policyholders:    Christine and Malcolm Dougherty
     Our Claim Number:     84F99015
     Policy Number:        PPA-0008899321
     Date of Accident:     04/17/2001

Dear Mr. Murphy:

This letter acknowledges the receipt of the documents supporting Mrs. Dougherty's offer of settlement of $45,000 for her Underinsured Motorist bodily injury claim, arising from the subject accident.

Your settlement packet appears to be complete, and is in review for evaluation. If additional information is required, I will contact you with the specific request or request for that information.

In the meantime, please contact me to discuss this case in further detail.

Respectfully,

Jeffery V. Mangone
Special Claims Representative II
AMCO Insurance Company
(707) 769-1542 Voice
(707) 769-1547 Facsimile

Allied Group, Inc.
AMCO Insurance Company
Allied Property and Casualty Insurance Company
Depositors Insurance Company



PLAINTIFF'S DEPOSITION
EXHIBIT 10
6
Mangone

010320

# EXHIBIT D
to Declaration of
David M. Porter

1      IN THE UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO)

3        ---oOo---

4

5  CHRISTINE DOUGHERTY,

6      Plaintiff,

7    VS.        No. C 07-01140 MHP

8  AMCO INSURANCE COMPANY,
   AND DOES ONE THROUGH TWENTY,
9  INCLUSIVE,

10      Defendants.
   _____/
11

12     DEPOSITION OF JASON WARTACH

13      March 4, 2008

14

15

16

17
  Reported by:
18  ANNETTE M. SNYDER
   CSR NO. 1880
19  murphy

20

21
       LUSK & SNYDER
22    3715 MONTEREY BOULEVARD
    OAKLAND, CALIFORNIA  94619
23   (510)482-9991/FAX(510)482-1052

24

25

1                    INDEX

2                         PAGE

3    EXAMINATION BY MR. MURPHY............... 6

4

5              ---oOo---

6              EXHIBITS

7    PLAINTIFF'S

8    EXHIBIT 1:  NOTICE OF TAKING DEPOSITION ......    6

9    EXHIBIT 2:  DOCUMENT ENTITLED "PHYSICAL THERAPY"   24

10   EXHIBIT 3:  DOCUMENT ENTITLED "FUTURE SURGERY"   26

11   EXHIBIT 4:  DOCUMENT ENTITLED "CONSULTATION TIPS"  31

12   EXHIBIT 5:  COLOSSUS SCREEN ...................    33

13   EXHIBIT 6:  COLOSSUS SCREEN:  ASSESSMENT FOR

14          GENERAL DAMAGES ...................    39

15   EXHIBIT 7:  COLOSSUS TRAINING MANUAL ..........    43

16   EXHIBIT 8:  COLOSSUS GUIDELINES ...............    55

17   EXHIBIT 9:  PCRO COLOSSUS UNIT WORKFLOW

18          GUIDELINES .......................    56

19   EXHIBIT 10: COLOSSUS HINTS ....................    56

20   EXHIBIT 11: EXEMPT CLAIM CATEGORIES ...........    57

21   EXHIBIT 12: IMPAIRMENTS .......................    57

22   EXHIBIT 13: INJURY DISSECTION SHEET ...........    57

23   EXHIBIT 14: MEDICAL ABBREVIATIONS .............    57

24   EXHIBIT 15: RED FLAGS IN IMPAIRMENT EVALUATION.    58

25   EXHIBIT 16: USEFUL WEB SITES ..................    58

1              EXHIBITS, CONTINUED

2

3   EXHIBIT 17:  COLOSSUS SCREEN, INDEPENDENT

4         MEDICAL EXAM .................... 77

5   EXHIBIT 18:  COLOSSUS SCREEN, INDEPENDENT

6         MEDICAL EXAM .................... 78

7   EXHIBIT 19:  COLOSSUS SCREEN, NON MEDICAL

8         FACTORS ......................... 79

9   EXHIBIT 20:  COLOSSUS SCREEN, NON MEDICAL

10        FACTORS ......................... 80

11  EXHIBIT 21:  COLOSSUS SCREEN, RECOMMENDED

12        SETTLEMENT ..................... 80

13  EXHIBIT 22:  COLOSSUS SCREEN, CONSULTATION

14        SUMMARY ........................ 84

15  EXHIBIT 23:  COLOSSUS SCREEN, ADJUSTMENTS .... 89

16

17

18

19

20

21

22

23

24

25

1  Q.    Was your authority restricted to whatever

2  value Colossus may have come up with?

