**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Julian J. Pardini, Esq.  SB# 133878
Stephen J. Liberatore, Esq.  SB# 129772
Rowena C. Seto, Esq.  SB# 235103
One Sansome Street, Suite 1400
San Francisco, California 94104
Telephone: (415) 362-2580
Facsimile: (415) 434-0882

Attorneys for Defendant
AMCO INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINE DOUGHERTY, | CASE NO. C 07-01140 MHP |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT AMCO INSURANCE COMPANY'S REPLY TO PLAINTIFF'S OPPOSITION TO AMCO'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |
| v. | |
| AMCO INSURANCE COMPANY, and DOES ONE through TWENTY, Inclusive, | Date: April 28, 2008<br>Time: 2:00 p.m.<br>Dept.: 15 — Hon. Marilyn Hall Patel |
| Defendant. | |

**TABLE OF CONTENTS**

**PAGE**

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ............................................................. ii

I.   Plaintiff Fails to Argue, Much Less Raise Triable Issue of Fact, that AMCO Breached the Insurance Contract ................................................................ 1

II.   No Delay in the Resolution of Plaintiff's Insurance Claim is Attributable to AMCO .... 2

III.   No Provision of the Policy Required AMCO to Pay Plaintiff's Demand .............. 9

IV.   There Was No "Bad Faith" Even If There Was A Breach of the Insurance Contract .... 10

V.   Plaintiff Is Not Entitled to an Award of Punitive Damages ........................ 13

VI.   Plaintiff's Opposition Is Replete With Falsehoods ............................... 13

VII.   Conclusion ........................................................................ 15

LEWIS BRISBOIS BISGAARD & SMITH LLP
ONE SANSOME STREET, SUITE 1400
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE (415) 362-2580

**TABLE OF AUTHORITIES**

**CASE LAW**                                         **PAGE**

*Aydin Corp. v. First State Ins. Co.*
    18 Cal.4th 1183, 1188 (1998) .................................................. 7

*Flyer's Body Shop v. Ticor Title Ins. Co.*
    185 Cal.App.3d 1149 (1986) .................................................. 13

*Love v. Fire Ins. Exchange*
    221 Cal.App.3d 1136 (1990) .................................................. 1-2, 4, 13

*McCormick v. Sentinal Life Ins. Co.*
    153 Cal.App.3d 1030 (1984) .................................................. 2-3

*Mock v. Michigan Millers Mut. Ins. Co.*
    4 Cal.App.4th 306 (1992) .................................................. 13

*Royal Globe Ins. Co. v. Whitaker*
    181 Cal.App.3d 532, 537 (1986) .................................................. 7

*Tomaselli v. Transamerica Ins. Co.*
    25 Cal.App.4th 1269 (1994) .................................................. 13

*Waller v. Truck Ins. Exchange*
    11 Cal.4th 1 (1995) .................................................. 1-2, 4

*Wilson v. 21st Century Insurance Company*
    42 Cal.4th 713 (2007) .................................................. 3-5, 7-8

Defendant AMCO Insurance Company ("AMCO") hereby submits this memorandum of points and authorities in reply to the opposition of Plaintiff Christine Dougherty ("Plaintiff") to AMCO's motion for summary judgment or, in the alternative, for partial summary judgment.

## I. Plaintiff Fails to Argue, Much Less Raise Triable Issue of Fact, that AMCO Breached the Insurance Contract

In California, an insured must first show that an insurer breached the insurance contract before the insured may recover for the insurer's alleged breach of the implied covenant of good faith and fair dealing, or acted in "bad faith," in the handling of the insured's claim. In her opposition, Plaintiff addresses only AMCO's alleged bad faith, but makes no effort to identify any breach of the insurance contract. Plaintiff attempts to discount the applicability of the California appellate court's decision in *Love v. Fire Insurance Exchange*, 221 Cal.App.3d 1136 (1990), but that case, cited with approval by the California Supreme Court, establishes that a breach of contract is a prerequisite to the survival of this action.

The *Love* court stated, "[T]here are at least two separate requirements to establish breach of the implied covenant: (1) *benefits due under the policy must have been withheld*; and (2) the reason for withholding benefits must have been unreasonable or without proper cause. [Citations.] Here, the undisputed facts show the threshold requirement is absent. No benefits due were withheld or delayed, because the Loves' claim to benefits was already time barred." (*Love*, 221 Cal.App.3d 1136, 1151-1152, emphases added.) The emphasized portion of the court's holding is the recognition that there must first be a breach of contract.

