1  LAW OFFICES OF STEPHEN M. MURPHY
   STEPHEN M. MURPHY (SBN # 103768)
2  JEREMY A. GRAHAM (SBN # 234166)
   180 Montgomery Street, Suite 940
3  San Francisco, CA 94104
   Tel: (415) 986-1338
4  Fax: (415) 986-1231

5  LAW OFFICES OF DAVID M. PORTER
   DAVID M. PORTER (SBN # 124500)
6  44 Montgomery Street, Suite 2500
   San Francisco, CA 94104
7  Tel: (415) 982-8600
   Fax: (415) 391-7808

8
   Attorneys for Plaintiff
9  CHRISTINE DOUGHERTY

10

11
                    IN THE UNITED STATES DISTRICT COURT
12
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
13

14  CHRISTINE DOUGHERTY,          )    NO. C 07-01140 MHP
                                  )
15                                )    **PLAINTIFF'S MEMORANDUM OF**
    Plaintiff,                    )    **POINTS AND AUTHORITIES IN**
16                                )    **SUPPORT OF MOTION FOR SUMMARY**
    v.                            )    **ADJUDICATION**
17                                )
                                  )    Date: June 9, 2008
18  AMCO INSURANCE COMPANY        )    Time: 2:00 p.m.
    and DOES ONE through TWENTY,  )    Judge: Hon. Marilyn Hall Patel
19  Inclusive,                    )    Dept.: 15
                                  )
20  Defendants.                   )
                                  )
21  _____  )

22

23

24

25

26

1

**TABLE OF CONTENTS**

2

3

TABLE of CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

4

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

5

6

I.      SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

7

II.     FACTUAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

8

9

III.    PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

10

IV.     DEFENDANT UNREASONABLY WITHHELD POLICY BENEFITS
        THAT WERE DUE TO PLAINTIFF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

11

12

V.      DEFENDANT BREACHED ITS DUTY TO FULLY INVESTIGATE
        ALL POSSIBLE BASES FOR PLAINTIFF'S CLAIM  . . . . . . . . . . . . . . . . . .  15

13

14

VI.     DEFENDANT'S IMPROPER USE OF COLOSSUS
        FURTHER ESTABLISHES ITS BAD FAITH  . . . . . . . . . . . . . . . . . . . . . . . .  17

15

16

VII.    DEFENDANT DID NOT FULFILL ITS DUTIES TO PLAINTIFF
        MERELY BY SATISFYING THE ARBITRATION AWARD  . . . . . . . . . . . . .  19

17

18

VIII.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

19

20

21

22

23

24

25

26

1

# TABLE OF AUTHORITIES

2

FEDERAL CASE LAW

3

4

Federal Courts of Appeal

5

*Amadeo v. Principal Mut. Life Ins. Co.,*
   290 F.3d 1152, 1161 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

6

*Miller v. Glenn Miller Productions, Inc.,*
   454 F.3d 975, 987 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7

8

9

FEDERAL RULES OF COURT

10

Federal Rule of Civil Procedure 56(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

11

Federal Rule of Civil Procedure 56(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

12

13

U.S. DISTRICT COURT, NORTHER DISTRICT OF CALIFORNIA

14

General Order 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

15

16

CALIFORNIA CASE LAW

17

18

California Supreme Court

19

*Aydin Corp. v. First State Ins. Co.,*
   18 Cal.4th 1183, 1188 (Cal. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

20

*Egan v. Mutual of Omaha Ins. Co.,*
   24 Cal.3d 809, 819, 820, 822, 823 (Cal. 1979) . . . . . . . . . . . . . . . . . . . . . . 15,16

21

22

*Frommoethelydo v. Fire Ins. Exchange,*
   42 Cal.3d 208, 214-215 (Cal. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

23

*Wilson v. 21st Century Insurance Company,*
   42 Cal.4th 713,719-725 (Cal. 2007) . . . . . . . . . . . . . . 1,2,11,12,14,15,16,17,19,20

24

25

26

**TABLE OF AUTHORITIES - Continued**

California Courts of Appeal

*Downey Savings & Loan Assn. v. Ohio Casualty Co.,*
   189 Cal.App.3d 1072, 1084 (Cal.App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hightower v. Farmers Ins. Exchange,*
   38 Cal.App.4th 853, 862 (Cal.App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Richardson v. Employers Liab. Assur. Corp.,*
   25 Cal.App.3d 232, 239 (Cal.App. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Royal Globe Ins. Co. v. Whitaker,*
   181 Cal.App.3d 532, 537 (Cal.App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12


CALIFORNIA STATUTES

Insurance Code §552 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Insurance Code §555 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Insurance Code §11580.2(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Insurance Code §11580.26(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

1  **I. SUMMARY OF ARGUMENT**

2      The evidence before the Court establishes as a matter of law that defendant AMCO

3  breached its duties to plaintiff under her insurance contract with AMCO, and is liable

4  for breach of the implied covenant of good faith and fair dealing by unreasonably

5  withholding policy benefits. It is undisputed that plaintiff made a settlement demand of

6  considerably less than her policy limits, that defendant made no offer, and that the

7  arbitrator (considering essentially the same information presented to AMCO years

8  earlier) awarded plaintiff more than her policy limits.

9      Defendant attempts to justify its failure to make a reasonable offer by blaming

10  plaintiff's counsel for not obtaining additional medical documentation after her claim

11  had been denied. As set forth in the Declaration of Thomas J. Corridan, an

12  experienced insurance claims adjuster and supervisor, AMCO - not plaintiff's counsel -

13  owed a duty to its insured to thoroughly investigate her claim. AMCO violated its duty

14  by failing to conduct a fair and objective evaluation of its insured's claim and by failing

15  to conduct a prompt, unbiased, and thorough investigation into what it considered

16  questionable medical issues surrounding plaintiff's injury claims. Defendant's repeated

17  requests for additional medical documentation, made over the course of nine months

18  **after** defendant had already denied plaintiff's claim, were nothing more than a delaying

19  tactic. As such, AMCO breached both the insurance contract and the implied covenant

20  of good faith and fair dealing.

