UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINE DOUGHERTY, | No. C 07-01140 MHP |
| Plaintiff, | |
| v. | **MEMORANDUM & ORDER** |
| AMCO INSURANCE COMPANY, | **Re: Defendant's Motion for Summary Judgment** |
| Defendant. | |

Plaintiff Christine Dougherty filed this action in the Superior Court for the state of California on January 24, 2007 alleging causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing against defendant AMCO Insurance Company ("AMCO"). Defendant removed the action to this court based on diversity jurisdiction. Now before the court is defendant's motion for summary judgment. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court rules as follows.

BACKGROUND

On April 17, 2001 Dougherty was injured in an automobile collision. Mangone Dec., ¶ 2.[1] She reported the accident to her automobile insurer, AMCO. Id.; see also Hoffman Dec., Exh. T (hereinafter "Policy"). AMCO assigned Dougherty's claim to its adjuster, Jeffrey Mangone. Mangone Dec., ¶ 2. Dougherty suffered $7,874 in medical expenses and AMCO paid $5,000 for her medical bills—the policy limit under the "med-pay" provisions of her policy. Id., ¶ 3; see also Policy at 020061.

A year later, on April 16, 2002, Dougherty filed suit against the other driver involved in the collision. Mangone Dec., ¶ 4, Exh. A. A week later, the insurer for the other driver accepted liability for the collision on behalf of its insured. Porter Dec., Exh. A at 010085. On December 20, 2002 Dougherty settled that action for $30,000, the policy limit of the other driver's insurance policy. Mangone Dec., ¶ 5, Exh. B.

On January 8, 2003 Dougherty notified AMCO that she was filing a claim under the underinsured motorist ("UIM") provisions of her policy, which had a limit of $100,000. Id., ¶ 6; see also Policy at 020061. On February 4, 2003 Dougherty provided AMCO supporting documentation, including copies of her and her treating physician's depositions taken during the litigation between Dougherty and the other driver involved in the collision. See Pardini Dec., Exh. X.

On February 20, 2003, based on this documentation, Mangone set the UIM reserves at $15,000. Porter Dec., Exh. A at 010095. The reserve value, which could change on a daily basis, is based upon AMCO's potential exposure. Id., Exh. E (hereinafter "McKeever Dep.") at 41:12–23. When setting the reserves, Mangone stated that "the injury appears to be of a serious enough nature and the surgery to repair the shoulder injury is going to happen sooner or later, if the insd has not already had the operation." Id., Exh. A at 010095. He further stated that "we may need to adjust this after teh [sic] rest of the docs are in." Id. The same day, Mangone requested Dougherty's "treatment records and billings for her care." Pardini Dec., Exh. Y. Mangone also wanted to know "if Mrs. Dougherty is still undergoing treatment, and if the surgical intervention has taken place." Id. Receiving no response, Mangone wrote Dougherty three times over the next four months asking for the treatment information. Id., Exhs. Z, AA & BB.

On July 9, 2003 Dougherty provided further documentation of her injuries and demanded $45,000 to settle her claim. Mangone Dec., Exh. C. Dougherty's demand letter indicated that she had suffered "constant pain in her neck and right shoulder for over a year after the incident," and that "she continues to regularly experience aching, pain and stiffness in her neck and shoulder." Id. at 010404.

On July 29, 2003 AMCO responded by stating that Dougherty's claim file "appears to be complete, and is in review for evaluation." Porter Dec., Exh. C. The letter went on to state that "[i]f

2

additional information is required, [AMCO] will contact you with the specific request for that information." Id. On August 22, 2003 AMCO requested additional information, particularly about Dougherty's wage loss claim and future medical care. Mangone Dec., Exh. D.

On August 28, 2003 Mangone spoke to Dougherty's attorney via telephone. Dougherty's attorney advised that Dougherty was not making a wage loss claim and had chosen not to have surgery to address certain injuries sustained in the automobile collision. Id., ¶ 9. It is undisputed that Dougherty was foregoing surgery even though her treating physicians recommended surgery. When Dougherty's attorney was asked about the medical necessity of this surgery, Dougherty's attorney represented that he would query Dougherty's physician and report back to AMCO. Id. Mangone's notes from the same day state that "[i]f the surgery is a medical necessity, and teh [sic] insd chooses not to have the surgery, we can put more money on the evaluation of her general damages to move the settlement range above the $30,000.00 range." Porter Dec., Exh. A at 010102.