3  A.    No, I was not.

4  Q.    What were you trained was the purpose of any

5  Colossus value?

6  A.    The purpose of Colossus was a tool, a jumping

7  off point for myself, as the associate, to give me a

8  general possible range of where that claim might settle.

9  Q.    And was -- did Colossus provide a value for

10  general damages?

11  A.    Yes.

12  Q.    Did it provide a value for -- that included

13  medical expenses?

14  A.    The specials, which would include medical

15  expenses, lost wages, things of that nature, there was a

16  place where you could include that in the consultation,

17  if you wish.

18  Q.    And in the ultimate number that would be

19  produced by Colossus, was it typically a range of

20  values?

21  A.    Yes.

22  Q.    And whatever the range was, did you have

23  authority to make a settlement that was above the top

24  end of the Colossus range?

25  A.    Yes.

1  A.    No.

2        MR. MURPHY:  Let me mark this as Exhibit 2.

3        (Whereupon, document entitled "Physical

4        Therapy" was marked Plaintiff's Exhibit 2 for

5        identification.)

6        MR. MURPHY:  Q.  I took some excerpts from

7   some of the materials that were produced.  And, I just

8   want to ask you about some of the entries here.

9        Do you recognize this, this page of a

10  document?

11  A.    This is one of the pages in one of our

12  training manuals.  I don't know which version this is

13  from, though.

14  Q.    If you look at the bottom, it looks like --

15  A.    Okay.  Version 5.  I'm sorry.

16  Q.    Your name is there, so I am assuming this was

17  taken from your computer?

18  A.    Yes.

19  Q.    And it has types of physical therapy,

20  including licensed physical therapist, doctor of

21  osteopathic medicine, chiropractor, massage therapist

22  and acupuncturist.  For some of them they say that you

23  enter data into Colossus, but others no.  And I want to

24  ask you about the no's.

25        It says performed by an acupuncturist and the

1   answer is "No," for entering into Colossus.

2          Do you know why that is?

3   A.      As I understand, acupuncturists are not

4   recognized by the American Medical Association, so that

5   is not entered into the physical therapy section.

6   Q.      And it says enter -- medical bills only are

7   entered?

8   A.      Correct.

9   Q.      Do you have an understanding what effect the

10   entering only the medical bills for acupuncturists would

11   have on the consult number provided by Colossus?

12   A.      Are we speaking the general range, or the

13   final range, which includes specialists.

14   Q.      Say the general range?

15   A.      Yes, I do.

16   Q.      What is the effect?

17   A.      Without entering additional physical therapy,

18   and only including the medical bills, that would reduce

19   the amount of trauma associated with that consultation.

20   That is how it would view it.

21   Q.      And would the result be a lower number for

22   general damages, than if the acupuncturists had been

23   entered into in a way, the same way that the licensed

24   physical therapists and osteopath were entered into this

25   system?

1    A.      It could.  It would depend on the number of

2    visits.

3    Q.      Is there a minimum number of visits to one of

4    these therapists that would result in some increase in

5    the general damage amount?

6    A.      I am not aware of the coding that went on

7    behind the scenes by CSC.  I do know that one or two

8    entries may or may not result in a change in the general

9    damages.  That is what we would see.

10   Q.      Did AMCO have a department that was

11   responsible for inputting data into Colossus, separate

12   from the individual adjusters handling claims?

13   A.      A department?

14   Q.      Yeah.  Was there a Colossus Department?

15   A.      There was no Colossus Department.

16           (Whereupon, a document entitled Future Surgery

17           was marked Plaintiff's Exhibit 3 for

18           identification.)

19           MR. MURPHY:  Q.  All right.  Let me show you

20   Exhibit 3, which is another excerpt.  This is on Future

21   Surgery.  You recognize this as the same document as the

22   previous exhibit?  I mean from the same document?

23   A.      Yes, I do.

24   Q.      Okay.  And as far as this in regards future

25   surgery and Colossus asks if the surgery would be

1   possible, probable or definite.  And then there is

2   definitions for each of these categories.

3        Do you have an understanding as to what effect

4   each of these entries would have on the value for

5   general damages provided by Colossus?

6   A.    I do have a general understanding, yes.

7   Q.    What is that understanding?

8   A.    With these three, possible, probable, and

9   definite, each is going to assign, again, a different

10  severity or add a severity amount to that final range.

11  Each one of them is going to add to it, but each one is

12  going to add a slightly different amount:  "Possible"

13  being least amount, "definite" being the greatest

14  amount.

15  Q.    And are adjusters trained on how to determine,

16  from the medical records, whether a surgery is possible,

17  probable or definite?

18  A.    We provide, as part of our training, a -- we

19  do go through this page and provide a, our understanding

20  of when these would apply.