In *Waller v. Truck Ins. Exchange*, 11 Cal.4th 1 (1995), The California Supreme Court held:

> In its original decision, the Court of Appeal [in *Love*] noted at the beginning of its discussion that because a contractual obligation is the underpinning of a bad faith claim, such a claim cannot be maintained unless policy benefits are due under the contract. [Citations.] . . .
>
> [T]here can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer. (*Love v. Fire Ins. Exchange, supra*, 221 Cal.App.3d 1136, 1151-1153.) As the *Love* court observed, its "conclusion that a bad faith claim cannot be maintained unless policy benefits are due is in accord with the [jurisprudential] policy in which the duty of good faith is [firmly] rooted." (*Id*. at p. 1153.) . . . In sum, the covenant is implied as a

LEWIS BRISBOIS BISGAARD & SMITH LLP
ONE SANSOME STREET, SUITE 1400
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE (415) 362-2580

> supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement. (*Love, supra*, 221 Cal.App.3d at p. 1153.) Thus, as the *Love* court noted, when benefits are due an insured, "delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because" they frustrate the insured's right to receive the benefits of the contract in "prompt compensation for loss." (*Ibid.*) Absent that contractual right, however, the implied covenant has nothing upon which to act as a supplement, and "should not be endowed with an existence independent of its contractual underpinnings." (*Ibid.*)

(*Waller*, at 35-36 (first and second bracketed language inserted by AMCO.)

The above-cited excerpt makes clear that, according the California Supreme Court, the law in California requires that an insured first establish that there was a breach of the insurance contract, and then and only then, will the insured be permitted to pursue a claim for bad faith.

Also, the above-cited excerpt makes clear that the California Supreme Court was not worried about the differences between the underlying insurance claims in the *Waller* case (a third-party duty to defend question) and *Love* case (a first-party property question), as is Plaintiff in her opposition. Thus, Plaintiff's effort to suggest that this Court can ignore the *Love* court's holding must be motivated by her wish to avoid the consequences of that holding, to wit, that she must show, first and foremost, that AMCO breached the insurance contract *before* she can offer any argument that AMCO acted in bad faith. As established by the very first sentence in her opposition, Plaintiff makes <u>no</u> argument that AMCO breached the insurance contract; rather, and improperly, she immediately begins to argue bad faith.

Thus, this Court should view Plaintiff's opposition as conceding that there was no breach of contract and, therefore, this Court should grant this motion without further discussion.

## II. No Delay in the Resolution of Plaintiff's Insurance Claim is Attributable to AMCO

Plaintiff seems to suggest that AMCO might have breached the insurance contract by delaying payment of policy benefits that were due. Under California law, such a delay by an insurer may, under certain circumstances, constitute a breach of the insurance contract if it deprives the insured of the protections of the insurance policy, thus resulting in the same consequences as a denial of the insured's claim. (See *McCormick v. Sentinel Life Ins. Co.*, 153

Cal.App.3d 1030 (1984), discussed in AMCO's opening brief at p. 12.) As discussed in detail below, such circumstances are not present here.

Plaintiff also tries to liken this case to that discussed in the recent California Supreme Court case of *Wilson v. 21st Century Insurance Company*, 42 Cal.4th 713 (2007).[1] In that case, Ms. Wilson, a college coed planning to study abroad in Australia the following semester, was severely injured in a high-speed automobile accident with a drunken driver. She underwent treatment for her injuries, including numerous MRIs, and her physicians concluded that "degenerative disk changes" diagnosed in Wilson's spine were caused by the accident. She settled with the drunken driver for his liability coverage limit of $15,000, then filed an underinsured motorist claim with 21st Century, her auto insurance carrier, demanding $85,000, the total amount available under her policy for underinsured motorist coverage. She supported her demand with all the medical records regarding her treatment, including those in which the physicians concluded that her then-present condition was the result of the accident and that cervical disk changes would adversely affect her later in life.

Nevertheless, the adjuster sought and received supervisor approval to offer Wilson only $5,000 in settlement of her claim, justifying the amount with his own interpretation of MRIs, and claiming that the x-rays were normal, that cervical disk changes were the result of a pre-existing condition, and that she had suffered only soft-tissue injuries as a result of the accident, all of which were directly contrary to the conclusions of Wilson's treating physicians. (*Id.* at 717-719.)

Wilson thereafter demanded arbitration and two years later, after at least three physicians recommended surgery to address Wilson's condition, 21st Century revised its evaluation and paid her the $85,000 available under her policy's underinsured motorist coverage. Wilson then sued 21st Century for breach of the insurance contract and breach of the implied covenant of good faith and fair dealing. 21st Century moved for summary judgment, or in the alternative, summary adjudication of the bad faith cause of action. The trial court granted the motion, the appellate

---

[1] Given the amount of attention Plaintiff gave *Wilson* in her opposition, the case is discussed at length here.