21      Based on strikingly similar facts, the California Supreme Court recently held that

22  summary judgment in favor of the defendant insurer in a bad faith case was improper.

23  In *Wilson v. 21st Century Insurance Company*, 42 Cal.4th 713 (Cal. 2007) (modified

24  without change in disposition at 42 Cal.4th 806a) the plaintiff alleged a bad faith denial

25  of an underinsured motorist claim. The Court held that, in evaluating a claim, the

26  insurer must give at least as much consideration to the interests of its insured as it

1  does to its own interests. *Id*. at 720. Before denying a claim by its own insured, an

2  insurer must **affirmatively** investigate all possible bases for the claim, as opposed to

3  sitting on its hands and demanding information from the insured or the insured's

4  counsel. *Id*. at 721.

5  In addition, AMCO had a contractual obligation to promptly pay plaintiff policy

6  benefits at the time they were due.  (Exhibit C to Declaration of David M. Porter in

7  Support of Motion for Summary Adjudication ("Policy"), at Bates Nos. 020025-020026

8  & 020047-020052.)

9  Here, AMCO relied on Colossus evaluation software to deny plaintiff's claim. As set

10  forth in the Declaration of Thomas J. Corridan in Opposition to Motion for Summary

11  Judgment, or in the Alternative, for Partial Summary Judgment ("Corridan Decl."),

12  AMCO's reliance on Colossus was biased and unreasonable since both the input and

13  output data were flawed. Defendant has apparently misplaced the Colossus report

14  detailing the evaluation. Nevertheless, the information available indicates that

15  Colossus systematically was unable to consider several relevant aspects of plaintiff's

16  claim. The output was flawed because the program was tuned to reflect average pre-

17  litigation settlements by AMCO and its parent company, and **not** average jury verdicts,

18  arbitration awards, or post-litigation settlements in the relevant venue. Moreover,

19  AMCO's claims supervisor and adjusters were not properly trained on these flaws and

20  limitations in the Colossus program. As such, AMCO's reliance on Colossus for

21  evaluating such claims violated best practices since the system was set up to produce

22  biased and unreasonable evaluations. (Corridan Decl. ¶ 9(c).)

23  The undisputed facts here establish the following: 1) policy benefits were due to

24  plaintiff in 2003, when she submitted to AMCO complete documentation of her claim

25  and made a reasonable demand; 2) AMCO's review of the documentation submitted

26  by plaintiff in support of her claim was inadequate and unreasonable; 3) AMCO's

1  determination in November of 2003 that plaintiff's claim was not viable was

2  unreasonable; and 4) AMCO's attempts in 2003 and 2004 to secure additional

3  information from plaintiff's counsel did not discharge its duty to investigate all possible

4  bases for plaintiff's claim.

5    Accordingly, plaintiff's motion for summary adjudication as to liability on her claims

6  for breach of contract and for breach of the covenant of good faith and fair dealing

7  should be granted in its entirety.

8  **II. FACTUAL HISTORY**[1]

9    On April 17, 2001, plaintiff was injured in an automobile accident which occurred

10  after the other driver failed to yield at a stop sign. Plaintiff reported the accident to

11  defendant pursuant to her automobile insurance policy. (Declaration of Jeffrey

12  Mangone in Support of Motion of Defendant AMCO Insurance Company for Summary

13  Judgment, or in the Alternative, Partial Summary Judgment ("Mangone Decl."), at ¶ 2.)

14  A week later, the insurer for the other driver (Glenn Osmidoff) notified defendant that it

15  accepted liability for the accident on behalf of its insured.  (Exhibit A to Declaration of

16  David M. Porter in Opposition to Motion for Summary Judgment, or in the Alternative,

17  Partial Summary Judgement, and in Support of Cross-Motion for Continuance

18  Pursuant to FRCP 56(f) ("First Porter Decl.") at Bates No. 010085.)

19    Plaintiff suffered serious injuries, including cervical disc bulges that impinged on the

20  spinal cord and a tear of the rotator cuff. (Exh. B to First Porter Decl., deposition of Dr.

21  Sponzilli.) Although plaintiff's treating physicians recommended surgery, plaintiff

22  declined all surgical procedures. (*Id.*) Because she was pregnant, she also could not

23  take pain-relief medication. (*Id.*) Plaintiff gave birth to her son on December 17, 2001.

24  (*Id.*)

25

26    [1]This section is substantially similar to the Factual History recounted in plaintiff's memorandum in opposition to motion for summary judgment, already incorporated into this motion. It is included here for ease of reference.

1

In April of 2002, plaintiff filed suit against the other driver, Glenn Osmidoff. (Exh. A

2    to Mangone Decl.) Plaintiff settled that case for $30,000, the policy limit of Osmidoff's

3    insurance. (Exh. B to Mangone Decl.) In January of 2003, plaintiff notified defendant

4    that she was filing a claim under the underinsured motorist provisions of her policy,

5    (Mangone Decl. at ¶ 6,) which had a limit of $100,000. (Policy at Bates No. 020061.)

6    Defendant assigned plaintiff's claim to its adjuster, Jeffrey Mangone. (Mangone Decl.

7    at ¶ 2.) Mangone's supervisor was Kelly Bellinghausen, (Exh. C to First Porter Decl.,

8    deposition of Jeffrey Mangone ("Mangone deposition") at 16:20-17:13,) who was

9    supervised by Michael McKeever. (Exh. E to First Porter Decl., deposition of Michael

10    McKeever ("McKeever deposition") at 10:8-18.)  McKeever oversaw defendant's

11    processing of all bodily injury claims in both California and Nevada.  (*Id*. at 7:16-9:3.)