On October 29, 2003 Mangone wrote to Dougherty's attorney reiterating his query about the medical necessity of the surgery that Dougherty has elected to forego. Mangone Dec., Exh. E. Receiving no response, on November 26, 2003 Mangone notified Dougherty that "our current evaluation of Mrs. Dougherty's injury claim does not indicate an underinsured motorist for bodily injury is present. Please let me know if you have had any success in obtaining a more comprehensive report from Dr. Sponzolli [sic] with regard to the issue of the medical necissty [sic] for back surgery." Id., Exh. F.

Over the course of the next six months, Mangone sought information on the eventual need for the surgery that Dougherty had elected to forego. He repeatedly—at least eight times—requested Dougherty's physicians' assessment regarding whether surgery was a medical necessity. Id., Exhs. G, H, I, J, K, L, M & N. The letter dated May 6, 2004 asks Dougherty to "please send these documents as soon as practicable. Our current evaluation of Ms. Dougherty's claim does not indicate the opther [sic] party's liability limits were inadequate for the compensation of her injury claim." Id., Exh. M. The letter dated June 11, 2004 states:

> We have not heard from you concerning the additional reports from Dr. Sponzilli.
>
> Without further medical documentation of Ms. Dougherty's injuries, our evaluation does not indicate an under insured motorist claim for this loss.

3

> Please advise us of the status of your progress with Ms. Dougherty's doctors. If we do not hear from you within a reasonable amount of time, we will presume we can close our file.

Id., Exh. N. Each of these eight requests went unanswered.

In reaching the conclusion that no monies were owed to Dougherty, AMCO relied on its Colossus software. Colossus is a claims adjusting software that takes as input select data from the claims file and outputs a settlement range. Porter Dec., Exh. D (hereinafter "Wartach Dep.") at 13:4–21, 24:2–28:21. On August 13, 2003 Mangone acknowledged "clear liability" on the part of the other driver, and stated that even though Dougherty "had discontinued care," she was "still experiencing chronic pain symptoms in her neck and shoulder." Id., Exh. A at 010098, 010100. The same day, he referred Dougherty's claim to AMCO's Colossus unit. Id. at 010101; Pardini Dec., Exh. W at 95:17–96:2 (testimony of Mangone). Mangone's referral indicated that Dougherty had zero percent comparative negligence. Porter Dec., Exh. A at 010101; Pardini Dec., Exh. W at 96:3–97:3 (testimony of Mangone). The Colossus unit completed its consultation on August 21, 2003 and concluded that Dougherty had already been fully compensated for her injuries by way of the $30,000 she had already received from the settlement of her case against the other driver and the $5,000 received for medical payments. Porter Dec., Exh. A at 010101–02. Specifically, the Colossus unit stated that Dougherty's claim fell in the range of $26,522 to $32,102. Id., Exh. B at 108:10–13 (testimony of Mangone).

The settlement range output by Colossus was based solely on pre-litigation settlements within the group of companies owned by AMCO's parent company. Wartach Dep. at 46:6–49:9. Neither jury verdicts, arbitration awards nor post-litigation settlements were reflected in the Colossus analysis of settlement value. Id. The software did, however, distinguish between different geographic regions when providing settlement ranges. Id. at 49:10–50:22. Mangone testified that he had no discretion to vary from the Colossus settlement range in making an offer on a claim, Porter Dec., Exh. B at 46:18–25 (testimony of Mangone), and that after reviewing the Colossus report he concluded that Dougherty did not have a viable claim. Id. at 107:22–108:24; Porter Dec., Exh. A at 010101, 010105. Mangone could have, however deviated from the range with permission from his manager.

4

On September 28, 2004 AMCO notified Dougherty that it was closing her file. Mangone Dec., Exh. O. AMCO stated that it had "previously advised you our evaluation of Ms. Dougherty's injuries did not indicate a viable underinsured motorist claim. Our evaluation was based on the treatment data as provided by your office." Id.