21  Q.    And what do you train in that regard?

22  A.    We ask -- we instruct the associate to look

23  for medical documentation from the provider as to

24  whether or not the chance for future surgery would be

25  possible, probable, or definite.

1    Q.    Is the medical documentation, that you

2    instruct adjusters to look at, medical records and

3    reports?

4    A.    It would include documentation provided by the

5    medical provider, generally about the person who might

6    be referring them for these surgeries.

7    Q.    Does Colossus require that any, any entry as

8    to future surgery, whether it be possible, probable, or

9    definite, be backed up by medical record or report?

10    A.    We always instruct the associate that they

11    should be looking for objective medical documentation to

12    support their entries.  So in this situation, we would

13    want some type of documentation or support from a

14    medical provider, such as an anticipated surgery date,

15    perhaps an estimate of surgical costs, perhaps a

16    treatment plan that would include maybe additional care,

17    and then, if that care was not successful, discussion

18    about a surgical option.

19        In any case, we would instruct the associate

20    to really look for medical documentation to support

21    whatever entry they select here.

22    Q.    Is there any provision in Colossus for

23    inputting data from deposition transcripts?

24    A.    I don't quite understand.

25    Q.    If an adjuster has a deposition transcript

LUSK & SNYDER                28
(510)482-9991/FAX (510)482-1052

1    over it and point and click, as opposed all key strokes,

2    to typing something in.

3    Q.    Instead of typing "spine" you click on the

4    spine?

5    A.    You click on the spine.  There were be a

6    diagram of the spine, and then you would be able to

7    click on certain vertebra.  It had more bells and

8    whistles.  It was still essentially the same product,

9    just a little more user friendly from a point-and-click

10    standpoint.

11    Q.    Now turn to the "Introduction" on Exhibit 7.

12        It says:  Welcome to COLOSSUS, the

13    knowledge-based system for assessing general damages for

14    bodily injury claims.

15        Was it your understanding that Colossus was to

16    assess general damages only, or general damages and

17    economic special damages?

18    A.    It would do both.

19    Q.    Do you have any understanding on what specific

20    factors Colossus relied on in assessing general damages?

21    A.    I don't quite understand the question.

22    Q.    Okay.  Do you have an understanding of the

23    methodology that Colossus employed in order to take the

24    data that was input, and then come up with a value for

25    general damages?

1   A.     I am not a programmer.  I don't know the

2   algorithms that were probably used behind the scenes.  I

3   understand the process of entering the consultation and

4   some of the similar categories or areas of consultation,

5   but I am not a computer engineer, programmer.

6   Q.     Well, for example, do you know if the CSC

7   utilized Average Jury Verdicts on particular types of

8   injuries in order to reach a value of general damages?

9   A.     As I understand it, the value that was

10  returned in the consultation, was based on Allied's

11  internal, they call it "tuning," or review of Allied

12  files.  The range was not provided by CSC based on

13  anything outside of Allied.

14  Q.     So, Allied programs Colossus in some way in

15  order to impact the amount of general damages produced?

16  A.     There is a tuning process where we review a

17  number of our files, and then the results of the

18  settlements of those files is what is used to establish

19  that general range that is presented.

20  Q.     Were you involved in any of that fine tuning?

21  A.     Yes.

22  Q.     When was that done?

23  A.     That was done every year to 2 years.

24  Q.     And so when were you involved?

25  A.     During my entire time in the staff area.

1   Q.      Okay.  Can you be specific in terms of month

2   and year when you were involved in that tuning process?

3   A.      Unfortunately, no, I can't.

4   Q.      How many times did you do it?

5   A.      Each region we would try to get to once every

6   year to 2 years.  So with five regions, we are looking

7   at half a dozen times or more.

8   Q.      And, could you explain in any, in more detail,

9   what you would do in order to review files, how would

10  you pick the files, how many would you pick, what data

11  would you input into the system, in order to fine tune

12  it for this purpose?

13  A.      What would happen is:  We had a tech person

14  that would go and just basically pull a random sample,

15  with no focus on any settlement ranges, names, anything

16  of that nature, for a given region.  We would like to

17  have anywhere from 250 to 300 files that would be

18  reviewed.  Myself and the two nurses would review what

19  was in the file, including both passport and AWD, what

20  was documented.  We would look at the consultation, and

21  then we would try to make sure that the entry, or the

22  entries that were in there, were as appropriate as

23  possible.

24  Q.      So -- and then what kind of input would you

25  make into the Colossus to fine tune it for purposes of

1  evaluating general damages?