4848-8949-2994.1                                3
DEFENDANT AMCO INS. CO. REPLY BRIEF RE SUMMARY JUDGMENT
CASE NO. 07-01140 MHP

court reversed, and the Supreme Court affirmed the appellate court's reversal. (*Id.* at 720.)

In finding that the trial court erred in granting 21st Century's motion with respect to the cause of action for breach of contract, the Supreme Court stated:

> To protect its insured's *contractual* interest in security and peace of mind, "it is essential that an insurer fully inquire into possible bases that might support the insured's claim" before denying it. [Citation.] By the same token, denial of a claim on *a basis unfounded in the facts known* to the insurer, or *contradicted by those facts*, may be deemed unreasonable.

(*Wilson*, at 721, emphasis added.) In other words, acts and/or omissions on the part of the insurer that indicate a breach of the insurance contract may also be evidence of insurer's bad faith conduct.

The Supreme Court then went on to note triable issues of fact regarding how 21st Century might have breached the insurance contract:

> Despite his receipt of this information [regarding Wilson's physician's conclusion that the degenerative changes in her spine were caused by the accident], 21st Century's claims examiner asserted in his internal denial memo that it was "unlikely" the disk bulges were caused by the accident and that because Wilson was "on vacation" in Australia her claims of severe pain should be "discount[ed]." Having received approval to deny the claim, he then did so on the ground that Wilson's pain was due only to "soft tissue injury superimposed by a preexisting degenerative disc disease."
>
> [A] jury could reasonably find that nothing in the material the claims examiner had received justified these conclusions. 21st Century directs us to *no medical report or opinion* on the basis of which the claims examiner could reasonably have *ignored or disbelieved* [Wilson's physician's] conclusion that the changes in Wilson's cervical spine were probably caused by her recent trauma; as far as the record reveals, *the claims examiner had no basis for his contrary conclusion* that such a causative link was "unlikely." *Nor is there any apparent medical basis for the claims examiner's assertion* that Wilson had "preexisting degenerative disc disease." No such diagnosis appears in the medical reports submitted to 21st Century, and we are directed to *no evidence that the company's claims examiner had sufficient medical expertise to make such a diagnosis himself.*

(*Wilson*, at 721-722, emphasis added.) The above facts cited by the Supreme Court paint a classic picture of the "oppressive conduct by [a] claim[] adjuster[] seeking to reduce the amounts legitimately payable" under the policy, described by the *Love* court and referred to by the Supreme Court in *Waller*.

///

But <u>nothing</u> like that happened here. Indeed, the <u>exact</u> <u>opposite</u> happened here. Unlike in *Wilson*, here Mr. Mangone (AMCO's claim adjuster) did <u>not</u> disregard Plaintiff's physician's diagnoses or conclusions or substitute his own conjectures in place of the physician's medical opinions. He did <u>not</u> discount or minimize Plaintiff's injuries, as did the claim adjuster in *Wilson*. Further, unlike the claim adjuster in *Wilson*, Mr. Mangone did <u>not</u> seek to reduce the amount legitimately payable under Plaintiff's policy, but rather actively sought information that would increase the value of her claim. At deposition, Mr. Mangone testified:

> The surgery is an inevitable, whether she has it now or she's forced to have it eight years from now. It should be included in the evaluation to give the policyholder as much benefit as we possibly can for the client.

(Decl. of Pardini (served with AMCO's opening brief), ¶5, Ex. W (Depo. of Mangone), at 111:10-14.)

Perhaps most important, unlike what happened in *Wilson*, here Mr. Mangone, realizing he did not have all of the information he needed to fully adjust Plaintiff's underinsured motorist claim, actively solicited further input from Plaintiff's treating physician. In his declaration supporting this motion and filed with AMCO's opening brief, Mr. Mangone testified:

> On August 28, 2003, Mr. Murphy and I spoke by telephone. At that time, [Mr. Murphy] advised that Ms. Dougherty was <u>not</u> making a wage loss claim and that she had chosen <u>not</u> to have surgery to address certain injuries allegedly sustained in the auto accident. When I asked whether Ms. Dougherty's physicians believed that surgery was a medical necessity, [Mr. Murphy] indicated that he would question Plaintiff's physicians and report back to me.

(Decl. of Mangone, ¶9, emphasis in original.)