12

In February of 2003, plaintiff provided documentation of her injuries and entitlement

13    to policy benefits, including the deposition of her treating physician, Ernest Sponzilli,

14    M.D., taken in the case against the other driver.  (Exh. X to Declaration of Julian J.

15    Pardini in Support of Motion of Defendant AMCO Insurance Company for Summary

16    Judgement, or in the Alternative, Partial Summary Judgment ("Pardini Decl.").)  Based

17    on this documentation, Mangone set the reserves at $15,000.  (Exh. A to First Porter

18    Decl. at 010095.)

19

In July of 2003, plaintiff provided further documentation of her injuries and

20    entitlement to policy benefits and demanded $45,000 to settle her claim. (Exhibit D to

21    Declaration of David M. Porter in Support of Motion for Summary Adjudication

22    ("Second Porter Decl.").) At this time, plaintiff had complied with **all** her obligations

23    under her policy to assert her UIM claim. (*See* Policy at Bates Nos. 020030 and

24    020051.) Plaintiff's demand letter indicated that she had suffered "constant pain in her

25    neck and right shoulder for over a year after the incident," and that "she continues to

26    regularly experience aching, pain and stiffness in her neck and shoulder." (Exh. D to

1    Second Porter Decl.) These statements were supported by both the medical

2    documentation and by plaintiff's deposition taken by the adverse insurer in her case

3    against Osmidoff, a copy of which was attached to the demand letter. (*Id*.)

4        In a letter dated July 29, 2003, defendant stated that plaintiff's claim file "appears to

5    be complete." (Exh. C to First Porter Decl.) The notes entered into the case file by its

6    adjuster Mangone on August 13, 2003 acknowledged "clear liability" on the part of the

7    other driver, (Exh. A to First Porter Decl. at 010098,) and that plaintiff was "still

8    experiencing chronic pain symptoms in her neck and shoulder." (*Id*. at 010100.)

9        On August 13, 2003 Mangone referred plaintiff's claim to defendant's Colossus unit.

10   (*Id*. at 010101 & Mangone deposition at 95:17-96:2.)  Colossus is claims adjusting

11   software than inputs select data available from the claims file and outputs a settlement

12   range. (Exh. D to First Porter Decl., deposition of Jason Wartach ("Wartach

13   deposition") at 13:4-21 & 24:2-28:21.) Mangone's referral indicated that plaintiff had

14   zero percent comparative negligence. (Exh. A to First Porter Decl. at 010101 &

15   Mangone deposition at 96:3-97:3.) The Colossus unit completed its consultation on

16   August 21, 2003 and concluded that plaintiff had already been fully compensated for

17   her injuries by the $30,000 she had already received from settlement of her case

18   against Osmidoff. (Exh. A to First Porter Decl. at 010101.) As utilized by defendant, the

19   settlement range output by Colossus is based solely on pre-litigation settlements within

20   the group of companies owned by defendant's parent company. (Wartach deposition

21   at 46:6-49:9.) Neither jury verdicts, arbitration awards, or post-litigation settlements

22   were reflected in the Colossus analysis of settlement value. (*Id*.)

23       Mangone testified at his deposition that he had no discretion to vary from the

24   Colossus settlement range in making an offer on a claim (Mangone deposition at

25   46:18-25,) and that as a result of the Colossus report, he concluded that plaintiff did

26

1    not have a viable claim.[2]  (*Id*. at 107:22-108:24 & Exh. A to First Porter Decl. at 010101

2    & 010105) Defendant made no offer to settle plaintiff's claim at this or any other time.

3    (First Porter Decl. at ¶ 4 & McKeever deposition at 42:10-21.)

4        From late 2003 through mid-2004, defendant repeatedly requested a "report" from

5    Dr. Sponzilli, plaintiff's treating physician, describing the need for future surgery, even

6    though defendant already had the sworn deposition testimony of Dr. Sponzilli, and no

7    separate "report" existed. (Exhibits G-N to Mangone Decl.) Defendant's requests

8    purported to seek information on the need for the surgical procedure that plaintiff had

9    continued to defer indefinitely. (*Id*.) Defendant failed to obtain plaintiff's medical

10   records directly pursuant to a medical release form, have a physician of its own review

11   the medical records plaintiff had provided, request that plaintiff be examined by a

12   physician of its choosing, take its own deposition of Dr. Sponzilli, or exercise any of its

13   other rights under the policy to resolve questions as to plaintiff's medical condition.

14   (First Porter Decl. at ¶ 2; Corrigan Decl. at ¶ 9(f); Mangone deposition at 114:4-115:6.)

15   Instead, in a letter dated September 28, 2004 defendant simply told plaintiff that "we

16   are closing our file. ¶ We previously advised you our evaluation of Ms. Dougherty's

17   injuries did not indicate a viable underinsured motorist claim. Our evaluation was

18   based on the treatment data as provided by your office."  (Exh. F to Second Porter

19   Decl.)

20       Plaintiff then demanded that her claim be submitted to arbitration. (Exh. G to

21   Second Porter  Decl.) On November 9, 2004, Kelly Bellinghausen received authority

22   from Michael McKeever to transfer plaintiff's claim to defendant's litigation section and

23   defendant transferred plaintiff's claim from Mr. Mangone to Linda Howard. (Exh. A to

24   First Porter Decl. at 010107 & McKeever deposition at 57:13-19.) On February 24,

25   2005, Ms. Howard entered into her notes for the claim file that "Carl feels we should

26

[2]Defendant has been unable to locate and produce the Colossus report for plaintiff's claim.

1    make some kind of offer." (Exh. A to First Porter Decl. at 010112.)

2        The Honorable Alfred Chiantelli presided over the arbitration hearing in January,

3    2006. (First Porter Decl. at ¶ 3.) Contrary to its numerous prior acknowledgments of

4    "clear liability" on the part of the other driver,[3] defendant argued for the first time that

5    the accident was entirely Ms. Dougherty's fault. (Exh. A to Second Porter Decl. at

6    Bates No. 01083.) In response to a direct question from Judge Chiantelli, defendant

7    estimated that, assuming plaintiff bore no fault in the accident, her claim underinsured

8    motorist claim was "at most . . . worth $20,000."  (Second Porter Decl. at ¶ 3.)