On November 4, 2004 Dougherty demanded that her claim be submitted to arbitration. Id., Exh. P. AMCO acceded. On November 9, 2004 Dougherty's claim was transferred to AMCO's litigation section. Porter Dec., Exh. A at 010107. On February 24, 2005, Linda Howard, presumably an AMCO employee, entered into her notes for the claim file that "Carl feels we should make some kind of offer." Id. at 010112. The notes further state that Howard reviewed the file to "determine what to offer" and that "there is no way to make educated offer at this point as we still cannot figure out why adverse paid her the $30K and we need full med info." Id.

The arbitration was held on January 26, 2006. Rolph Dec., ¶ 6; Porter Dec., ¶ 3. Dougherty argued that her claim was worth between $125,000 and $175,000, which was in addition to the $35,000 she had already received. Rolph Dec., ¶ 5, Exh. Q. AMCO argued that given Dougherty's comparative negligence and the nature of her injuries, she had already been adequately compensated. Id., ¶ 6, Exh. R at 01083. AMCO also estimated that, assuming Dougherty bore no fault in the accident, her claim was "at most . . . worth $20,000." Id., ¶ 6. On March 1, 2006 the arbitration judge awarded Dougherty $107,874. Id., Exh. S (hereinafter "Award") at 2. The award expressly assumed that Dougherty would never have the surgical procedure previously recommended. Id. at 3. Consequently, given the monies Dougherty had already received, Dougherty was entitled to recover $72,874 from AMCO. Id., ¶ 7. AMCO paid this amount on March 29, 2006. Id., ¶ 8.

LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is

1  genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving
2  party. Id. The party moving for summary judgment bears the burden of identifying those portions
3  of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material
4  fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party
5  will have the burden of proof at trial, the moving party need only point out "that there is an absence
6  of evidence to support the nonmoving party's case." Id.

7  Once the moving party meets its initial burden, the nonmoving party must go beyond the
8  pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a
9  genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving
10 party's allegations. Id.; Gasaway v. Nw. Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). The
11 court may not make credibility determinations, and inferences to be drawn from the facts must be
12 viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker
13 Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

14

15 DISCUSSION

16 It is undisputed that Dougherty presented certain documents to AMCO and made a demand.
17 It is also undisputed that based on its evaluation of the submitted documents, AMCO rejected that
18 demand. These documents evidenced her damages, including her pain and suffering and the
19 treatment she had received to date. Subsequently, at arbitration, Dougherty was awarded thousands
20 of dollars more than her initial demand. Dougherty claims that AMCO breached the insurance
21 policy and the duty of good faith and fair dealing "by the way in which they handled, and
22 mishandled, plaintiff's claims for underinsured motorist benefits. They did not pay promptly and/or
23 handle the claim fairly." Def.'s Request for Judicial Notice, Exh. U (hereinafter "Complaint"), ¶
24 19.[2] Thus, the issue here is whether AMCO's denial of Dougherty's claim was reasonable in light of
25 the information then at its disposal. See Wilson v. 21st Century Ins. Co., 42 Cal. 4th 713, 723
26 (2007).

27 In Wilson, the plaintiff had been injured by a third party in an automobile collision and she
28 settled with the third party for the third party's policy limit, $15,000. Plaintiff then claimed

6

underinsured benefits from her insurer, the defendant. Defendant insurance company, however, denied the claim stating that the $15,000 received from the third party and the $5,000 it paid for medical expenses adequately compensated plaintiff. This denial was based on the defendant's claims adjustor's view that plaintiff's medical conditions were preexisting and on his own interpretation of the medical evidence, both of which were directly contrary to the conclusions of plaintiff's treating physicians. Id. at 717–19. Thereafter, plaintiff initiated arbitration. The insurance company then investigated plaintiff's claims further and eventually agreed to pay $85,000 to settle her claim.

The California Supreme Court stated that a genuine issue of material fact existed as to whether the insurance company had thoroughly investigated and objectively evaluated plaintiff's claim before initially denying it. The Court took particular issue with the fact that the insurance company had rejected plaintiff's claim even though it had no basis for its rationale that the harm was preexisting or that the causative link for the harm was unlikely. The court went on to say that if the insurance company had good faith doubts as to the veracity of the claims, it should have investigated them further. Specifically, "[w]hat [the insurance company] could not do, consistent with the implied covenant of good faith and fair dealing, was *ignore* [their insured's treating physician's] conclusions without any attempt at adequate investigation, and reach contrary conclusions lacking any discernible medical foundation." Id. at 722.