2  A.      We would only look at closed files.  So these

3  were files where consultation, usage of the consultation

4  was done.  And, if we needed to make a change to the

5  consultation for the purpose of tuning, we would do

6  that.  And then, there was an application that was

7  provided by CSC that would then take that information

8  and from that, tune the Colossus system specific to

9  Allied.

10  Q.      What would you specifically do to tune it?

11  A.      I don't quite understand.

12  Q.      Would you fill out a form?

13  A.      No.

14  Q.      Send it to CSC?  Would you input it into the

15  website?

16  A.      We go right onto the website.

17  Q.      What kind of data would you put in the

18  website?

19  A.      We would just make sure that the information

20  was correct.  So, if the associate didn't put down that

21  the person had a hospital stay when they should have

22  made that selection, we would go in and change that.

23  Q.      How would that have an impact on the ultimate

24  number that Colossus would generate for other cases?

25  A.      Once we had a sample, 250 to 300 files, it

1  would get through this process.  Again, I was not the

2  one who did this.  We had a tech person that would do

3  that.  They would then go to that particular region and

4  say:  We see that we might need to adjust or tune these

5  ranges, and the region would sign off on it.  And, then,

6  again, I don't know the behind the scenes how that would

7  all occur.  But then future forward any new

8  consultations, once that tuning was complete, would

9  reflect that difference.

10  Q.     Was there any variation in the tuning by

11  geographical region?

12  A.     Yes.

13  Q.     And how was it divided up?

14  A.     Each region would have the ability to have a

15  rural versus an urban area that they would select from.

16        So that if you were sitting in California, you

17  would not be presented with a range that somebody,

18  perhaps in Lincoln, was selling a claim for?

19  Q.     Lincoln, Nebraska?

20  A.     Lincoln, Nebraska.  There is probably many

21  Lincolns, but, yes.

22  Q.     There are.  So would there be one range for

23  all of the State of California?

24  A.     There would be at least two.

25  Q.     Either a rural or an urban for the State of

1   California?

2   A.      Depending on which the associate selected when

3   they began the consultation.

4   Q.      Was there any specific range, in terms of

5   tuning for general damages, for Northern California

6   versus Southern California?

7   A.      No.

8   Q.      Or by county, San Francisco county versus

9   Marin County?

10  A.      No.

11  Q.      Was there any tuning done for the Colossus

12  range of general damages that took into account not just

13  the Allied claims settlements, but the jury verdicts in

14  a particular region?

15  A.      Litigated files were not included in the

16  tuning sample.

17  Q.      All right.  Well, is it your understanding

18  that Allied used Colossus so that pre-litigation claim

19  settlements would have some consistency?

20  A.      I don't know about pre-litigation.  I think

21  they were just looking for overall consistency amongst

22  their associates.

23          MR. PARDINI:  Would this be a good time to

24  take a short break.

25          THE VIDEOGRAPHER:  It is 11:16.

# EXHIBIT E
## to Declaration of David M. Porter

1                UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO)

3                    ---oOo---

4

5   CHRISTINE DOUGHERTY,

6             Plaintiff,

7        VS.              No. C 07-01140 MHP

8   AMCO INSURANCE COMPANY,
    AND DOES ONE THROUGH TWENTY,
9   INCLUSIVE,

10            Defendants.
    _____/
11

12          DEPOSITION OF MICHAEL McKEEVER

13                March 6, 2008

14

15

16

17
    Reported by:
18   ANNETTE M. SNYDER
     CSR NO. 1880
19   MURPHY

20

21
              LUSK & SNYDER
22         3715 MONTEREY BOULEVARD
           OAKLAND, CALIFORNIA  94619
23         (510)482-9991/FAX(510)482-1052

24

25

1              INDEX

2                         PAGE

3  EXAMINATION BY MR. MURPHY................ 5

4

5              ---oOo---

6              EXHIBITS

7  PLAINTIFF'S

8  EXHIBITS 1 - 23 MARKED IN JASON WARTACH'S DEPO.

9                ---oOo---

10  EXHIBIT 24:  EXCERPT FROM PASSPOST FILE ...  25

11

12

13  DEFENDANT'S

14  NONE MARKED

15

16

17

18

19

20

21

22

23

24

25

1  A.      Good point.  1998, TIG was sold to Nationwide,

2  so it would be 9 years.

3  Q.      So you worked for TIG before --

4  A.      Prior to Nationwide.

5  Q.      All right.

6          What was your first -- take me through your

7  positions with Nationwide.

8  A.      I was a, in -- I was a litigation manager.  I

9  moved to Sacramento, was still a litigation manager.

10  Shortly after moving to Sacramento, I become a claims

11  director; and most recently I have become a litigation

12  specialist.