At deposition, Mr. Mangone testified as follows:

> Question [by Mr. Murphy]: Well, is there any reason you did not put in the letter [of August 22, 2003 (see Ex. D)] that your evaluation showed that the case had no value.
>
> Answer [by Mr. Mangone]: Well, no, no, because I recognize that there was still data out there that— or at least I believed there was still reports, records, data that I'm requesting in this letter, some clarification concerning her future surgery.
>
> . . .
>
> A: As far as I knew, she may have opted not to have surgery, but I didn't know whether or not that was a medical necessity, and

> that was the data I was looking for, as to whether or not the surgery was a medical necessity, but it can be a medical necessity and she can choose not to have the surgery, because that's her choice, so the evaluation would have to include the medical necessity, I guess, part of it.
>
> The surgery is an inevitable [*sic*], whether she has it now or she's forced to have it eight years from now. It should be included in the evaluation to give the policyholder as much benefit as we possibly can for the client.
>
> . . .
>
> A:   It would be one of those surgeries, if it's a medical necessity, she couldn't ignore it forever. Ultimately, eventually, she would have to have it. Say that she decides not to, it's still something, a future expense that she could incur, that she would incur and should be evaluated so she can be compensated for it.
>
> . . .
>
> A:   If it's part of her injury and it's a surgery that would have had to have been done, regardless of what she chooses to do, I would— I would do my best to get that included in the evaluation of her claim.
>
> . . .
>
> A:   I read [Dr. Sponzilli's] deposition that said he would recommend surgery, but I saw no clinical data to back up that recommendation, which is what I requested.
>
> . . .
>
> A:   . . . [T]ypically, I will see testing that's done, or, for that matter, just remove all the testing. How about some, you know, an examination, some notes as a result of an examination, or a plan of care? Nothing like that was contained within [Dr. Sponizilli's] deposition, just that, you know, the surgery could be, could not be done. It wasn't clear that it was a medical necessity from his deposition.

(Decl. of Pardini, ¶5, Ex. W at 110:9-16; 111:2-14; 112:1-6, 15-18; 113:7-9, 11-18.)

Mr. Mangone sought additional input from Plaintiff's physicians; Plaintiff's own attorney, Mr. Murphy, stated that he would obtain that additional input and provide it to Mr. Mangone. But Mr. Murphy <u>never</u> <u>did</u>. He <u>never</u> did what he told Mr. Mangone he would do. Never.

As stated in AMCO's opening brief, Mr. Mangone followed up with Mr. Murphy after that August 28, 2003, telephone conversation by writing to Mr. Murphy *10 times* over the next

1  10 months to renew his request that Mr. Murphy provide the additional information that
2  Mr. Murphy offered to provide. But Mr. Murphy <u>never</u> responded.
3        Now Plaintiff argues that Mr. Mangone should have forced her to submit to an independent
4  medical examination ("IME") to obtain the information he sought. But her reasoning is exactly
5  backwards: An insurer has the right, though not necessarily the obligation, to require an insured to
6  submit to an IME where the insurer has reason to question a diagnosis or proposed course of
7  treatment. In *Wilson, supra,* at 722, the Supreme Court took 21st Century to task for dismissing
8  the findings and recommendations of Wilson's physicians without conducting an IME. Here, by
9  contrast, Mr. Mangone did not disbelieve or doubt Plaintiff's physician findings or
10 recommendations, but requested additional information from the physician, information that
11 Mr. Murphy said he would obtain and provide. Mr. Mangone made clear in his deposition that he
12 needed only a note from Plaintiff's physician, and an intrusive IME of Plaintiff at the hands of a
13 physician unknown to her was not necessary. (See AMCO's opening brief at p. 13, fn. 7.) Now
14 Plaintiff wishes to excoriate AMCO and Mr. Mangone for not forcing her to submit to an IME.
15       In California, an insured bears the initial burden of "proving up" her claim, of providing
16 the insurer with adequate information for a complete evaluation thereof. (*Aydin Corp. v. First*
17 *State Ins. Co.*, 18 Cal.4th 1183, 1188 (1998); *Royal Globe Ins. Co. v. Whitaker*, 181 Cal.App.3d
18 532, 537 (1986).) That was the purpose of Mr. Mangone's letter to Mr. Murphy of August 22,
19 2003 (Ex. D) and telephone conversation with Mr. Murphy on August 28, 2003— to request that
20 Plaintiff provide additional information to "prove up" her claim. Mr. Murphy said he would
21 provide the information. He never did and, to date, has offered no explanation for his failure to do
22 what he said he would do.
23       Further, in *Wilson*, 21st Century argued that after its claims examiner told Wilson's
24 attorney that the submitted medical reports did not support the claim of cervical disk injury
25 resulting from the accident, Wilson's attorney did not take issue with the claim examiner's
26 statement or offer to provide additional information, thus relieving 21st Century of any duty to
27 further assess Wilson's claim. The Supreme Court wasted little time dismissing the argument,
28 pointing out Wilson's attorney had already drawn the claim examiner's attention to Wilson's

1 physician's report and opinion regarding causation. (Id. at 722, fn. 6.)