9        In March of 2006, Judge Chiantelli awarded plaintiff $107,874, in excess of the UIM

10   policy limit. (Exh. B to Second Porter Decl. ("Award") at 2.) Judge Chiantelli's award

11   expressly assumed that plaintiff would never have the surgical procedure previously

12   recommended. (*Id*. at 3.)

13   **III.    PROCEDURAL HISTORY.**

14       Plaintiff Christine Dougherty filed this action in state court on January 24, 2007

15   alleging causes of action for breach of contract and breach of the implied covenant of

16   good faith and fair dealing against defendant AMCO based on its handling of her UIM

17   claim. Defendant filed an answer in state court and then removed the case to this

18   Court based on diversity jurisdiction.

19       Prior to the initial Case Management Conference, defendant filed its first motion for

20

21       [3]These include: 1) Osmidoff's insurer accepting full liability a week after the accident, (Exh. A to
     First Porter Decl. at 010085;) 2) defendant's 8/13/03 note in its claim file, "[t]his is a case of clear liability
     on the part of the [claimant] driver. The [claimant] failed to yield for the [insured] at a stop sign," (*Id*. at
22   010098;) 3)" defendant's 11/5/04 note in its claim file marking "Clear" and not marking "Disputed" in the
     entry following "Liability," (*Id*. at 010106;) 4) defendant's 11/9/04 note in its claim file, "[i]nsured pulled into
23   the intersection and was in the process of making a left turn when adverse vehicle pulled into intersection
     from the opposite direction and collided with right rear side of insured vehicle at significant impact.
24   Independent witness indicates that adverse driver was not looking forward as pulled forward," (*Id*. at
     010106;) and 5) defendant's 11/12/04 note in its claim file, "[l]iability accepted by other carrier, [insured]
25   taking a left turn from a [stop sign] and hit by truck coming from opposite direction in moderate impact.
     [Insured] did not have turn signal on but this does not seem to matter as adverse was looking elsewhere
     per witnesses." (*Id*. at 010108.) The first indication that defendant's position had shifted was a year later in
26   its 11/29/05 note in its claim file, "At [arbitration] we'll argue some comparative on the [insured] for making
     the left turn and some question about the severity of the injuries as well as pre-existing injuries." (*Id*. at
     010118;)

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION

6

summary judgment. Because defendant filed its motion without obtaining leave of the court, as required by Judge Marilyn H. Patel's standing orders, this Court did not hear the motion.

On March 19, 2008, defendant filed its second Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment. Plaintiff filed her Opposition on April 7, 2008 along with a Cross-Motion for Continuance Pursuant to FRCP 56(f) and a Motion to Strike Declarations in Support of Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment, for Failure to Comply with General Order No. 45. Defendant filed a Reply memorandum and declaration on April 14, 2008. Concurrently with this motion, plaintiff has filed a Request to Take Judicial Notice of all moving papers, declarations, and exhibits thereto filed in support of and opposition to the above motions.  Plaintiff incorporates all documents listed in her Request to Take Judicial Notice into this Motion for Summary Adjudication.

## IV.    DEFENDANT UNREASONABLY WITHHELD POLICY BENEFITS THAT WERE DUE TO PLAINTIFF.

"An interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages." F.R.C.P. 56(d)(2).

In a motion for summary judgment, the burden is on the moving party to show that there is no disputed issue of material fact and that it is entitled to judgment as a matter of law. All facts and inferences must be considered in the light most favorable to the non-moving party. *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).

Defendant had a duty to plaintiff under the policy provisions and the Insurance Code to promptly pay plaintiff policy benefits at the time they were due. (Policy at Bates Nos. 020025-020026 & 020047-020052 & Cal Ins. Code §§ 552 & 555.) By July of 2003, plaintiff had provided defendant with a complete package of documentation to support her underinsured motorist claim.

1    Plaintiff anticipates that defendant will dispute that plaintiff's documentation was

2    complete, and will argue that it acted reasonably in requesting that plaintiff provide

3    additional medical information and in closing its file – essentially denying plaintiff's

4    claim – when no such information was forthcoming. Under the governing case law and

5    the undisputed facts, defendant's position is untenable as a matter of law.

6    On July 29, 2003, defendant notified plaintiff that "[y]our settlement package

7    appears to be complete." (Exh. C to First Porter Decl.) At that time defendant was in

8    possession of the following documents, all provided by plaintiff in support of her claim:

9    1)    Plaintiff's state court complaint filed against Glenn Osmidoff, the negligent
      driver.

10   2)    The release of all claims settling her case against Osmidoff.

11   3)    The declarations portion of Osmidoff's insurance policy.

12   4)    The deposition of plaintiff's treating physician, Ernest Sponzilli. M.D. taken in
13        her case against Osmidoff.

14   5)    Plaintiff's deposition taken in her case against Osmidoff case.

15   6)    The police report from the April 17, 2001 accident.

16   7)    The records of plaintiff's treatment from Dr. Sponzilli.

17   8)    Relevant portions of the records of plaintiff's treatment from Dr. Simmonds, her
18        OBGYN, confirming her pregnancy.

19   9)    The records of plaintiff's physical therapy.

20   10)   The records of plaintiff's acupuncture treatment.

21   11)   Plaintiff's MRI's ordered by Dr. Sponzilli.

22   12)   The billing records related to the treatment listed as nos. 7, 9, 10, and 11,
         above.

23   (Exh. X to Pardini Decl. & Exh. D to Second Porter Decl.)

24   In addition to the above-listed documentation, plaintiff sent defendant a four-page

25   demand letter outlining the basis for her claim together with a demand for $45,000, or

26   one-half the policy limits. (Exh. D to Second Porter Decl.) Although plaintiff's medical

1   documentation indicated that treatment was ongoing, plaintiff's demand letter

2   demonstrated that she was entitled to the full amount of her demand based on her

3   pain and suffering and the treatment she had received to date. (*Id*. & Corrigan Decl. at

4   ¶ 9(c).) Regarding plaintiff's pain and suffering, the letter stated:

5           Ms. Dougherty suffered constant pain in her neck and right
            shoulder for over a year after the incident. The pain made
6           Ms. Dougherty's pregnancy more difficult to endure. . . . . . .
            Although the pain in Ms. Dougherty's neck and shoulder
7           has decreased, she continues to regularly experience
            aching, pain and stiffness in her neck and shoulder.