Based on the above case law and after discussing a threshold issue, this court discusses separately the initial denial of Dougherty's claim and AMCO's alleged failure to investigate the issue of definite future medical expenses.

### A.  Threshold Issue

The law implies in every contract a covenant of good faith and fair dealing. Comunale v. Traders & General Ins. Co., 50 Cal. 2d 654, 659 (1958). In the context of a liability insurance policy, the California Supreme Court found that "[w]hen an insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." Wilson, 42 Cal. 4th at 720 (quoting Frommoethelydo v. Fire Ins. Exchange, 42 Cal. 3d 208, 214–15 (1986)). Thus,

1  AMCO's argument that no claim for the breach of the implied covenant of good faith and fair

2  dealing can be brought in the absence of a breach of contract is not quite correct.

3        In acknowledging the principle laid down in Comunale, the Supreme Court characterized its

4  application to insurance policies thus:

> Because the covenant is a contract term, in most cases compensation for its breach is limited to contract rather than tort remedies. But '[a]n exception to this general rule has developed in the context of insurance contracts where, for a variety of policy reasons, courts have held that [an insurer's] breach of the implied covenant will provide the basis for an action in tort.'

Kransco v. Am. Empire Surplus Lines Ins. Co., 23 Cal. 4th 390, 400 (2000) (quoting Foley v. Interactive Data Corp., 47 Cal. 3d 654, 684 (1988)).

      Thus, a breach of the covenant is perforce a breach of the contract. Admittedly, this area is not without some confusion. Subsequent to the opinion in Kransco, the California Court of Appeal reiterated that "[i]t is well established that a breach of the implied covenant of good faith is a breach of the contract." Schwartz v. State Farm Fire & Cas. Co., 88 Cal. App. 4th 1329, 1339 (2001). Nonetheless, the Schwartz court went on to state that "even an insurer that pays the full limits of its policy may be liable for breach of the implied covenant, if improper claims handling causes detriment to the insured." Id. The court then distinguished cases where no breach of contract and, therefore, no breach of the covenant occurred because there was no coverage or no insurable interest. These are not the circumstances here and as explained hereafter if there is a breach of the covenant it would constitute a breach of the contract.

      B.     Denial of Dougherty's Claim

      Dougherty discusses the methodology by which AMCO determines the range of settlement amounts for UIM claims. AMCO uses a software named Colossus and Dougherty claims the software is flawed for two reasons. First, that AMCO had a policy and practice of failing to properly evaluate first-party claims by providing Colossus with incomplete information about the claims. This flaw, Dougherty contends, violates the standard set forth in Wilson. Second, that AMCO set the settlement range output by Colossus based solely on pre-litigation settlements, which consistently led to the output of underinclusive settlement ranges. The second flaw, Dougherty

8

1 contends, whereby AMCO only makes low-ball offers is inconsistent with industry standards and
2 "best practices." See generally Corridan Dec. Neither of these alleged flaws, however, evidence
3 bad faith.

4       First, Dougherty claims that the input to Colossus "failed to consider acupuncture treatment,
5 deposition testimony, the existence of two protruding cervical disks (rather than only one), and the
6 insured's subjective complaints regarding her shoulder." Corridan Dec., ¶ 9(c). Thus, Dougherty
7 argues, the insurance company ignored information she submitted, in contravention to Wilson's
8 requirements. Wilson, however, holds that "[w]hat [the insurance company] could not do, consistent
9 with the implied covenant of good faith and fair dealing, was *ignore* [their insured's treating
10 physician's] conclusions without any attempt at adequate investigation, and reach contrary
11 conclusions lacking any discernible medical foundation." 42 Cal. 4th at 722. There is no evidence
12 here that AMCO reached a conclusion lacking any discernible medical foundation.

13       The court further notes that the Colossus software's inability to take into account the
14 information Dougherty believes should have been taken into account does not evidence bad faith on
15 AMCO's part. Dougherty has presented no evidence that additional variables, if entered into the
16 Colossus system, would have changed the settlement range output by the system. Specifically, there
17 is no evidence that Dougherty should have been paid $45,000 above and beyond what she had
18 already received. Further, the court is unwilling to define what information an insurer must take into
19 account when evaluating a claim. In this regard, this court agrees with and is bound by the
20 California Supreme Court's rationale when declining to set forth a floor for the investigation an
21 insurer must always perform:

22     We agree that, the critical issue being the reasonableness of the insurer's conduct
under the facts of the particular case, stating a general rule as to how much or what
23     type of investigation is needed to meet the insurer's obligations under the implied
covenant is difficult. An insurer's good or bad faith must be evaluated in light of the
24     totality of the circumstances surrounding its actions.