13  Q.      What year did you become a litigation

14  specialist?

15  A.      This year.

16  Q.      So for the period of 2003 through 2006, what

17  was your title?

18  A.      Director.

19  Q.      Director of claims?

20  A.      Field Claims Director is the official title,

21  but, yes, in the Claims Department.

22  Q.      What were your job duties as a field director

23  of claims?

24  A.      I oversaw a casualty group of four to six

25  claims managers and their teams.

1    Q.    And what geographical area did you cover?

2    A.    State of California and Nevada.

3    Q.    And by "casualty claims," did that include

4    personal injury claims?

5    A.    Yes.

6    Q.    And uninsured or underinsured-motorist claims?

7    A.    Yes.

8    Q.    Take a look at Exhibit 1, which is the First

9    Amended Notice of Deposition.  And I understand you are

10   being produced as the person most qualified for various

11   categories.  Can you identify which categories that is?

12          MR. PARDINI:  Mr. McKeever is the being

13   produced as the person most qualified in all categories,

14   with the exception of Category 8.

15          MR. MURPHY:  All right.  Great.  Thank you.

16   Q.    Let's look at them in order.

17          Number 1 is AMCO's policies, procedures, and

18   practices regarding training its employees in

19   evaluating, adjusting, and handling uninsured and

20   underinsured motorist claims between 2002 and 2007.

21          What -- first of all, what's the basis for

22   your knowledge about that subject?

23   A.    I was employed as a claims director for Allied

24   at the time.  I would be familiar with all of those.

25   Q.    So were you the primary claims person in

1  California during that period?

2  A.       Primary claims person wouldn't be a title.

3  There were several directors that worked in casualty,

4  and I was one of them.

5  Q.    How many were there?

6  A.    Five directors.

7  Q.    And who did you report to, as a field

8  director?

9  A.       The state officer, which would be Randy Egers.

10  Q.    What is his title?

11  A.    State officer.

12  Q.    State?

13  A.       Officer.

14  Q.    That is a new title for me.  I haven't heard

15  that.

16  A.    It's actually changed in the last couple of

17  weeks, but the last time I reported to him, it was

18  State Officer.

19  Q.    Do you know who Randy Egers reported to at

20  that time?

21  A.    He would report to the resident vice-president

22  of Pacific Coast regional office.  And that changed.

23  Q.    And I take it you worked out of the

24  Pacific Coast regional office?

25  A.       Yes.

1  Q.    What geographical of area is covered by

2  Pacific Coast regional office?

3  A.    California and Nevada.

4  Q.    What was your job location; where was your

5  office?

6  A.    In Sacramento.  I started in Camarillo,

7  California, and moved to Sacramento.

8  Q.    What year?

9  A.    That would be 2000.

10  Q.    And so you were one of roughly five claims

11  managers?

12  A.    Directors.

13  Q.    Directors.  And you all supervised claims

14  managers?

15  A.    Correct.

16  Q.    And were the directors responsible for

17  discrete areas of coverage, or claims, or geographical

18  areas?

19  A.    We specialized primary by casualty and

20  litigation.

21  Q.    So some were either casualty, and others were

22  litigation?

23  A.    One was litigation and several were casualty.

24  Q.    And how was it determined which claims

25  managers the various directors would supervise?

1   A.      We had relatively entry-level associates, who

2   handled very simple claims reporting to a director.  I

3   was in a casualty, inside-casualty environment, so I

4   would have that particular people.  We had somebody that

5   was over field associates.

6          In fact, at the time of this claim, I was --

7   handled both inside and field managers.

8   Q.      Which claims managers did you handle from 2003

9   to 2006?

10  A.      Okay.  Kelly Bellinghausen, Jeanne Grubin,

11  Mark Knoll -- drawing a blank.  Possibly

12  Sharon Strikwerda.  And those are the ones that come to

13  mind.  I think I am missing a couple, but they are

14  not -- they weren't involved with this case.

15  Q.      Was Jeff Mangone one of the adjusters within

16  your chain of command?

17  A.      Jeff Mangone reported to Kelly Bellinghausen

18  and Kelly Bellinghausen reported to me.

19  Q.      All right.  So, with regard to Category

20  Number 1, what type of training did AMCO provide its

21  employees with regard to adjusting underinsured-motorist

22  claims?

23  A.      We like to grow our own, so to speak, so most

24  of the associates who came to Allied began in career

25  school, which was a fairly intensive, 6-to-8 week

1  Eventually we are all merging into the Nationwide group

2  of companies, including AMCO.

3       MR. MURPHY:  Q.  What years did those things

4  happen?