2 Here, quite unlike in *Wilson*, Mr. Murphy <u>never</u> referred Mr. Mangone to information in the materials that Mr. Murphy had already submitted that might have provided Mr. Mangone with the additional information he requested regarding whether surgery was a "medical necessity" for Plaintiff. Indeed, the only conclusion to draw from the evidence presently before the Court is that Mr. Murphy <u>agreed</u> that Plaintiff's physician's records and deposition testimony did <u>not</u> provide Mr. Mangone with the additional information Mr. Mangone had requested. Surely, if Mr. Murphy believed Mr. Mangone possessed all the information necessary for a full evaluation and decision on Plaintiff's claim, he would have said so and he would not have offered to obtain that information from Plaintiff's physicians and provide it to AMCO.

11 Plaintiff offers no evidence to refute these facts— no letters from Mr. Murphy to Mr. Mangone responding to Mr. Mangone's many letters to Mr. Murphy renewing the request for additional information, no telephone records showing efforts by Mr. Murphy to contact Mr. Mangone to provide the requested information, no declaration from Mr. Murphy to contradict Mr. Mangone's deposition testimony or sworn declaration in support of this motion. Indeed, in her opposition Plaintiff painstakingly avoids any mention of the August 28, 2003, telephone conversation between Mr. Mangone and Mr. Murphy, Mr. Murphy's offer to obtain the requested additional information from Plaintiff's physicians and provide it to Mr. Mangone, and Mr. Murphy's utter failure to respond to any of Mr. Mangone's follow-up letters for more than a year. Perhaps Plaintiff wishes this unrefuted evidence would just go away on its own; alas, it will not.

21 The only evidence before the Court is that provided by Mr. Mangone. That evidence establishes that any delay in AMCO's final determination regarding Plaintiff's claim was occasioned by Mr. Murphy's failure ever to provide the information he said he would provide or otherwise to advise AMCO that he could not provide it.

25 Thus, AMCO contends that no delay in the final determination on Plaintiff's claim can be laid at AMCO's feet as the basis for finding that it breached the insurance contract. Plaintiff offers no argument regarding how AMCO might have, allegedly, breached the insurance contract. Therefore, AMCO requests that the Court grant its motion for summary judgment.

### III. No Provision of the Policy Required AMCO to Pay Plaintiff's Demand

Plaintiff argues in her opposition that "the documentation [Mr. Murphy] had provided to [AMCO] as of July 2003 conclusively demonstrated that [she] was entitled to at least her $45,000 demand." (Opp. Br., at 17:13-15.) Variations on this theme are repeated throughout Plaintiff's opposition— she complains that AMCO did not make a monetary settlement offer, argues that AMCO's "liability [was] reasonably clear," and suggests the arbitrator's award established as unreasonable any valuations of her claim less than the award. Plaintiff thus seems to argue that, as a matter of law, she was entitled to monies over and above the $35,000 she had already received ($30,000 from her settlement with the other driver and $5,000 from AMCO in medical payments benefits).

But this simply isn't so. The amount of damages that will reasonably compensate a plaintiff for harm allegedly suffered is a question of fact, invariably submitted to a jury for determination. It is a question upon which reasonable minds may differ. Simply because one person believed she should be paid over $100,000 does not conclusively establish that someone else could not reasonably conclude that $35,000 would adequately compensate her for her injuries.

There are three points established here: First, neither the policy at issue nor California law required that AMCO make an offer at any time to pay monies to Plaintiff over and above what she had already received; thus, any perceived failure by AMCO to make such an offer could not be characterized as a breach of contract.

Second, as the above discussion establishes, Mr. Mangone did not believe he had all the information pertinent to a full and final determination of the value of Plaintiff's claim (and thus, as a matter of common sense, could not make a monetary offer). Thus, Mr. Mangone sought that information and Mr. Murphy agreed to provide it.