8   (Exh. D to Second Porter Decl.) Plaintiff's pain and suffering were further documented

9   in her deposition taken in the Osmidoff case, where she had been questioned

10  extensively by opposing counsel. (*Id*. noting that plaintiff's deposition in the Osmidoff

11  case was attached.)

12      In his notes to the claim file for August 13, 2003, defendant's claims adjuster wrote

13  that "[t]his is a case of clear liability . . . [Osmidoff] failed to yield for [plaintiff] at a stop

14  sign." (Exh. A to First Porter Decl. at 010098.) He further wrote that "[t]he impact to

15  [plaintiff's vehicle] was significant." (*Id*.) Regarding plaintiff's injuries he wrote "[t]he

16  initial exam reports that the insured had no prior history for the complaints reported –

17  radiating neck pain," (*Id*.), and "[plaintiff] has discontinued care, however, she is still

18  experiencing chronic pain symptoms in her neck and shoulder." (*Id*. at 010100.) On

19  August 22, 2003, defendant's adjuster wrote in the claim file that "[i]t is not

20  unreasonable to expect continuing pain from the accident injuries." (*Id*. at 010102.)

21  That same day defendant notified plaintiff that "[o]ur review and evaluation of Mrs.

22  Dougherty's treatment data is complete."  (Exh. E to Second Porter Decl.)

23      Properly reviewed, the documentation plaintiff had provided to defendant as of July

24  of 2003 conclusively demonstrated that plaintiff was entitled to at least her $45,000

25  demand. (Corridan Decl. at ¶ 9(d).)

26

1    Nevertheless, defendant denied plaintiff's claim.[4] Over a year later, on September

2    28, 2004, defendant wrote to plaintiff's counsel, "we are closing our file. We previously

3    advised you our evaluation of Ms. Dougherty's injuries did not indicate a viable

4    underinsured motorist claim. Our evaluation was based on the treatment data as

5    provided by your office."

6        In *Wilson v. 21st Century Insurance Company*, 42 Cal.4th 713 (Cal. 2007) (modified

7    without change in disposition at 42 Cal.4th 806a), the plaintiff insured alleged bad faith

8    arising from the insurer's denial of her underinsured motorist claim and the subsequent

9    two-year delay in the payment of her claim. *Id*. at 717-720. The Court held that a jury

10   could find 21st Century liable for bad faith even though, subsequent to Wilson's

11   demand for arbitration, it conducted an independent medical examination, concluded

12   that plaintiff's claim was valid, and paid the limits of her policy. *Id*. at 719.

13       The issue here, as in *Wilson*, is whether the insurer's initial denial of the insured's

14   claim was reasonable in light of the information then at its disposal and the totality of

15   the circumstances. *Id*. at 723. Submitting to a insured's demand for arbitration does

16   not excuse an insurer from withholding policy benefits after an insured has provided

17   adequate documentation to support a claim. *Wilson*, *supra*, at 721.

18       In *Wilson*, the Court found sufficient evidence that 21st Century's conclusions that

19   plaintiff's injuries were either preexisting, not severe, or both, were not reasonably

20   based on the medical documentation provided to it by Wilson. *Id*. at 721-722.

21       Here, defendant takes the position that plaintiff did not sufficiently "prove up" her

22   claim. (Reply at 7, citing *Aydin Corp. v. First State Ins. Co.*, 18 Cal.4th 1183, 1188

23   (Cal. 1998) and *Royal Globe Ins. Co. v. Whitaker*, 181 Cal.App.3d 532, 537 (Cal.App.

24

25       [4]Defendant disputes that it ever "denied" plaintiff's claim. (McKeever deposition at 50:19-51:1.)
     The record, however, is replete with contemporaneous admissions by defendant that it did deny plaintiff's
26   claim. "Our current evaluation of Mrs. Dougherty's injury claim does not indicate an underinsured motorist
     for bodily injury [sic.] is present. (Exh. F to Mangone Decl.) "We previously advised you our evaluation of
     Ms. Dougherty's injuries did not indicate a viable underinsured motorist claim." (Exh. F to Second Porter
     Decl..) "Claim denied by claims rep due to injury evaluation." (Exh. A to First Porter Decl. at 010108).

1986).) Defendant claims that it required additional clarification as to whether or not surgery was required to repair the tear to plaintiff's rotator cuff. (*Id.* at 5.)  Defendant further claims that plaintiff's counsel initially agreed to provide such clarification, but failed to respond to numerous letters requesting the information in the form of a "report" from Dr. Sponzilli, plaintiff's treating physician. (*Id.* at 6-7; *see also* Motion for Summary Judgment at 9-10, 12-13.)

Viewing the evidence in the light most favorable to defendant, defendant's argument nonetheless presumes that: 1) it was reasonable to conclude that plaintiff's claim was not viable unless she would require future surgery; and 2) it was reasonable to believe that additional medical documentation would clarify whether such surgery would occur. There is no evidence, however, to support either of these conclusions.

Defendant had documentation to support a claim for the full amount of plaintiff's demand based on her injuries, independent of the need for surgery. Judge Chiantelli's award expressly stated "this award was issued with the opinion that the claimant will **not** have any related surgery in the near future." (Award at 3, emphasis added.) Judge Chiantelli found that plaintiff had proven $100,000 in "general damages which is reasonable compensation for the pain and suffering she endured from the accident through the birth of her child, her recuperation period and present permanent condition." (*Id.* at 2.)