25 Wilson, 42 Cal. 4th at 723. Here, Dougherty's disputes are with certain aspects of her claim that
26 were not specifically input into Colossus. Two of these disputes are with respect to purely
27 subjective considerations, her deposition testimony and her complaints. These are adequately
28 addressed by the fact that Colossus outputs a range and not a particular number. Furthermore, the

1 *failure* to consider acupuncture treatment (other than its costs) could *increase* Dougherty's claim for
2 pain and suffering, not reduce it. Finally, the failure to specify, in Colossus, that Dougherty had two
3 protruding cervical disks instead of only one does not evidence bad faith. Dougherty's argument
4 implicitly assumes that her general protruding disk ailment was entered into Colossus. The level of
5 specificity that could be entered into the software knows no bounds. Indeed, if Colossus had an
6 input field for the number of protruding disks, Dougherty might well have argued that Colossus does
7 not take into account the specific disks that were protruding. The major aspect of Dougherty's
8 claim, the protruding disk issue, was taken into account by Colossus. Consequently, since Colossus
9 outputs a range of possible settlement values, the court holds that the failure to include the
10 information that Dougherty seeks to include was not in bad faith.

11       Second, if AMCO uses a flawed methodology in order to categorically deny legitimate
12 claims, then AMCO may very well be doing so in bad faith. However, there is no evidence of bad
13 faith here since Colossus takes into account pre-litigation settlement amounts when determining a
14 settlement range for *use during pre-litigation proceedings*. Use of pre-litigation data at the expense
15 of other data, by itself, does not demonstrate bad faith. In this case, whether this settlement range
16 ought to incorporate jury verdicts, arbitration awards or post-litigation settlements is a business
17 decision best left to the decision makers at AMCO. This business decision, if not made correctly,
18 can lead to unnecessary or extensive business expenses. For instance, if AMCO is using a flawed
19 methodology to evaluate claims, then it will pay for this flaw during arbitration. If, as Dougherty
20 claims, the Colossus system provides for settlement offers that are unreasonably low, then AMCO's
21 insureds will reject those offers and collect more during the arbitration proceedings. This is exactly
22 what happened here.[3]

23       In sum, the failure to incorporate information into the Colossus system that Dougherty
24 considers pertinent, whether provided by her or other post-litigation settlement information, is not
25 bad faith on AMCO's part.

10

C. <u>Failure to Investigate</u>

11

1    Under California law, when evaluating a claim, an insurer must give at least as much
2 consideration to the interests of its insured as it does to its own interests. Wilson, 42 Cal. 4th at 720.
4 This requires the insurance company to investigate the possible bases that might support the
5 insured's claims. Id. at 721.
6    Dougherty claims that AMCO acted in bad faith by failing to investigate Dougherty's claim
7 and instead asking her for information regarding the necessity of further surgery. Specifically,
8 Dougherty claims that bad faith is evidenced by AMCO's failure to obtain her medical records
9 pursuant to a medical release form, have its own physician review medical records she provided,
10 request that she be examined by a physician of its choosing, take its own deposition of her physician,
11 or exercise any of its other rights under the policy to resolve questions regarding her medical
12 condition. Porter Dec., ¶ 2; Pardini Dec., Exh. W at 114:4–115:6 (testimony of Mangone).
13    This entire line of reasoning is unpersuasive. Dougherty claims it was bad faith for the
14 insurance company to request information from its insured and not engage in more expensive and
15 intrusive forms of investigation. However, Dougherty never stated that she was unwilling or unable
16 to provide this information. Indeed, her counsel agreed to provide this information. Nor has
17 Dougherty demonstrated that the requested information was present in the documentation and
18 evidence she provided AMCO.[4] Furthermore, Mangone testified that he did not subject Dougherty
19 to an independent investigation because:

20 > Independent medical examinations, or really any kind of examination is intrusive, it's time consuming, it's stressful. She'd already been through all that. She's already has
21 > her stress, she's already had her inconvenience and so forth. No need to be poked and prodded when all we needed was a simple note from [her physician] explaining
22 > whether this surgery was a medical necessity. I figured that would be a lot easier than sending her through an independent medical examination, and it was just a note
23 > that I was asking for.