5  A.     I believe '98 TIG was purchased.

6  Q.     Right.

7  A.     And then 2000, Allied was purchased.  And I

8  think I'm -- I think '98 actually Allied was purchased

9  so TIG was purchased prior to that.  I am a little off

10  with that date; not a good historian for you on that.

11  Q.     Those are public records?

12  A.     Yes.

13  Q.     Did the company have a practice of obtaining

14  independent medical exams for uninsured or underinsured

15  motorist claims?

16  A.     I wouldn't describe it as a "practice."  It

17  was --

18  Q.     Was that a tool available to the adjusters?

19  A.     Sure, yes.

20  Q.     Were the adjusters trained on the

21  circumstances which to request such an exam?

22  A.     No.  There was no formal training on when to

23  acquire an IME.  It was simply a tool used to potential

24  further evaluate a claim.

25  Q.     Do you have any understanding as to how

1  frequently IME's were used in UM claims?

2  A.      We would rarely use them in a casualty

3  environment.  Somewhat evasive.  And there is a little

4  bit of a handling with kid gloves on an uninsured.  We

5  would rather obtain that information through other means

6  and evaluate it.  More likely than not, the IME would be

7  done as a part of litigation, on an arbitration issue.

8  Q.      So, before arbitration was demanded on a

9  UM claim, is it your understanding that the company

10  never would ask an insured to go through an IME?

11  A.      No, I would not say "never."  It would be on

12  an infrequent basis.

13  Q.      Do you have any understanding of the

14  statistics, what percentage, how many times it happened?

15  A.      No.

16  Q.      Were adjusters trained to use the IME in

17  UM claims on an infrequent basis?

18  A.      Adjusters were aware an IME could be used as a

19  tool to, to evaluate a UIM claim.  But beyond that,

20  there was no formal training program.

21  Q.      Was there a list of physicians that the

22  company used, from 2002 to 2007, for the purpose of

23  IMEs?

24  A.      No, not an exclusive list.

25  Q.      Was there a non-exclusive list?

1   A.      No.

2   Q.      What is your understanding of the purpose of

3   the standard reserve amounts?

4   A.      The standard reserve?

5   Q.      Yeah.

6   A.      Essentially, it's a reserve put on the file,

7   on every file, that balances the books at the end of the

8   year.  In other words, gives us an accurate picture of

9   what our exposure was every year.  Simply a technique to

10  try to get the reserve right at the end of the year, as

11  opposed to trying each file.

12  Q.      And when the reserve-setting system changed to

13  evaluating the exposure, was the purpose of the reserve

14  then to determine what the company might have to pay in

15  the end?

16  A.      Well, the reserve is based on information that

17  we know at the time it's set, based -- that gives us our

18  exposure.  So, currently that could change.  It could

19  change on a daily basis, and occasionally I see files

20  where the reserve changes quite a bit.

21  Q.      What is meant by "exposure"?

22  A.      The amount that we potential -- not

23  potentially, but that we probably will pay on the case.

24  Q.      So, do you train adjusters to pay -- at

25  least -- to offer at least the reserve that was set by

1  looking at exposure?

2  A.    No.  The reserve and claims evaluations are

3  two distinct issues.  Obviously, you should set your

4  reserves based on your evaluation, but it doesn't

5  necessarily mean you pay your reserve.

6  Q.    Well, in the underinsured-motorist claims, do

7  you train adjusters to offer the insured the reserve, if

8  it's based on exposure?

9  A.    No.

10  Q.    Is there any particular training given to

11  adjusters on a negotiating underinsured-motorists claims

12  versus third-party claims?

13  A.    No.

14  Q.    When an uninsured-motorist claim reaches the

15  litigation stage, are the litigation adjusters trained

16  on negotiating those claims?

17  A.    I don't think there is any formal UM versus

18  third-party negotiation training.  I would say we give

19  first-party claims the benefit of the doubt; but beyond

20  that, there is no -- not much difference how we are

21  evaluating a third-party or first-party claim.

22  Q.    Did the company have a practice, from 2002 to

23  2007, of not settling underinsured-motorist claims when

24  there had been a demand for arbitration?

25  A.    No.

1  Q.    Have you ever spoken to Linda Howard about

2  this claim?

3  A.    No.

4  Q.    You have never spoken to Mangone about the

5  claim?

6  A.    No.

7  Q.    Or Kelly?

8  A.    Aside from --

9  Q.    The transfer?

10  A.    Right.

11  Q.    That's it?

12  A.    Yes.

13  Q.    What did you do in order to testify with

14  regard to Item Number 7, which is the decision-making

15  process utilized by AMCO in evaluating, adjusting, and

16  handling Plaintiff's claim?