Third, Plaintiff cannot reasonably believe that she was entitled to any monetary recovery from AMCO because *her own attorney did not think so*, at least not as based on the information he submitted in support of her claim. As pointed out above, Mr. Murphy <u>never</u> provided to Mr. Mangone the information he (Mr. Murphy) said he would provide; Mr. Murphy <u>never</u> told Mr. Mangone that all of information necessary to respond to Mr. Mangone's questions had already

been submitted; Mr. Murphy <u>never</u> referred Mr. Mangone to portions of the deposition of Plaintiff's physician where Mr. Mangone's questions were answered; Mr. Murphy <u>never</u> advised Mr. Mangone that he (Mr. Murphy) could not obtain the physician's cooperation so as to provide the requested information. Quite to the contrary, Mr. Murphy, in obvious agreement with Mr. Mangone's observation that neither the medical records submitted nor the deposition testimony of Plaintiff's physician determined whether surgery was a medical necessity for Plaintiff (and thus should be factored into the evaluation of the monetary value of her claim), and presumably, in the best interests of his client, agreed to contact Plaintiff's physician, obtain the information Mr. Mangone requested, and provide it so that evaluation of Plaintiff's claim could be completed. Yet, inexplicably, Mr. Murphy <u>never</u> followed through on his commitment to provide the needed information. Neither the Court, AMCO, nor perhaps even Plaintiff herself will ever know why he did not.

But it is disingenuous for Plaintiff to argue now that all of the necessary information had been submitted to AMCO and that it is "conclusively established" that she was entitled to at least $45,000 as of July 2003. The unrefuted facts establish otherwise, and Plaintiff offers no evidence in support of her argument.

### IV. There Was No "Bad Faith" *Even If* There Was Breach of the Insurance Contract

Inasmuch as Plaintiff does not even argue, much less raise a triable issue of fact, that AMCO breached the insurance contract, it follows as a matter of law that AMCO could not have acted in bad faith. However, even assuming for the sake of argument that there is a triable issue of fact as to whether AMCO breached the insurance contract, the above-discussed facts establish that AMCO did not act in bad faith in the handling and adjustment of Plaintiff's claim.

AMCO accepted Plaintiff's claim and set about to evaluate it. Through Mr. Mangone, AMCO received and considered information regarding the accident, Plaintiff's injuries, Plaintiff's past medical treatment and prognosis for further care. It did not disregard or discount any of the information submitted, or substitute its own judgment in place of that of Plaintiff's treating physicians. It did not believe that the information submitted answered the question whether surgery for Plaintiff was a "medical necessity," and thus should be included in assessing the

1  monetary value of Plaintiff's claim, regardless of whether she opted to have the surgery. *And her*
2  *own attorney agreed that such information had not been submitted*, and said he would obtain and
3  provide it, but never did. AMCO continually and repeatedly renewed its request for the additional
4  information regarding Plaintiff's medical condition so that it could, as necessary, re-evaluate the
5  value of her claim, but Plaintiff, as was her duty in "proving up" her claim, never responded (or at
6  least her attorney did not). After more than a year of futilely asking and re-asking for the
7  information Plaintiff's attorney said he would provide, and never even receiving the courtesy of a
8  response, AMCO closed its file.

9  What was unreasonable about AMCO's handling of Plaintiff's claim? That it did not force
10 Plaintiff to submit to an IME so that Plaintiff could "prove up" her claim? One need not much of
11 an imagination to hear the cries of "bad faith" Plaintiff would have raised in that circumstance:
12 "Even though Mr. Murphy agreed to obtain the additional information AMCO requested, AMCO
13 nevertheless unreasonably and unnecessarily forced Plaintiff to submit to an IME conducted by a
14 physician completely unknown to Plaintiff and unfamiliar with her medical history." In other
15 words, Plaintiff essentially argues that no matter how AMCO handled her claim, it would have
16 acted in bad faith. But the facts are otherwise.

17 Did AMCO act in bad faith in using the Colossus program to determine a reasonable range
18 of the value of Plaintiff's claim? Or did AMCO act in bad faith in accepting the Colossus result
19 that, based on the (incomplete) information submitted by Plaintiff, her damages fell in the range of
20 $26,522 to $32,102? Plaintiff seems to argue that the use of Colossus and its result are evidence
21 of AMCO's bad faith, yet nowhere in her opposition does Plaintiff explain how Mr. Murphy
22 determined that her damages were worth $45,000 more than the $35,000 she had already received.
23 As it turned out, Mr. Murphy did <u>not</u> believe her case was worth more than she had received.
24 Conspicuous by the absence of any effort by Plaintiff to rebut the evidence of the August 28, 2003,
25 telephone conversation between Mr. Murphy and Mr. Mangone, is the obvious conclusion that
26 Mr. Murphy realized that, absent the information Mr. Mangone had requested regarding whether
27 surgery was a "medical necessity," Plaintiff <u>had</u> been aedquately compensated her for her injuries
28 by the $35,000 she had already received. Thus Mr. Murphy agreed to obtain from Plaintiff's