The evidence reviewed by Judge Chiantelli was essentially the same as that which defendant had in its possession two and one-half years before the arbitration hearing. (First Porter Decl. at ¶ 3.) "The only difference was that Judge Chiantelli took live testimony from Dr. Sponzilli, by telephone, whereas AMCO had Dr. Sponzilli's deposition testimony from the Osmidoff case.  The substance of each were the same." (*Id*.)

Dr. Sponzilli's deposition in the Osmidoff case contained the following exchange:

> Q.  Can you state, Doctor, with reasonable medical probability one way or the other she will improve or she will not improve without more aggressive care?
>
> A.  I think that she will likely have intermittent problems with her shoulder.  There's a medical probability, given that there is a tear, that she'll have periods of aggravated symptoms depending on activity.  But she hadn't indicated to me that she would want surgery for that and that she would rather live with the symptoms the way they were.  I explained to her that, given there is a tear, the best solution would be surgery.  She wasn't interested in that, so . . .

(Exh. B to First Porter Decl., deposition of Dr. Sponzilli at 25:25 - 26:14.)

At the time that defendant concluded that plaintiff did not have a viable claim absent future surgery, it knew that plaintiff was no longer seeing Dr. Sponzilli and was still experiencing pain. "The [insured] has discontinued care, however, she is still experiencing chronic pain symptoms in her neck and shoulder." (Exh. A to First Porter Decl. at 010100, August 13, 2003 claim file entry.) "It is not unreasonable to expect continuing pain from the accident injuries." (*Id*. at 10102, August 22, 2003 claim file entry.) "Our current evaluation of Mrs. Dougherty's injury claim does not indicate an underinsured motorist for bodily injury [sic.] is present. ¶ Please let me know if you have had any success in obtaining a more comprehensive report from Dr. Sponzolli [sic.] with regard to the issue of the medical necessity for back surgery." (Exh. F to Mangone Decl., November 26, 2003 letter to plaintiff's counsel.)

When evaluating a first-party claim, "an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests. When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." *Wilson*, *supra*, at 720 (quoting *Frommoethelydo v. Fire Ins. Exchange*, 42 Cal.3d 208, 214-215 (Cal. 1986)).

In *Wilson*, the Court held that sufficient evidence supporting liability would allow "a jury [to] find that [defendant] lacked any factual basis for [its] conclusion [that plaintiff's claim was not valid] and that in reaching it the company had unfairly ignored medical

1  evidence submitted by its insured." *Wilson*, *supra*, at 724; *see also Amadeo v.*

2  *Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir. 2002) (reversing summary

3  judgment in a bad faith claim based on evidence that the insurer ignored medical

4  opinions submitted by the insured in support of her claim). Here, this is the **only**

5  conclusion that can be reached by a reasonable jury. Assuming that Mr. Mangone was

6  sincere in his belief that the viability of plaintiff's claim was wholly dependant on the

7  need for future surgery, this belief was objectively unreasonable.  (*See* Corrigan Decl.

8  at ¶ 9(a) & (k).)

9      A similar issue arose in *Wilson* where  21st Century argued that its denial of plaintiff's

10  claim was reasonable in light of the fact that it did not learn until after Wilson

11  demanded arbitration that she had opted to forgo recommended surgery. *Id*. at 719,

12  725. The Court noted, however, that "the basis for Wilson's policy limits claim, as

13  communicated in her attorney's demand letter, was not that the neck injury was so

14  severe as to require expensive treatment in the short term, but rather that it was

15  continuing to cause her significant pain . . . Plaintiff's . . . demand for the policy limits

16  did not depend on anticipated future damages for spinal surgery." *Id*. at 725.

17      Here, as in *Wilson*, plaintiff's demand letter and supporting documentation asserted

18  a viable claim based on her injuries and ongoing pain and suffering, completely

19  independent of the necessity, or lack thereof, of future surgery.

20      Defendant simply ignored its own affirmative obligation to conduct a prompt,

21  reasonable, and thorough investigation, even though it has long been the law than an

22  insurer is required to **fully inquire** into all possible bases that might support the

23  insured's claim. *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 819 (Cal. 1979)

24  (emphasis added).[5]  As a matter of law, defendant's failure is not excused by its

25  _____

26      [5] A thorough investigation by AMCO should have included interviews of witnesses with significant information. *Downey Savings & Loan Assn. v. Ohio Casualty Co.*, 189 Cal.App.3d 1072, 1084 (Cal.App. 1987).

1  proffered evidence that plaintiff's counsel did not respond to its requests for more

2  information.

3      In *Wilson*, the California Supreme Court rejected 21st Century's contention that it

4  was Wilson's attorney's failure to provide it with additional medical documentation that

5  was responsible for its initial failure to properly evaluate Wilson's claim:

6          21st Century observes that after its claims examiner told
           plaintiff's attorney . . . of his opinion that the submitted
7          medical reports did not support the claim of cervical disk
           injury from the accident, [plaintiff's attorney] did not argue
8          the point further or immediately send additional medical
           information. 21st Century maintains this relieved it of any
9          duty to further assess or evaluate the claim, at least until it
           received more information. But [plaintiff's attorney] had
10         already drawn the claims examiner's attention to [Wilson's
           treating physician]'s report and opinion. **A jury could find
11         that the insurer's willingness to receive additional
           information did not conclusively demonstrate its good
12         faith in disregarding the information already provided.**

13 *Id*. at 722, fn. 6 (emphasis added).

14 **V.     DEFENDANT BREACHED ITS DUTY TO FULLY INVESTIGATE ALL
            POSSIBLE BASES FOR PLAINTIFF'S CLAIM.**

15     As in *Wilson*, defendant's failure here to fully and affirmatively investigate plaintiff's

16 claim before denying it provides an independent ground for liability. At the time that

17 Wilson filed her claim, she provided medical documentation of the injuries to her neck.

18 Nevertheless, 21st Century denied Wilson's claim without doing any investigation of its

19 own to resolve any doubts it had as to the validity of Wilson's claim. *Wilson*, *supra*, at

20 721-722.