24 Pardini Dec., Exh. W at 114:21–115:6. This does not evidence bad faith. Indeed, the California
25 Supreme Court has stated:

26 > [The insurance company], of course, was not obliged to accept [Wilson's treating physician]'s opinion without scrutiny or investigation. To the extent it had good faith
27 > doubts, the insurer would have been within its rights to investigate the basis for Wilson's claim by asking [Wilson's treating physician] to reexamine or further
28 > explain his findings, having a physician review all the submitted medical records and

12

offer an opinion, or, if necessary, having its insured examined by other physicians . . . . Wilson, 42 Cal. 4th at 722. Here, unlike in Wilson, AMCO did not deny Dougherty's claim without exercising these contractual rights. AMCO exercised the first step and specifically asked for further explanation from Dougherty's treating physician. It is only after Dougherty's continued non-response for over a year that AMCO closed its file. In light of Dougherty's non-responsiveness, AMCO's decision not to embark upon further more expensive and intrusive steps is not bad faith. Indeed, Dougherty does not explain why AMCO should be required to escalate the issue when her actions evince that she has abandoned the issue.

Furthermore, Dougherty attempts a Catch-22 with AMCO's responsibility. AMCO's decision not to subject Dougherty to a medical examination was not in bad faith. However, had AMCO subjected Dougherty to a medical examination without asking for a simple note from her physician, she could just as easily have claimed that AMCO was acting in bad faith. This cannot be so. Although Dougherty is correct to note that conducting an independent review of the submitted evidence or deposing her physicians would not have inconvenienced her at all, she does not explain the need for the same when a note from her physician would have sufficed.[5]

This action boils down to a dispute regarding the compensable value of Dougherty's pain and suffering. There is no dispute that Dougherty suffers from continuing pain due to her injuries. The arbitrator's award found Dougherty had proven $100,000 in "general damages which is reasonable compensation for the pain and suffering she endured from the accident through the birth of her child, her recuperation period and present permanent condition." Award at 2. This decision, by itself, does not demonstrate AMCO's bad faith. The so called "genuine dispute rule" supports this disposition. The rule holds that "an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to . . . the amount of the insured's coverage claim is not liable for bad faith . . . ." Wilson, 42 Cal. 4th at 723 (internal quotation omitted). Here, there was a genuine dispute as to the value of Dougherty's claim. This dispute was maintained in good faith and on reasonable grounds. AMCO can substantiate its decision via its Colossus software, which takes the most relevant information into account, does not ignore important medical information and has the proper benchmarks for use in the pre-litigation setting. Further, AMCO

13

consistently asked Dougherty to substantiate her future medical expenses claim. Indeed, AMCO's *good* faith is demonstrated by its claims adjustor's statement that the medical evidence being sought would likely take Dougherty's claim out of the $30,000 range and into a range that would allow Dougherty further recovery. See, e.g., Mangone Dep. at 112:1–6 (the future surgery is "still something, a future expense that she could incur, that she would incur and should be evaluated so she can be compensated for it.").

Though Dougherty attempts to liken this action to Wilson, she is unable to demonstrate either that AMCO "lacked any factual basis for [its] conclusion" or that it "unfairly ignored medical evidence submitted by the insured." 42 Cal. 4th at 724. Unlike Wilson, AMCO's declination to pay Dougherty was not based on its belief that her injuries were overstated, but instead on its good faith belief that the amount of damages demanded were overstated.

Furthermore, AMCO did not act in bad faith by presenting a novel argument at the arbitration; namely, that Dougherty was comparatively negligent and therefore did not deserve compensation under her policy. AMCO is well within its rights to try to justify its decision to the arbitrator. The arbitrator need not accept this explanation. Obviously, the arbitrator did not do so here. Nor did AMCO act in bad faith by refusing to make an offer of settlement. AMCO determined that the $35,000 Dougherty had already received adequately compensated her and consequently denied her claim. Rolph's statement that, in the absence of comparative negligence, Dougherty's claim would be worth *at most* $20,000 does not demonstrate that a settlement offer should have been made.