17  A.    I am completely familiar with the decision

18  processes that AMCO uses.

19  Q.    How did -- now it's your understanding that --

20  is it your understanding AMCO denied Ms. Dougherty's

21  underinsured-motorist claim?

22  A.    Well, ultimately, AMCO paid Ms. Dougherty's

23  underinsured-motorist claim, so I don't think there was

24  ever a denial as such.  There was an arbitration, when

25  two parties disagreed; and there was an award that was

LUSK & SNYDER            50
(510)482-9991/FAX (510)482-1052

1  paid, but I don't think it was denied.

2  Q.      What decision did AMCO make with regard to

3  Ms. Dougherty's claim before the demand for arbitration

4  was made?

5  A.      That she had been fairly compensated by

6  underlying coverages.

7  Q.      So was the decision then she was not entitled

8  to any underinsured-motorist benefits?

9  A.      Again, until we are through the entire

10  process, which includes arbitration, that is our way of,

11  of satisfying our disagreements about value, I would say

12  there were letters by Mr. Mangone that suggested that we

13  owed nothing on the claim.  And Jeff always understood

14  that, you know, you could arbitrate it and an arbitrator

15  would make the determination.

16  Q.      Is it your understanding that company would

17  satisfy its obligation under the insurance code, to the

18  insured, by arbitrating underinsured-motorist claims?

19  A.      I mean it was part of the conditions of the

20  contract that we enter into binding arbitration, so,

21  yes, I think that, that complies with 790.03.

22  Q.      So if the company decided to arbitrate all

23  underinsured-motorist claims regardless of the merits of

24  any of them, you think that would comply with the

25  company duty under the insurance code?

1  A.    I don't know.

2  Q.    Are there statistics or records available that

3  would tell you that?

4  A.    I don't think so.

5  Q.    Would all decisions to arbitrate a UM claim

6  have to be approved by you, if they were within your

7  area?

8  A.    No.  Again, the arbitration process itself is

9  a legal process, so it would have been done in the

10  Litigation Department.

11  Q.    So --

12  A.    I was, again, in charge of casualty division.

13  Q.    Okay.  For a UM demand for arbitration to get

14  into the litigation section, you would have had to

15  approve that?

16  A.    It wasn't an approval process to send it to

17  litigation.  It was simply a review of a legal document

18  indicated we needed to refer to litigation.  So it's

19  more procedural than anything else.

20  Q.    So once it's in litigation, the Litigation

21  Department has the authority to say:  We settle this

22  case or we arbitrate it?

23  A.    Once it leaves casualty, the Litigation

24  Department conducts an independent evaluation of the

25  claim.

1  didn't want to assert that comparative negligence.

2  Litigation in their independent evaluation apparently

3  asserted that defense.

4  Q.    And in that regard, did AMCO put its own

5  interest ahead of the insured?

6  A.    No.  Again, it's two parties with different

7  opinions over liability or damages.  It happens in every

8  claim.

9  Q.    So the same decision-making process would

10  apply in any claim, whether it's a liability claim or

11  underinsured-motorist claim?

12  A.    Yes.  I mean it's a process of evaluating

13  liability, and then evaluating damages.  And each claim

14  would be unique on its facts.

15  Q.    Does AMCO have any mechanism that it follows

16  to survey files that are uninsured or

17  underinsured-motorist claims, to see if the company

18  complied with its duties under the insurance code?

19  A.    Managers audit files.  Managers review files.

20  Directors review files.  Outside auditors review files.

21  UM is not separated from third party, but it's -- it is

22  among the population of files that would be reviewed.

23  Q.    You are not aware of any mechanism to audit

24  UM files specifically to determine whether the company

25  complied with its duties under the insurance code?

1  A.    I mean under the insurance code, we have the

2  same duties to third parties as we do the first parties.

3  So we wouldn't differentiate third-party customers.  In

4  fact we do call third parties our customers.  So the

5  answer is:  No, they are not treated differently.

6  Q.    So third-party claimants are treated the same

7  as first-party claimants?

8  A.    Ideally we like to convert them to customers

9  of Allied.  Again, I would tell you that we do give

10  first parties the benefit of the doubt.

11  Q.    You do not give third parties the benefit of

12  the doubt?

13  A.    Depends on the facts of the case.  Each case

14  is a little different.

15  Q.    So is there any mechanism in place, or has

16  there been since 2002, where Allied would look at

17  first-party UM claims to see if the company gave those

18  insureds the benefit of the doubt?

19  A.    No.  That is not a benefit-of-the-doubt

20  survey.  It's fair treatment.