LEWIS BRISBOIS BISGAARD & SMITH LLP
ONE SANSOME STREET, SUITE 1400
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE (415) 362-2580

1  physician the additional information Mr. Mangone requested, recognizing that that information
2  might increase the value of Plaintiff's claim beyond the amount she had already received.
3        The simple fact of the matter, as the Court well knows by its own experience, is that the
4  valuation of a plaintiff's damages is an inexact science on the best of days. Different people go
5  about that task in different ways and, again, reasonable minds may differ. But here, Mr. Mangone
6  recognized that he did not have all the information he needed, requested the additional information
7  regarding the "medical necessity" of surgery for Plaintiff, and relied on Mr. Murphy to provide it,
8  as Mr. Murphy committed himself to do. As Mr. Mangone testified, that information might well
9  have increased the value of Plaintiff's claim, and he wanted to give her "as much benefit as
10 possible."
11       Is Plaintiff's demand for arbitration evidence of AMCO's alleged bad faith? How can that
12 be? Mr. Mangone advised Mr. Murphy in August 2003 that the information submitted in support
13 of Plaintiff's claim was insufficient to determine whether surgery was a "medical necessity," that
14 such information was required for a full and complete evaluation of Plaintiff's claim, and that,
15 without it, AMCO believed that Plaintiff had been adequately compensated by the $35,000 she had
16 already received. *And Mr. Murphy agreed!* Thus he said he would provide the additional
17 information needed to establish, if indeed it would establish, that Plaintiff's damages were greater
18 than the amount already paid to her. When he failed to communicate further with AMCO for more
19 than a year, AMCO advised that it was closing its file. Then, and only then, did Mr. Murphy
20 respond— by demanding arbitration. AMCO contends that the demand for arbitration, far from
21 being evidence of *AMCO's* bad faith, was how Mr. Murphy chose to deflect attention away from
22 his own dilatory conduct in failing to provide to AMCO the additional information he had
23 promised.
24       AMCO contends that, as a matter of law, based on the unrefuted facts presented to the
25 Court, it did not act in bad faith in its handling and adjustment of Plaintiff's claim, and that it
26 should not be held to account for Mr. Murphy's failure to provide the additional information he
27 agreed was necessary to a full evaluation of his client's claim.
28       Therefore, even if the Court is inclined to believe that there is a triable issue of fact as to

1  whether AMCO breached the insurance contract, AMCO respectively requests that the Court grant
2  its motion for partial summary judgment with respect to Plaintiff's cause of action for bad faith.

3  **V.    Plaintiff Is Not Entitled to an Award of Punitive Damages**

4  In the insurance context, an insured cannot recover punitive damages unless the insurer's conduct goes *beyond* that ordinarily characterized as "bad faith." Accordingly, even if it is determined that an insurer is liable for "bad faith" due to the unreasonable handling of a claim, it does not follow that the insurer is liable for punitive damages. (*Mock v. Michigan Millers Mut. Ins. Co.*, 4 Cal.App.4th 306, 328 (1992).) In reversing a jury award of punitive damages in a first party insurance case, one California Court of Appeal held:

> [T]he actions of [the insurance company] may be found to be negligent (failing to follow up information provided by the insured), overzealous (taking an unnecessary deposition under oath of the insured), legally erroneous (relying on an endorsement which was not shown to have been delivered), and callous (failing to communicate). There was nothing done, however, which could be described as evil, criminal, recklessly indifferent to the rights of the insured, or with a vexatious intention to injure.

(*Tomaselli v. Transamerica Ins. Co.*, 25 Cal.App.4th at 1288.) Another court set forth the law this way: "Punitive damages are proper only when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate." (*Flyer's Body Shop v. Ticor Title Ins. Co.*, 185 Cal.App.3d 1149, 1154 (1986), emphasis added.)

AMCO contends that even were the Court to find that there are triable issues of fact regarding whether AMCO acted in bad faith, no reasonable trier of fact could find that AMCO's handling and adjustment of Plaintiff's claim was motived by an "evil, criminal, [or] reckless[] indifferen[ce]" to Plaintiff's rights at "a level which decent citizens should not have to tolerate."