21     "To protect its insured's contractual interest in security and peace of mind, 'it is

22 essential that an insurer fully inquire into all possible bases that might support the

23 insured's claim' before denying it." *Id*. at 721 (quoting *Egan v. Mutual of Omaha Ins.

24 Co.*, 24 Cal.3d 809, 819 (Cal. 1979)).

25     "21st Century, of course, was not obliged to accept [Wilson's treating physician]'s

26 opinion without scrutiny or investigation. To the extent it had good faith doubts, the

1  insurer would have been within its rights to investigate the basis for Wilson's claim by

2  asking Dr. Southern to reexamine or further explain his findings, having a physician

3  review all the submitted medical records and offer an opinion, or, if necessary, having

4  its insured examined by other physicians . . ." *Id*. at 722. Having denied Wilson's claim

5  without having exercised these contractual rights, however, a jury was entitled to find

6  that 21st Century had acted in bad faith. *Id*.

7      Here, if it were true, as defendant claims, that it had a good faith belief that the

8  viability of plaintiff's claim depended on additional medical clarification as to the

9  necessity of future surgery, then defendant had a duty to use the myriad tools at its

10 disposal to acquire this information **before** it denied plaintiff's claim. These included:

11 1) obtaining an interview with the treating doctor by using a release form signed by the

12 insured, 2) seeking an independent medical examiner's review of the medical records,

13 3) scheduling an independent medical examination; 4) interviewing Ms. Dougherty or

14 requesting an Examination Under Oath as allowed under its insurance policy. (*See*

15 Corridan Decl. at ¶ 9(d) & (f).)

16      Defendant acknowledges that an independent medical examination was an

17 available tool to resolve its outstanding questions about the necessity of surgery.

18 (McKeever deposition at 36:13-37:20.) Defendant's adjuster acknowledges that he

19 could have requested such an examination, but did not because "[i]ndependent

20 medical examinations, or really any kind of examination is intrusive, it's time

21 consuming, it's stressful. She'd already been through all that. She's already has her

22 stress, she's already had her inconvenience and so forth." (Mangone deposition at

23 114:12-115:6.) Notwithstanding the adjuster's concern for plaintiff, conducting an

24 independent medical review of the records in its possession, and/or deposing plaintiff's

25 treating physicians would not have inconvenienced her at all.[6]

26 

_____

[6]These methods of investigation would, however, have been conducted at defendant's expense.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION

16

1    "An insurer's good or bad faith must be evaluated in light of the totality of the

2    circumstances surrounding its actions." *Wilson*, *supra*, at 723.

3    Despite the clear meaning of Dr. Sponzilli's deposition testimony, Mr. Mangone

4    testified that "all we needed was a simple note from Dr. Sponzilli explaining whether

5    this surgery was a medical necessity." (Mangone deposition at 115:1-6.) Yet for almost

6    an entire year, the only action he took to acquire such a note was to send letters to

7    plaintiff's counsel. (Exh. E - N to Mangone Decl.) When no response was forthcoming,

8    he closed his file. (Exh. F to Second Porter Decl.)  Defendant's failure to use any of the

9    alternate methods available to it to acquire the information it deemed necessary is, as

10    a matter of law, a breach of its duty to fully investigate all possible bases for plaintiff's

11    claim.

12    **VI.    DEFENDANT'S IMPROPER USE OF COLOSSUS FURTHER ESTABLISHES
       ITS BAD FAITH.**

13    Defendant's unreasonable denial of plaintiff's claim was a direct result of its

14    company-wide practices and procedures with respect to Colossus. The manner in

15    which defendant utilized Colossus in evaluating plaintiff's claim further establishes its

16    bad faith.

17    Defendant rigged its Colossus analysis at both the input and the output stage to

18    systematically undervalue its insureds' claims. (Corridan Decl. at ¶ 9(g).) First,

19    defendant had a policy and practice of failing to properly evaluate first-party claims by

20    inputting incomplete data into Colossus. Second, defendant set the settlement range

21    output by Colossus based solely on prelitigation settlements.

22    Mr. Mangone based his denial of plaintiff's claim solely on the Colossus report he

23    received in August of 2003. (Mangone deposition at 46:18-25 & 107:22-108:24.)

24    Colossus did not consider plaintiff's acupuncture treatments for her injuries, did not

25    facilitate the input of deposition testimony of a treating physician where this was the

26    best available documentation, did not allow input for the severity of pain, did not

1    consider that plaintiff's pain made her pregnancy more difficult to endure, counted

2    plaintiff's two distinct disc bulges as a single injury, and failed to consider whether that

3    plaintiff's disc bulges were impinging the spinal cord. (Wartach deposition at 24:2-

4    28:21 & Exhibit H to Second Porter Decl., deposition of Jason Wartach, additional

5    excerpts, at 28:22-39:10 & 66:16-68:14.)

6        Further, defendant concealed the undervaluation of claims by Colossus from its own

7    adjusters. Mr. Mangone did not input the data into Colossus himself. All data entry for

8    Colossus was done by the Colossus unit. Mr. Mangone never spoke with the person in

9    the Colossus unit who entered the data for plaintiff's claim. Thus, he had no way of

10   identifying the information in the claims file that was not considered by Colossus.

11       Additionally, defendant appears not to have educated the claims-handing side of its

12   operation as to the basis for the settlement range output by Colossus. Michael

13   McKeever,[7] produced as defendant's Person Most Knowledgeable on "AMCO's

14   policies, procedures, and practices regarding utilizing Colossus to evaluate claims in

15   your California offices from 2002 through 2007," testified that "what Colossus used to

16   evaluate their general damage evaluations [was] Jury verdicts." (McKeever deposition

17   at 64:25-66:20.) Jason Wartach testified that he was personally involved in the "tuning"

18   process that set the settlement ranges for Colossus based on a "sample [of] 250 to

19   300 files" internal to Allied, the group of companies owned by defendant's parent

20   company. "Litigated files were not included in the tuning sample." (Wartach deposition

21   at 45:19-50:22.)