Dougherty also argues that the setting of the reserve value at $15,000 evidences that AMCO acted in bad faith when it denied her claim. However, the setting of this reserve value, which can change depending on the available information, seems to take into account the medical necessity of shoulder surgery. Porter Dec, Exh. A at 010095 (when setting the reserve value, Mangone stated that "the injury appears to be of a serious enough nature and the surgery to repair the shoulder injury is going to happen sooner or later, if the insd has not already had the operation."). Consequently, it was not bad faith to fail to offer $15,000 to settle the claim without first knowing if shoulder surgery was a medical necessity. Furthermore, the fact that Mangone decided to voluntarily double the

14

1  initial reserve value of $7,500 before he knew of the Colossus assessment does not demonstrate that
2  Mangone disagreed with the Colossus assessment.  The fact-specific reserve value is subject to
3  change and merely setting it at a particular value without having all the pertinent information does
4  not demonstrate that Mangone acted in bad faith when he chose not to ask his manager to deviate
5  from the range provided by Colossus.[6]

6  Along the same vein, Dougherty's argument that first-party claims must be treated differently
7  than third-party claims is unpersuasive.  Although Dougherty is correct that liability is imposed for
8  bad faith in a first-party claim based on the "special relationship" between an insured and the
9  insurer, Foley v. Interactive Data Corp., 47 Cal. 3d 654, 684–85 (1988), her conclusory statement
10 does not demonstrate bad faith due to AMCO's alleged treatment of the first-party claim in the same
11 manner as third-party claims.

12 In sum, although AMCO has responsibilities and duties under Wilson, this court does not
13 interpret those to mean that it is AMCO's responsibility to maximize the monetary value of
14 Dougherty's claim.  Based on documentation submitted by Dougherty, AMCO concluded in good
15 faith that no monies were due under the policy.  It then asked Dougherty to substantiate her claim
16 further in case future expenses could lead to recovery under the UIM provision of the policy.
17 Dougherty did not do so despite repeated requests.  This cannot be considered bad faith on the part
18 of AMCO.  There is no evidence that AMCO disregarded or discounted any of the information
19 submitted, or that it substituted its own judgment in place of Dougherty's physicians.[7]
20 Consequently, Dougherty cannot maintain a claim for the breach of contract or for breach of the
21 implied covenant of good faith and fair dealing.[8]

23 CONCLUSION
24 For the foregoing reasons, defendant's motion for summary judgment is GRANTED.
25 IT IS SO ORDERED.

Dated: June 20, 2008

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

**ENDNOTES**

1. Plaintiff moves to strike the declarations of Jeffrey Mangone, Darbie Hoffman and Renton Rolph because required attestations signaling their concurrence in filing of the documents were not provided. There is no evidence to indicate that the declarations were falsely filed. Consequently, plaintiff's motion to strike is DENIED. The court refuses to place a technical oversight above the substance of the declarations. However, the court's benevolence ends here and it warns AMCO to abide by local rules in the future.

2. The court hereby takes judicial notice of Exhibit U of AMCO's Request for Judicial Notice pursuant to Federal Rule of Evidence 201.

3. The court notes that the rejection of Dougherty's claim did not rest on anticipated future special damages for surgery. The rejection was based on AMCO's evaluation of Dougherty's claim for general damages based on pain and suffering caused by the 2001 collision.

4. Dougherty points to language in Dr. Sponzilli's deposition that allegedly states that the surgery was a medical necessity. See Porter Dec., Exh. B at 10225–26. None of the doctor's statements, however, state that the surgery was a "medical necessity."

5. The court also notes that if, as Dougherty contends, AMCO requested further medical information from Dougherty after rejecting her claim, then AMCO did not delay in processing Dougherty's claim.

6. Since the methodology used to set the fact specific reserve value will not change the court's disposition, further discovery regrading the same is unnecessary.

7. Dougherty requests that if the court is inclined to grant the motion for summary judgment, then she be allowed to conduct additional discovery. Specifically, she seeks to further depose Mangone regarding his setting of the reserve value. However, the court's order provided that it was up to AMCO to provide the person most knowledgeable regarding the reserves issue. Pardini Reply Dec., ¶ 5. In any event, given the court's holding above, the issue of how the reserves were set is of no consequence and therefore no further discovery is warranted.

8. Due the court's holding, it has no occasion to reach Dougherty's argument regarding punitive damages.