21  Q.    Well, but is there a survey to see if they

22  were treated fairly?

23  A.    No.  There is a review whether the file was

24  evaluated appropriately and resolved appropriately.  To

25  the extent that enters into the concept of "fair," yes.

1   But it's a relatively normal review of pending files.

2   Q.      Can you tell me all of the ways in which AMCO,

3   in it's decision-making process in this case, gave

4   Ms. Dougherty the benefit of the doubt?

5   A.      I think Jeff gave her the benefit of the doubt

6   on liability.  I think Jeff made reasonable efforts to

7   solicit additional information in which to evaluate the

8   claim further.  Those are two examples I think where

9   some benefit of the doubt was given to the insured.

10  Q.      Any others you can think of?

11  A.      Again, having cursorily reviewed the file, no.

12  Q.      Item Number 6 asks for all data relied upon by

13  AMCO in setting reserves for Plaintiff's claim.

14          What have you done to obtain knowledge about

15  that subject?

16  A.      We're -- that's the conversation we have had

17  about standard reserves versus current reserves

18  practices.  I have seen the note you pointed out on the

19  $15,000 reserve change.  I don't have an explanation

20  why, in my mind, $15,000 except that could have been a

21  standard reserve back then.  So, I think we've kind

22  discussed that issue.

23  Q.      So, you -- even though you're appearing here

24  on behalf of AMCO to testify to that issue, you have no

25  knowledge about it?

1  Q.      What do you know about that?

2  A.      Again, it's something we have talked about.

3  We use Colossus as a tool.  We used a central entry unit

4  where associates would give information to a central

5  unit.  Central unit would plug information into

6  Colossus.  Colossus referral would be sent back to the

7  associate, who then had a tool to help him evaluate, or

8  her, evaluate the case.

9  Q.      Do you have understanding as to what data gets

10  input into Colossus?

11  A.      Well, the medical data, special damages, the

12  doctor's reports; as much data as we develop gets

13  entered into Colossus.

14  Q.      Have you ever input data into Colossus?

15  A.      No.

16  Q.      Do you have an understanding as to the meaning

17  of whatever amount that Colossus generates for general

18  damages comes from, or the basis for that number?

19  A.      No, I don't have that information.

20  Q.      For example, are you aware whether that number

21  is generated as a result of some fine-tuning that AMCO

22  might do to the program?

23  A.      No, I don't have any understanding of that

24  process.

25  Q.      So what is your understanding of the

1   significance of whatever number that Colossus generates

2   for general damages?

3   A.      It's a tool to help associates evaluate the

4   claim.

5   Q.      Well, is that your understanding that number

6   is based on the probable jury verdict on general

7   damages?

8   A.      You know, it's -- when I was trained in

9   Colossus, many years ago, I suspect that was the basis

10   for some of the evaluations that are made on general

11   damages, was jury verdicts for similar injuries.

12   Q.      Is it your understanding that that was the

13   basis for the Colossus report generated on

14   Ms. Dougherty's claim?

15       MR. PARDINI:  Object; lacks foundation.

16       If you have an understanding, you may respond.

17       THE WITNESS:  I never saw the evaluation, so I

18   can't tell you.

19       MR. MURPHY:  Q.  Well, but in terms of

20   Colossus generally, in 2002, 2003, 2004, is it your

21   understanding that the values generated by Colossus for

22   general damages were based, in any way, on jury

23   verdicts?

24   A.      Well, I have an understanding that that is

25   what Colossus used to evaluate their general damage

1   evaluations:  Jury verdicts.

2   Q.      On what do you base that understanding?

3   A.      On training we received in Colossus earlier

4   than, than this, 2000.

5   Q.      Were you ever trained that the Colossus value

6   for general damages is based on what amounts AMCO had

7   paid in settlement of other pre-litigation claims?

8   A.      No.  I don't think Colossus was based on AMCO

9   evaluations.  I think it was based on jurisdictional

10   evaluations.

11   Q.      "Jurisdictional," meaning jury verdicts?

12   A.      Jury verdicts in California, in this instance;

13   in Nevada, if we were talking about Nevada.

14   Q.      Would you be surprised to know that Colossus

15   values are based on settlements of pre-litigation claims

16   in the company itself?

17   A.      Surprised?  No.  It's been awhile, so I guess

18   I wouldn't characterize it as "surprise."  But I would

19   be -- that would be my understanding; it would not be my

20   understanding.

21   Q.      So you understood that whatever value Colossus

22   generated would have some basis in reality, in terms of

23   what the claimant might ultimately recover in front of a

24   jury?

25   A.      No.  I would not characterize that ultimately