**VI.   Plaintiff's Opposition Is Replete With Falsehoods**

As noted above, in her opposition Plaintiff seeks to avoid those facts and truths that undercut or contradict her narrative about AMCO's acting in bad faith in virtually everything it did and did not do in the handling of her claim. She tries to skirt the obvious application of the *Love* court's holding, requiring her to establish, first, a breach of contract, which she does not do; she makes absolutely no mention whatsoever of the watershed discussion between Mr. Mangone and

1  her own attorney, Mr. Murphy, on August 28, 2003, when Mr. Murphy agreed to obtain and
2  provide additional information Mr. Mangone said he needed to a full and proper evaluation of
3  Plaintiff's claim.
4      But it gets worse: In her opposition, Plaintiff picks and chooses pieces of information—
5  whether from correspondence or deposition testimony or other sources— to create blatantly false
6  perceptions of the facts. AMCO contends that Plaintiff's only motivation is to deceive the Court
7  so as to avoid the granting of this motion. The page limit of this brief does not allow a full vetting
8  of these misrepresentations, so AMCO offers only a few of the more egregious instances:
9      1.   Plaintiff claims on numerous occasions in her opposition that Mr. Mangone advised
10 in his letter of August 22, 2003, that "[AMCO's] review and evaluation of Mrs. Dougherty's
11 treatment is data complete," so as to suggest that any delay thereafter in paying her policy benefits
12 was unreasonable. But Plaintiff does not tell "the rest of the story" and thereby offers the Court a
13 deliberately incomplete recitation of the facts. Immediately after the quoted sentence,
14 Mr. Mangone wrote:

> "Before we discuss the matter of the content of the evaluation, there appears to be some items and documentation that was not included with your offer of settlement. . . . Mrs. Doughtery testified she lost some time from work. However, these documents were not included with the rest of her treatment records.
>
> The other issue concerns the matter of future care of Mrs. Dougherty's injuries . . .. From her orthopedic surgeon's testimony, . . . surgical intervention for these injuries is mentioned, but only as an option. . . .

20 (See Decl. of Mangone, ¶8, Ex. D.) Indeed, this letter was the precursor to Mr. Mangone's
21 telephone conversation with Mr. Murphy of August 28, 2003, at which time Mr. Mangone advised
22 of the additional information he needed and Mr. Murphy agreed to provide.
23      2.   Plaintiff argues that AMCO used of the Colossus program in bad faith so as to
24 undervalue her claim. She states that "the Colossus report valu[ed] plaintiff's claim at zero."
25 (Opp. Br. at 21:1-2.) That statement is false. The evidence establishes, without question, that the
26 Colossus program valued Plaintiff's claim— with<u>out</u> the requested information regarding whether
27 surgery was a "medical necessity"— at between $26,522 to $32,102. Under that circumstance, no
28 underinsured motorist benefits would be due inasmuch as Plaintiff had already received $35,000.

But to say that Colossus valued Plaintiff's claim "at zero" is simply false. Further, Mr. Mangone testified that information indicating that surgery was a "medical necessity" for Plaintiff (that Mr. Murphy said he would provide) might well have increased the value of Plaintiff's claim beyond the range suggested by the Colossus program.

3. Plaintiff claims that AMCO representative Michael McKeever "oversaw [AMCO's] processing of all bodily injury claims in both California and Nevada," citing his deposition testimony. (Opp. Br. at 4:5-6.) Except, Mr. McKeever offered no such testimony. A simple reading of Mr. McKeever's referenced testimony establishes the falsity of Plaintiff's statement.

4. Plaintiff urges the Court, should it be inclined to grant this motion, to permit her to conduct additional discovery. In support of that position, she claims that on the day her opposition was due, AMCO's counsel, Julian J. Pardini, "agreed to produce Mr. Mangone for further questioning and allow him to testify regarding his setting of the reserves." (Opp. Br. at 24:9-10.) Apparently, Plaintiff could find no one willing to say so under penalty of perjury as no reference to a declaration is provided. But the statement is false. Mr. Pardini made no such agreement, as the Court is aware based on the telephone conference with counsel on April 8, 2008. (Decl. of Pardini, filed herewith, at ¶¶2-5.)

**VII. Conclusion**

Based on the foregoing, AMCO respectfully requests that the Court grant this motion.

Dated: April 14th, 2008

Respectfully submitted,

LEWIS BRISBOIS BISGAARD & SMITH LLP

By   /s/ Stephen J. Liberatore
   Julian J. Pardini
   Stephen J. Liberatore
   Rowena C. Seto
Attorneys for Defendant
AMCO INSURANCE COMPANY