22       After reviewing plaintiff's medical documentation, Mr. Mangone set the reserves at

23   $15,000 (Exh. A to First Porter Decl. at 010095) – according to defendant, the amount

24   it "probably will pay." (McKeever deposition at 41:12-23.) Six months later, he received

25

26
         [7]McKeever was Mangone's direct supervisor's direct supervisor. (Mangone deposition at 16:20-
    17:13 & McKeever deposition at 10:8-18.)

the Colossus report valuing plaintiff's claim at zero. (Exh. A to First Porter Decl. at 010101-010102). Even if Mangone recognized that the Colossus valuation was unreasonably low, he would have been incapable of reviewing the specific information ignored by Colossus to determine how much value this information added to the claim. Also, he would not have known to consult a compendium of average jury verdicts to supplement the results of the Colossus report and provide a high-end estimate of the true value of plaintiff's claim.

Defendant designed its Colossus system and protocols to prevent its adjusters from recognizing the true value of the claims they were assigned to handle.  The undisputed evidence regarding defendant's exclusive reliance on its flawed Colossus system to determine the value of plaintiff's claim further establishes its bad faith as matter of law.

**VII.    DEFENDANT DID NOT FULFILL ITS DUTIES TO PLAINTIFF MERELY BY SATISFYING THE ARBITRATION AWARD.**

An insurer's duties to its insured pursuant to the covenant of good faith and fair dealing continue after a demand for arbitration. The California Supreme Court held in *Wilson* that submitting to a insured's demand for arbitration does not excuse an insurer from withholding policy benefits after an insured has provided adequate documentation to support a claim. *Wilson*, *supra*, at 721. Even though the insurer in *Wilson* paid the insured's claim **before** arbitration, the Court held that the insurer could still be liable for bad faith.

Plaintiff anticipates that defendant will argue it fulfilled its legal duties to plaintiff by submitting to her demand for arbitration and by promptly paying the arbitration award. Taken to its logical conclusion, defendant's argument would allow an insurer to deny every UIM claim, regardless of the claim's merits, but nevertheless perform the terms of the contract and be immune from bad faith liability by paying out benefits only when

1  ordered to do so by an arbitrator.[8] This argument has been repeatedly rejected by the

2  courts.

3      "The mere availability of an arbitration procedure does not insulate an insurer from

4  liability for bad faith in its handling of an uninsured motorist claim." *Hightower v.*

5  *Farmers Ins. Exchange*, 38 Cal.App.4th 853, 862 (Cal.App. 1995) (reversing summary

6  judgment for defendant insurer).[9] In support of its holding, *Hightower* cited *Richardson*

7  *v. Employers Liab. Assur. Corp.*, 25 Cal.App.3d 232, 239 (Cal.App. 1972) where an

8  insurer was found to have acted in bad faith by, among other acts, withholding

9  payment of benefits "months after it knew the claim to be completely valid; [and]

10  forc[ing] an arbitration hearing on a claim against which it already knew that it had no

11  defense." *Id.*

12      Here, after plaintiff demanded arbitration, defendant compounded its bad faith by

13  arguing – for the first time – that plaintiff was entirely at fault in the underlying collision.

14  Defendant's position was not only rejected by the arbitrator[10], it was contrary to every

15  piece of evidence and every prior indication and acknowledgment in its own claim file.

16  The only independent witness to the accident said Osmidoff failed to yield, and

17  Osmidoff was cited and pled guilty for failure to yield. *See* footnote 3, *supra*.

18      Moreover, defendant acted in bad faith simply by requiring plaintiff to arbitrate

19

20      [8]Michael McKeever, produced as defendant's Person Most Knowledgeable on, among other

21  topics, "AMCO's policies, procedures, and practices regarding filing, responding to, evaluating, adjusting, and handling claims for uninsured and underinsured coverage between 2002 and 2007," testified at his

22  deposition that defendant satisfied its obligations under the insurance code and the contract by acceding to plaintiff's demand for arbitration. (McKeever deposition at 51:7-21.)

23      [9]Reliance on California Insurance Code section 11580.2(f) for a similar argument is also

24  misplaced. That section requires that disputes between an insurer and insured be submitted to arbitration. "[W]hile Insurance Code section 11580.26, subdivision (b), immunizes an insurer from liability for the bare

25  act of requesting arbitration of an uninsured motorist claim, it does not insulate an insurer from liability toward its insured for failing to attempt a prompt and fair settlement of a claim in which liability is reasonably clear, or for other wrongful acts." *Id.* at 856.

26      [10]Judge Chiantelli found "ample evidence" that the other driver's negligence was the sole cause of the accident.  (Award at 4.)

1  without making any offer whatsoever. At the arbitration, defendant admitted that

2  plaintiff's claim had some significant value – up to $20,000 – if she was found not to

3  have been at fault. (Second Porter Decl. at ¶ 3.) An entry in the claim file indicates that

4  "Carl feels we should make some kind of offer." (Exh. A to First Porter Decl. at

5  010112.) Yet no offer was made. Defendant's failure to make at least some attempt to

6  settle what it should have recognized as a valid claim is in and of itself bad faith. (*See*

7  Corridan Decl. at ¶ 9(i) & (k).)

8  **VIII.    CONCLUSION.**

9     For the foregoing reasons, plaintiff's Motion for Summary Adjudication should be

10  granted in its entirety. Defendant breached its contractual obligations under the policy

11  it issued to Plaintiff when it unreasonably withheld policy benefits due to plaintiff

12  pursuant to her underinsured motorist claim. Defendant also unreasonably failed to

13  investigate plaintiff's claim prior to its determination that she was not owed policy

14  benefits. The undisputed facts establish defendant's liability to plaintiff on her causes

15  of action for Breach of Contract and Breach of Covenant of Good Faith and Fair

16  Dealing.

17  Dated: April 29, 2008                    LAW OFFICES OF STEPHEN M. MURPHY

18
19     By: **/s/ Stephen M. Murphy**
   STEPHEN M. MURPHY
   Attorney for Plaintiff